IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | |
|---|---|
| DENNIS P. GLYNN ) | |
| 96 Lane Road ) | |
| Chester, New Hampshire 03036 ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. _____ |
| ) | |
| EDO CORPORATION ) | |
| 60 E. 42nd Street ) | |
| New York, Ny 10165-0006 ) | |
| ) | |
| Serve: ) | |
| ) | |
| William Sullivan ) | |
| Winston & Strawn LLP ) | |
| 1700 K Street, N.W. ) | |
| Washington, DC 20006 ) | |
| ) | |
| IMPACT SCIENCE & TECHNOLOGY, INC. ) | |
| 135 National Business Parkway ) | |
| Annapolis Junction, MD 20701 ) | |
| ) | |
| Serve: ) | |
| ) | |
| William Sullivan ) | |
| Winston & Strawn LLP ) | |
| 1700 K Street, N.W. ) | |
| Washington, DC 20006 ) | |
| ) | |
| MICHAEL CAPRARIO ) | |
| 27 Spartan Drive ) | |
| Bedford, NH 03110-4229 ) | |
| ) | |
| Serve: ) | |
| ) | |
| William Sullivan ) | |
| Winston & Strawn LLP ) | |
| 1700 K Street, N.W. ) | |
| Washington, DC 20006 ) | |

| | |
|---|---|
| **DEAN PUZZO,**<br>**1 Rainier Court**<br>**Merrimack, NH 03054-6816**<br><br>Serve:<br><br>William Sullivan<br>Winston & Strawn LLP<br>1700 K Street, N.W.<br>Washington, DC 20006<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

### Introduction

1.  Plaintiff, Dennis Glynn ("Glynn"), files this Complaint of retaliation in violation of the False Claim Act, 31 U.S.C. § 3730(h), and wrongful termination in violation of public policy against Impact Science & Technology, Inc. ("IST"), EDO Corporation ("EDO"), the successor-in-interest to Glynn's former employer IST, Michael Caprario in his individual capacity, and Dean Puzzo in his individual capacity.

2.  During his employment at IST, Glynn was assigned to work on a contract between IST and the Department of Defense ("DOD") under which IST supplied DOD with electronic jamming systems that are used to prevent insurgents in Iraq from exploding improvised explosive devices ("IEDs"). While working on this project, Glynn became increasingly concerned that IST was supplying defective jamming systems to DOD and that these devices would fail to protect United States troops. In particular, Glynn discovered that the transmitted output power of the jamming system was low when operating at high temperatures, thereby reducing the range at which the jamming system would prevent the explosion of an IED.

2

3. Concerned that IST management was defrauding the federal government and endangering the lives of United States troops serving in Iraq, Glynn repeatedly raised concerns to management during the period of May 2006 to December 2006 about the failure of the jamming systems to perform their intended function when operated in high temperatures in Iraq.

4. When it became clear to Glynn that IST management would not take any corrective action, Glynn raised his concerns with the DOD's Office of Investigator General ("DOD OIG").

5. In retaliation for Glynn disclosing to IST management and to the DOD OIG his concerns about IST's fraud on the government, IST stripped Glynn of his supervisory duties, isolated him from colleagues and terminated his employment.

## Jurisdiction and Venue

6. This Court has jurisdiction of this action by reason of 28 U.S.C. § 1331, and pursuant to 31 U.S.C. § 3730(h) as Defendant can be found and transacts business in this judicial district.

7. Venue is proper in this Court pursuant to 31 U.S.C. § 3730(h) because the Defendant transacts business and maintains a corporate office in this judicial district.

8. This Court also has supplemental jurisdiction over the pendent wrongful discharge claims pursuant to 28 USC § 1367.

## Parties

9. Plaintiff Dennis Glynn ("Glynn") resides in New Hampshire and worked as a Senior Principal Engineer at IST.

3

10. Defendant EDO Corporation ("EDO") conducts business and maintains an office in Maryland. EDO acquired all assets and liabilities of Impact Science & Technology, Inc. on or about September 15, 2006.

11. Defendant Impact Science & Technology, Inc. ("IST") conducts business and maintains an office in Maryland. EDO acquired all assets and liabilities of Impact Science & Technology, Inc. on or about September 15, 2006.

## Facts

### Glynn's Professional Career and Background

12. Glynn is a decorated veteran and served in the United States Air Force from 1976 to 1982. Glynn was trained as an air traffic control radar system crew chief and as a weapons system crew chief where he was responsible for installing tactical nuclear weapons on fighter aircraft. He received an honorable discharge and the USAF Good Conduct Medal.

13. After serving in the Air Force he attended Merrimack College. In 1987, he earned a Bachelor of Science in Electrical Engineering, Graduating Magna cum Laude.

14. In 1991, Glynn founded Dedicated Electronics, Incorporated ("DEI") to specialize in research, design and development of complex radio-frequency/microwave systems and integrated assemblies. DEI's clientele included governmental agencies and defense contractors.

15. In April 2002, the NASA Administrator granted Glynn an award for the creative development of a technical innovation which was published as a NASA Tech Brief entitled "Microwave System For Detecting Ice on Aircraft."

16. Glynn's scholarship in the area of microwave technology has been published in various trade journals.

17. Glynn has received a United States Patent for his Ice Thickness Measurement Reflectometer.

18. DEI won four Small Business Innovative Research (SBIR) Phase 1 contracts with four federal agencies, and DEI's contracts with the U. S. Army, the U. S. Navy, NASA and the U. S Department of Agriculture all resulted in SBIR Phase II awards.

19. DEI designed the Radio Frequency transceiver (RFA) used in the Enhanced Position Locating Reporting System (EPLRS) military communications radio.

20. In March 2004, Glynn sold DEI to IST and was hired by IST as Principal Engineer. Glynn's primary responsibility was to serve as the Engineering Manager for the Microwave and Radio Frequency Integrated Assemblies group.

21. Glynn oversaw production of an electronic counter measure (ECM) component that assists IST's Mobile Multi-Band Jammer-1A ("MMBJ-1A") to defeat IEDs.

22. Glynn was highly respected by his IST colleagues and made significant contributions to the growth and success of IST.

23. On February 2, 2004, Lew Dokmo ("Dokmo"), Executive Vice President, IST, offered Glynn a job as Principal Engineer. Dokmo said IST offers "an atmosphere of flexibility and minimal bureaucracy...."

24. Glynn achieved high marks on his 2005 performance evaluation at IST. His scores "Exceeded" or were "Above Average" on nearly all performance criteria. In the evaluation, Dean C. Puzzo ("Puzzo"), Information Warfare Director, stated, "Dennis does an excellent job working on multiple tasks under high schedule pressure."

25. On October 28, 2005, Puzzo promoted Glynn to Senior Principal Engineer in recognition of Glynn's performance in "functionally and programmatically supervising over

10 full-time staff members while representing one of IST's highest value microwave design talents, pivotally critical to the past and future successes of the IW product areas including ARM, Guard-Zone, and MMBJ."

26. Glynn achieved high marks on his 2006 performance evaluation at IST. His scores "Exceeded" or were "Above Average" on nearly all performance criteria. Puzzo commented that, "Dennis has a very good work ethic and follows policies and procedures." Puzzo went on to recognize Glynn stating, "Dennis did a very good job leading the microwave module design team to get a reliable and great performing [ECM component] into full rate production."

27. Each year IST increased Glynn's salary in recognition of his performance and contribution to IST over the prior year.

28. On or about July 26, 2006, Puzzo informed Glynn that IST would be sold to EDO and told Glynn that because his skills and knowledge were critical to IST's success, he would be offered a retention agreement to ensure that he would continue working after the acquisition.

29. Glynn was one of a handful of over 200 IST employees that was personally offered a retention agreement by EDO at the time of the sale of IST to EDO.

30. On or about September 15, 2006, EDO provided Glynn a Retention Agreement, which included a $60,000.00 retention bonus.

**IST Contract to Manufacture Jamming Devices**

31. On or about April 16, 2003, IST was awarded a contract to provide the U. S. Special Operations Command, MacDill AFB, Florida, electronic countermeasure systems

6

designed to impair IEDs. The system, called a MMBJ, is usually mounted inside a military vehicle with external antennas.

32. The MMBJ-1A systems generate a jamming signal that prevents an IED from exploding.

33. To enhance the MMBJ-1A system, IST developed the ECM component. Glynn oversaw development of the ECM component, which generates the radio frequency noise jamming signal in a number of frequency bands to defeat IEDs. The ECM component is installed in the MMBJ-1A "box" by IST's Systems Engineering team.

34. The U.S. military conducted training in this judicial district related to use of the MMBJ system.

35. The IST office in this judicial district received and disseminated information related to IST's manufacture of the MMBJ system.

**Production Shortfall**

36. In May 2006, IST experienced a shortfall in the production of ECM components. In an effort to bridge this production gap, Peter Rienzo ("Rienzo"), Production Manager, asked Glynn to repair approximately 80 ECM components that did not meet an output power requirement in A and B Bands.

37. To ensure that the ECM component requirements were correct, Glynn requested that Rienzo call a meeting with systems engineering to discuss the issue.

38. On or about May 23, 2006, a meeting was held in which Mike Caprario ("Caprario"), Program Manager, directed Scott Traurig ("Traurig"), Systems Engineering

Manager, to temperature test the MMBJ-1A so that the appropriate output power specification levels for the ECM component for A and B Bands could be determined.

**Temperature Testing Reveals Problems with Output Strength**

39.     In or about June 2006, Philip Joseph (P. Joseph) and John Joseph (J. Joseph) tested the output power of the MMBJ-1A and found that the E band output signal was low in power. In particular, tests at high temperatures revealed that the MMBJ-1A systems may not transmit sufficient power to jam the IEDs that insurgents use to blow up U.S. and allied military vehicles.

40.     In or about July 2006, Glynn's team developed a solution to the power output problems in the E band, which entailed using a temperature component that automatically adjusts the power output level.

41.     On or about July 21, 2006 Glynn and J. Joseph asked Jim Martin ("Martin") to implement steps to fix the malfunction caused by high temperatures, and the temperature components were installed beginning in or about July 2006 in the MMBJ-1A devices.

42.     Glynn was concerned that 800 to 1,000 MMBJ-1A units had been shipped to Iraq without the temperature components that enable the devices to perform in high temperatures.

**Glynn Discovers Additional Defects in the MMBJ-1A Jamming Devices**

43.     After learning the results of the temperature tests, Glynn went to Caprario and told him that the test results called into question all the units shipped to date. Glynn did this

because he was concerned that U.S. military personnel would be endangered by relying upon defective MMBJ-1A jamming devices.

44.     Glynn was also concerned that IST was defrauding the U.S. government by billing the government for jamming devices that did not function as intended. Each MMBJ-1A system is valued at approximately $40,000.00.

45.     Caprario and Puzzo told Glynn that IST would not recall the units and would not notify DOD of the defect in the MMBJ-1A devices. Caprario specifically told Glynn that IST did not want to "upset the apple cart right now."

### Glynn Continues to Investigate Defects in the Jamming Devices

46.     In or about June of 2006, Glynn asked Lew Dokmo ("Dokmo"), Vice President of IST, to support Glynn's request to see copies of the MMBJ-1A contracts. Glynn wanted to review the contracts to determine the extent of IST's violation of the contracts. Glynn asked Caprario to review the contracts and when Caprario refused, Glynn asked Puzzo to show him the contracts.

47.     Dokmo, Caprario, and Puzzo each refused to accommodate Glynn's repeated request to examine the contracts and refused to take corrective action and refused to inform the DOD of the defects in MMBJ-1A units shipped to Iraq.

48.     Glynn continued to raise concerns about the defective MMBJ-1A units.

49.     On or about July 21, 2006, IST issued an engineering change order to correct the power output problems in the ECM component. Upon information and belief, IST did not notify the DOD of this engineering change.

50.     On or about September 11, 2006, Glynn learned that Caprario, Traurig, and Puzzo were all stockholders of IST and would directly benefit from IST's sale to EDO.

51.    Glynn continued to request that IST management tell the government about the defective MMBJ-1A units. As management consistently rebuffed Glynn's requests to take corrective action, he concluded that management was more concerned about not endangering the pending sale of IST to EDO than about endangering the lives of U.S. troops in Iraq.

**Glynn Discloses IST's Violation of the False Claims Act to DOD**

52.    In order to prevent harm to U.S. troops in Iraq, Glynn informed DOD OIG Special Agent Ben Hochberger ("Special Agent Hochberger") about the defective jamming devices.

53.    Glynn reported to Special Agent Hochberger that in Glynn's opinion Caprario, Traurig, and Puzzo put lives at risk by ignoring the temperature problems with the MMBJ systems. Glynn also reported that Caprario, Traurig, and Puzzo improperly billed the government for equipment that did not fulfill contractual expectations and benefited financially from ignoring the problems when they sold IST to EDO.

54.    Glynn substantiated this claim by providing Special Agent Hochberger with the dates and results of the tests IST conducted on the MMBJ-1A units that reflected problems with power output from the ECM component.

55.    Glynn provided Special Agent Hochberger the names of IST executives, directors, and managers who knew about the dates and results of the MMBJ-1A tests.

56.    Glynn also provided Special Agent Hochberger information regarding modifications that were made to the ECM components to enhance their performance, the dates on which these modifications were implemented, and the number of MMBJ-1A units

that had been sent to Iraq prior to the implementation of modifications to the ECM components.

57.     Glynn provided Special Agent Hochberger with specific information identifying the MMBJ-1A units sent to Iraq that had not been fixed and were likely to produce a low power output.

## EDO Acquires IST

58.     On September 15, 2006, EDO and IST finalized their purchase agreement.

59.     EDO acquired all of the outstanding shares of IST.

60.     EDO controls IST's employment practices and decisions, and exercises centralized control over IST's Human Relations department and employee policies and training.

61.     Puzzo, Caprario, and Traurig were among the nine key IST officers that received retention payments from EDO in the form of 405,103 restricted common shares.

62.     Puzzo, Caprario, and Traurig each received lucrative five (5) year employment contracts from EDO in the sale of IST to EDO.

## IST Becomes Aware of Glynn's Disclosures to DOD

63.     On or about September 20, 2006, Glynn met with Special Agent Hochberger in Concord, NH and relayed his concerns about IST billing the federal government for flawed MMBJ-1A systems.

64.     On the previous day, Glynn told P. Joseph that he would be meeting the next day with a DOD investigator. On information and belief, P. Joseph told J. Joseph that Glynn

had gone to the government and J. Joseph in turn informed Puzzo, Caprario, and Traurig that Glynn was disclosing information to the DOD OIG.

65. On or about October 4, 2006, Colonel Grigsby, the end user of the MMBJ-1A systems, made an unannounced visit to IST in order to test the MMBJ-1A units. Special Agent Hochberger stated that Colonel Grigsby was informed that someone at IST was concerned about a whistleblower at the company who was raising questions about IST's testing protocols.

66. After Colonel Grigsby finished the testing, Glynn, Special Agent Hochberger, and Colonel Grigsby met to discuss the results of the tests at Special Agent Hochberger's suggestion. The tests of MMBJ-1A units were successful because they were performed using MMBJ-1A units that had been fixed. Tests were not performed on the defective MMBJ-1A units that were being used by U.S. troops in Iraq.

67. Special Agent Hochberger then told Colonel Grigsby about the flawed MMBJ-1A units that were being used by U.S. troops.

**IST Retaliates Against Glynn**

68. In early September 2006, when Glynn was pressuring IST management to remedy the faulty MMBJ-1A units that were being used in Iraq, Puzzo removed Lorraine Wolfram, Lindsey Monahan, and Michelle Russell, and their supervisor Dan Rice from Glynn's supervision and placed them under J. Joseph's supervision. This left Glynn without any supervisory authority over the individuals performing work for which he was accountable.

69. Shortly after Col. Grigsby made the unannounced October 4, 2006 visit to IST to test the MMBJ-1A Glynn was told not to go into the Assembly area or give work to the assemblers.

70. On or about October 11, 2006, Puzzo issued a Change of Supervisor letter to Martin, an IST engineer that Glynn had supervised since February 2005. Martin was reassigned to work under Michael "Mickey" Lincoln ("Lincoln").

71. Caprario said that Glynn and Martin had "drawn a line in the sand" and so any repercussions they suffered were caused by their own conduct.

72. In November 2006, management further retaliated against Glynn by instructing employees not to associate with Glynn.

## IST Terminates Glynn

73. On or about December 14, 2006, Glynn received a phone call from Gloria Jacobsen, the head of IST HR and Puzzo. Jacobson told Glynn that he was terminated effective that day. Jacobson said she was sorry to do this over the phone but that Glynn's last check was deposited into his account that day.

74. Jacobson offered no reason for the termination, other than that it was "for the good of the company."

75. Unaware that IST had any concerns about his performance, Glynn was shocked by his abrupt termination.

76. Glynn was especially surprised by his termination because just three months prior to terminating his employment, IST had offered him a retention bonus.

77. Glynn's coworkers were also shocked by his abrupt termination because they held him in high regard and relied on his expertise. In addition, Glynn was leading a project to develop a future ECM component, and Glynn's participation in this project was crucial.

78. The unwarranted and abrupt termination of Glynn's employment has caused him to suffer significant financial strain, diminished career opportunities, harm to his reputation, and emotional distress.

## FIRST CAUSE OF ACTION
### (False Claims Act Retaliation Violation, 31 U.S.C. § 3730(h))

79. The allegations of the preceding paragraphs are realleged as if fully set forth below.

80. EDO, IST, Puzzo, and Caprario, had a duty under the False Claims Act, 31 U.S.C. § 3730(h), to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for, or assistance in an action filed under this section.

81. Glynn took action in furtherance of a False Claims Act action by repeatedly raising concerns to IST management about flawed MMBJ-1A units that had been shipped to Iraq, investigating IST's fraud on the government, and providing information to the DOD OIG about IST's fraud on the government.

82. In retaliation for Glynn's protected activities, EDO, IST, Puzzo and Caprario stripped him of his supervisory duties, harassed him, isolated him from his coworkers, and ultimately terminated his employment.

## SECOND CAUSE OF ACTION
### (*Adler* Claim)
### Wrongful Discharge/Public Policy
### Common Law
*Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981)

83. The allegations of the preceding paragraphs are realleged as if fully set forth below.

84. EDO, IST, Puzzo, and Caprario wrongfully terminated Glynn in violation of the public policy mandate set forth in 18 U.S.C. § 1513(e), which prohibits any person or corporation from knowingly retaliating against a whistleblower who has provided to a federal law enforcement officer any truthful information relating to the commission or possible commission of any federal offense.

85. EDO, IST, Puzzo, and Caprario were aware that Glynn disclosed to the DOD OIG his concern that IST was defrauding the federal government by supplying defective MMBJ-1A units to the federal government for use by U.S. troops in Iraq.

86. EDO, IST, Puzzo, and Caprario terminated Glynn's employment because Glynn reported to the DOD OIG the commission or possible commission of federal crimes, including, IST's violations of the False Claims Act.

87. EDO's and IST's termination of Glynn's employment violates the public policy mandate set forth in 18 U.S.C. § 1513(e).

88. There is no private right of action under 18 U.S.C. § 1513(e).

89. As a result of the retaliatory acts taken by EDO, IST, Puzzo, and Caprario, Glynn has suffered damages, including, but not limited, to lost wages, lost benefits, diminished professional status, diminished job opportunities, mental anguish, and stress.

## THIRD CAUSE OF ACTION
### (*Monge* Claim)
### Wrongful Discharge/Public Policy
### Common Law
*Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974) and
*Howard v. Door Woolen Company*, 120 N.H. 295, 414 A.2d 1273 (1980)

90. The allegations of the preceding paragraphs are realleged as if fully set forth below.

91. EDO, IST, Puzzo, and Caprario wrongfully terminated Glynn in violation of the public policy mandate set forth in 18 U.S.C. § 1513(e), which prohibits any person or corporation from knowingly retaliating against a whistleblower who has provided to a federal law enforcement officer any truthful information relating to the commission or possible commission of any federal offense.

92. EDO, IST, Puzzo, and Caprario were aware that Glynn disclosed to the DOD OIG his concern that IST was defrauding the federal government by supplying defective MMBJ-1A units to the federal government for use by U.S. troops in Iraq.

93. EDO, IST, Caprario and Puzzo terminated Glynn's employment because Glynn reported to the DOD OIG the commission or possible commission of federal crimes, including, IST's violations of the False Claims Act.

94. As a result of the retaliatory acts taken by EDO, IST, Puzzo and Caprario, Glynn has suffered damages, including, but not limited, to lost wages, lost benefits, diminished professional status, diminished job opportunities, mental anguish, and stress.

95. EDO's and IST's termination of Glynn's employment violates the public policy mandate set forth in 18 U.S.C. § 1513(e).

96. There is no private right of action under 18 U.S.C. § 1513(e).

97. As a result of the retaliatory acts taken by EDO, IST, Puzzo and Caprario, Glynn has suffered damages, including, but not limited, to lost wages, lost benefits, diminished professional status, diminished job opportunities, mental anguish, and stress.

## PRAYER FOR RELIEF

Based on the foregoing discrimination, Glynn respectfully requests that he be awarded the following relief:

98. Reinstatement with the same seniority status, duties and working conditions applicable at the time of his termination, and abatement of the retaliatory conduct directed toward him, or alternatively, front pay;

99. Economic damages for lost wages and benefits, including two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination;

100. Compensatory (non-economic) damages, including damages for emotional distress and loss of reputation;

101. Non-economic damages for mental and emotional distress, embarrassment and humiliation, career damage, and harm to reputation;

102. Punitive damages to punish EDO, IST, Puzzo and Caprario for malicious acts of retaliation and to deter them from similar retaliatory conduct toward other employees;

103. Injunctive or equitable relief, as may be appropriate, to prevent further harm to others and the public caused by EDO's, IST's, Puzzo's and Caprario's retaliation against a whistleblower; and

104. Reasonable litigation costs, expert fees and reasonable attorneys' fees, together with all other relief available from law and equity.

Respectfully submitted
*By Counsel,*

*R. Scott Oswald* /GRSH
R. Scott Oswald, DMD Bar No. 25391
Gregory R. Sharma-Holt, DMD Bar No. 16896
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
*Counsel for Plaintiff*

### Jury Demand

Plaintiff demands a jury for all issues proper to be so tried.

*Gregory R. Sharma-Holt*
Gregory R. Sharma-Holt