**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
Baltimore Division

|  |  |  |
|---|---|---|
| DENNIS P. GLYNN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-01660-JFM |
| | ) | |
| EDO CORP., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### IMPACT SCIENCE & TECHNOLOGY, INC.'S COUNTERCLAIMS

Defendant Impact Science & Technology, Inc. ("IST") hereby asserts counterclaims against Plaintiff Dennis Glynn ("Glynn") and states as follows:

### JURISDICTION

1.      Glynn has submitted to the personal jurisdiction of this Court by asserting claims against IST and EDO Corporation.

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1367 because the claims asserted herein are so related to the federal law claims asserted by Glynn against IST that they form part of the same case or controversy under Article III of the United States Constitution.

### GENERAL ALLEGATIONS COMMON TO ALL COUNTS

3.      IST is a leader in providing intelligence and information warfare technologies and products to the United States government and armed forces.  These technologies include electronic countermeasure systems designed to impair improvised explosive devices ("IEDs").  These devices play an integral role in providing life-saving technologies that protect the men and women serving in our armed forces and help to ensure our national security.  IST has received

favorable reviews from its government clients, including the United States Special Operations Command ("SOCOM") representatives with whom it has worked, vendors, and the men and women who have used IST's devices in the field.

4.      The government contractor industry in which IST conducts its business is highly competitive.  Consequently, it is important for IST to protect its trade secrets and other proprietary and confidential information, including but not limited to its designs, machines, devices, modules, components, schematics, instructions, pricing and charge information, and key customer and vendor contact information.  Additionally, it is imperative that IST protect classified government information and related proprietary and confidential information of IST and the government.

5.      IST has invested substantial time and money acquiring, developing, and maintaining its trade secrets and other proprietary and confidential information.  These unique and proprietary trade secrets derive actual and potential economic value from not being generally known to or readily ascertainable by competitors or the public by proper means.

6.      IST works with a number of vendors to achieve timely, cost-effective, and compliant execution of its contracts for its customers.  IST has invested substantial time and money cultivating these vendor relationships.  Additionally, IST has devoted significant time and expense to learning the specialized needs of its customers and the specialized capabilities of its vendors, and aligning those respective needs and capabilities.

7.      IST has also invested substantial time and money to foster and maintain the goodwill of its customers, its vendors, and its employees.

8.      IST has taken reasonable steps under the circumstances to protect its trade secrets,

confidential and proprietary information and technology, and customer and vendor information,

contacts, and goodwill.  These efforts include, without limitation:

> (a)     Including in the IST Employee Handbook ("Handbook") a written "Non-Disclosure of Proprietary Information Policy;"
>
> (b)     Including in the IST Handbook a specific admonition that any violation of IST's computer policies concerning the use of and transfer of classified information will subject the employee to discipline, up to and including discharge;
>
> (c)     Requiring all employees, including Glynn, to review these policies and procedures and execute an acknowledgement form that they have received, reviewed, and are informed of IST's policies and procedures;
>
> (d)     Limiting access to IST's trade secrets and other confidential and proprietary information;
>
> (e)     Limiting access to the secure areas in which IST's trade secrets, confidential and proprietary information, and confidential technologies are kept;
>
> (f)     Using flashing red lights to inform employees that an uncleared visitor is in a controlled area on IST's premises and to prevent disclosure of classified information;
>
> (g)     Entering into written confidentiality agreements with Glynn and others who were involved in the development of or had access to IST's trade secrets, confidential and proprietary information, confidential technologies, and highly classified information;
>
> (h)     Expressly requiring that all employees, including Glynn, return any and all IST trade secrets, confidential and proprietary information, and other IST property in their possession upon termination of their employment; and
>
> (i)     Enforcing the non-disclosure and other agreements to which employees and former employees are subject.

9.      In March 2004, pursuant to the terms of an Asset Purchase Agreement ("Purchase

Agreement"), IST acquired Dedicated Electronics, Inc. ("DEI").  DEI was a privately held

company co-owned by Glynn, John Joseph, Philip Joseph, and Dan Rice.  DEI offered

technologies and services related to the production and maintenance of, among other things, information warfare technologies such as those produced by IST.  DEI's products and/or services related to, but were not limited to, microwave system engineering, microwave design, radio frequency system design, and electromagnetic modeling.

10.     Glynn executed the Purchase Agreement and the attached Schedules thereto both in his individual capacity as a co-owner of DEI and in his capacity as President of DEI.  See Purchase Agreement, attached hereto as Ex. A.

11.     As part of the Purchase Agreement, Glynn and the other co-owners of DEI:

(a)     Sold and transferred to IST any and all ownership, title, and interest in DEI's assets, including but not limited to, DEI's equipment, prototypes, diagrams, works-in-process, and other tangible assets;

(b)     Sold and transferred to IST any and all ownership, title, and interest in *all* intellectual property and information technology in which DEI had a proprietary interest, including but not limited to, any and all Microwave Module design and packaging techniques, and any other trade secrets, confidential and proprietary information and records, and all know-how;

(c)     Sold and transferred to IST any and all ownership, title, and interest in *all* of DEI's intangible property, rights, and goodwill;

(d)     Executed an Assignment of Intangible Personal Property, in which they expressly agreed to assign, sell, and transfer to IST *all* of their worldwide title and interest in all of their intangible personal property used in the operation of DEI;

(e)     Executed Royalty Agreements in which they each assigned to IST their interests in and to the Proprietary Technology defined in the agreements; and

(f)     Expressly recognized and agreed that *all* DEI assets, intellectual property, tangible and intangible property whatsoever was conveyed to and belonged to IST, and that the Purchase Agreement was legal, supported by proper consideration, and enforceable against them.

12.     As part of the consideration for the acquisition of DEI, IST offered Glynn, J. Joseph, P. Joseph, and Dan Rice positions at IST.  Glynn accepted IST's offer of employment

and, on March 30, 2004, executed an Employment Agreement ("Employment Agreement") with IST.

13.     As part of his Employment Agreement, Glynn agreed to and executed an explicit non-disclosure and confidentiality agreement, in which he agreed not to use, disclose, or allow access to IST's confidential information, confidential communications, trade secrets, or other proprietary information and technologies.  See Ex. B, §§ 6, 10.

14.     Additionally, as part of his Employment Agreement and in connection with the acquisition of DEI, Glynn agreed to and executed a covenant that prohibited him for a period of two years from his termination or five years from IST's acquisition of  DEI, whichever is later, from:  (1) competing with IST by providing or offering to provide to any IST customer with whom he worked any services related to, similar to, or competitive with a product on which he worked while employed with IST; and (2) soliciting IST's employees or former employees to leave the employment or IST or to become involved in a business venture.  Ex. B, § 7.

15.     All of the above-described agreements and restrictive covenants in the Employment Agreement were reasonable and were narrowly tailored to protect IST's legitimate interests, including but not limited to its trade secrets, confidential and proprietary information, unique business methods, vendor lists, pricing information, contacts, and goodwill and positive image.  Glynn expressly agreed and acknowledged that these terms and covenants were reasonable and did not constitute an undue hardship or restrict his ability to earn a livelihood, and that he received adequate and proper consideration for these terms and covenants, including but not limited to, the consideration that he received in connection with the acquisition of DEI, his employment with IST, and a significant salary and annual bonus compensation.

16.     The Employment Agreement specified that Glynn would receive a base salary of $105,040.00, and three payments of $36,900.00 on March 30, 2005, March 30, 2006, and March 30, 2007.

17.     From February 2004 to December 14, 2006, Glynn was employed by IST as a Principal Engineer and Senior Principal Engineer.  Upon commencing his employment, Glynn read and reviewed all IST policies and executed an acknowledgement form on February 5, 2004 confirming that he had received, reviewed, and was informed of IST's policies and procedures. See Ex. C.  Additionally, on or about January 10, 2006, Glynn signed an "Employee Acknowledgment" form confirming that he had received, reviewed, and was informed of IST's updated policies and procedures, which included policies prohibiting the disclosure of proprietary IST information.  See Ex. D.  A copy of these policies is attached hereto as Exhibit E.

18.     During his employment, Glynn worked at IST's headquarters in Nashua, New Hampshire.  Glynn's primary responsibility was to serve as an Engineering Manager for the Microwave and Radio Frequency Integrated Assemblies Group (the "Microwave Group").  In this capacity, Glynn worked on and oversaw the production of various IST modules and components that are designed to counter IEDs.

19.     As a Principal Engineer and Senior Principal Engineer, Glynn occupied a supervisory position and was reposed with a high degree of trust and confidence.  In his capacity as a Principal Engineer and Senior Principal Engineer, Glynn worked with the design components of IST's products and technologies and had access to IST's trade secrets and other confidential and proprietary information.  Glynn also worked with and corresponded directly with some of IST's key vendors and customers.

20.     At times, and increasingly beginning in the Spring of 2006, Glynn neglected and intentionally ignored his supervisory duties and created a negative, hostile, and divisive work environment in which he demeaned and insulted his subordinates, disrespected and ignored his superiors, and made disparaging and false statements about IST and its management and employees.

21.     At times, and increasingly beginning in the Spring of 2006, Glynn expressed extreme negativity about his co-workers at IST, making such statements as "I don't just dislike these people, I hate these people."

22.     A number of IST employees filed complaints with IST human resources about this conduct and other hostile conduct by Glynn.

23.     Glynn also used and disclosed confidential pay and salary information that he inadvertently received and knew or should have known was confidential and was not to be shared with other IST employees.  Specifically, Glynn disclosed such information to employees to create discontent among IST employees.  Glynn also used this information for his own benefit in an attempt to pressure IST to increase his salary.

24.     Additionally, Glynn disclosed confidential information about proposed retention agreements and pay related to EDO's acquisition of IST.  Glynn was expressly told by Dean Puzzo that such information was confidential and was not to be disclosed.  Despite this express statement of confidentiality, Glynn disclosed this information to other IST employees in an effort to create discontent among these employees with IST.

25.     Additionally, Glynn repeatedly made disparaging and attacking statements to other IST employees about the other co-owners of DEI and their decision to sell DEI.  Glynn

also made offensive statements to others, including statements of a demeaning nature about IST supervisors, which he repeated on multiple occasions.

26.     IST addressed with Glynn his misconduct, poor performance, intentional neglect of his supervisory duties, and intentional disparagement of IST and IST employees.  As part of this process, IST management and human resource personnel met with Glynn on multiple occasions and hired a management consultant to address the problems in the Microwave Group that Glynn supervised.

27.     Despite these efforts and Glynn's agreement to cease his improper conduct and improve his performance, Glynn continued to engage in the above-outlined conduct.

28.     Consequently, on December 14, 2006, IST terminated Glynn's employment.

29.     On January 17, 2007, Lisa M. Palumbo, Senior Vice President and General Counsel of EDO, sent Glynn on IST's behalf a letter reminding him of his obligations under the Employment Agreement, including his continuing confidentiality and non-compete obligations, and his obligation to return all IST proprietary materials and property in his possession. Palumbo also requested written confirmation from Glynn that he understood these continuing obligations and had or would immediately return IST's proprietary materials and property.  See Ex. F.  Glynn failed to respond to this letter and to subsequent demands by IST that Glynn return IST's confidential and proprietary materials and property in his possession.

30.     After Glynn's termination, IST learned about additional improper activities in which Glynn had engaged during his employment.  For instance, IST learned that:

> (a)     At times, including but not limited to June 2006 through October 2006, Glynn took time off from work to meet with individuals and attend conferences to learn how directly to compete with IST.  Glynn also encouraged other employees to do the same.  In June 2006, for example, Glynn and another IST employee, James Martin, made plans to attend the "Merrimack Valley Venture forum," addressing venture financing for

companies that are self-financed.  Martin stated in an email to Glynn, "I think we should attend this so we're prepared for March 07."  As specified above in Paragraph 18, Glynn was to receive his last annual payment from IST in March 2007.

(b)     At times, including but not limited to June 2006 through late November 2006, Glynn sent emails from his work account to his personal email account with, among other things, copies, pictures, drawings, and scans of various IST designs, machines, devices, modules, components, schematics, instructions and/or other IST technologies, trade secrets, and confidential and proprietary information.  Glynn also sent emails from his work account to his personal email account with IST's confidential cost information for its design efforts.

(c)     At times including but not limited to October 26, 2006, while still employed at IST, Glynn solicited IST employees to join Glynn in competing against IST by pursuing with him a government solicitation for proposals related to anti-IED devices.

(d)     During his employment, Glynn engaged in such additional improper activities as (i) searching the internet for competitive opportunities; (ii) emailing other IST employees or members of the government contractor business community about "IED competitor" websites and opportunities; (iii) sending email solicitations and requests for product and pricing information to IST vendors and other members of the government contractor business community as part of inquiries exclusively related to Glynn's intent to compete with IST; (iv) accessing and disclosing, without authorization, information about IST's services, products, and employee and vendor information for his own purposes; and (v) improperly utilizing his position at IST to misrepresent himself as an agent of IST when contacting and communicating with vendors and other members of the government contractor business community to make inquiries exclusively on his own behalf and for his competitive purposes.

28.     Subsequent to and since the termination of his employment with IST, Glynn has continued to encourage divisiveness among IST employees; solicited IST employees, customers, and vendors; attempted to compete against IST; and intentionally maligned IST's reputation and injured IST's goodwill by making disparaging and false statements about IST's goods, services, and business.  IST has learned, for instance, that:

(a)     At times, including but not limited to January and/or February 2007, Glynn contacted a major amplifier vendor for IST's anti-IED program, to

inquire if the vendor was interested in working with Glynn to compete against IST.  A representative of the vendor responded to Glynn's inquiries stating:  "First of all, I think it would be extremely poor judgment for [this Company] and especially you to attempt to do anything with the CREW2 program that would conflict with IST in any way. . . . I also think that your getting involved with CREW2 would be disruptive to the program office and harmful to national defense and to our troops, because *it seems that you are saying that there are technical problems that are not being addressed properly*.  Everything I know is that the systems are state-of-the art, continuously being improved, and provided the troops with the best protection possible within the schedule constraints. . . ."  (Emphasis added.)

(b)     In or about January 2007, Glynn formed a company called Saltwhistle Technology, LLC which competes or attempts to compete against IST in violation of Glynn's Employment Agreement with IST.  See http://saltwhistletechnology.com/pr01.htm, which is attached as Ex. G.

(c)     Glynn has formed an employment and/or contracting relationship with Foster-Miller, Inc., and is competing or attempting to compete against IST in violation of his Employment Agreement with IST.   Upon information and belief, this unlawful competition includes, but is not limited to, directly soliciting IST customer, SOCOM, to bid for the next generation of anti-IED devices that Glynn worked on whiled employed by IST.

(d)     At times including but not limited to January 2008, Glynn sent an unsolicited email to a military customer of IST, in which Glynn made disparaging and false comments about IST's products and capabilities.

29.     The above-described actions, as well as the actions described in further detail below, evince a pattern of intentional unlawful conduct by Glynn that began during his employment at IST and continues to date.

30.     As a result of Glynn's actions, IST stands to suffer, and will continue to suffer, irreparable harm for which there is no adequate remedy at law.

**FIRST COUNTERCLAIM**
**[Breach of Contract – Employment Agreement]**

31.    IST incorporates by reference their allegations set forth in paragraphs 1 through 30 as if fully restated herein.

32.    The Employment Agreement between Glynn and IST is a valid and enforceable contract, supported by proper consideration.  IST has honored its obligations under the Employment Agreement.

33.    Glynn agreed and expressly recognized that the Employment Agreement was supported by proper consideration and that the covenants therein are reasonable and do not constitute an undue hardship on him or his ability to earn a livelihood.

34.    Glynn has breached, is currently breaching, and, absent an injunction, will continue to breach his obligations under the Employment Agreement, including in particular his confidentiality agreement and non-compete and non-solicitation covenants.

35.    Glynn's above-described disclosure of IST confidential information in emails and other communications and his use of IST confidential information without consent directly violates Section 6 of the Employment Agreement.

36.    Glynn's above-described failure to return IST's Confidential Information, Confidential Communications, and other proprietary, confidential, and trade secret information directly violates Section 6 of the Employment Agreement.

37.    Glynn's above-described attempted and actual competition with IST, including but not limited to his solicitation of IST vendors and customers, and his engagement, association, and communications with IST's vendors and competitors directly violates Section 7 of the Employment Agreement.

38.     Glynn's above-described solicitation of IST employees and his conduct encouraging them to terminate their employment with IST or to become involved in a competitive business venture directly violates Section 7 of the Employment Agreement.

39.     Glynn's conduct has caused and stands to cause IST substantial and immediate irreparable injury, including but not limited to the actual and potential loss of vendor and customer relationships and the loss of goodwill among IST's current and prospective vendors, customers, and employees.  Glynn's conduct also has caused and stands to cause IST substantial and immediate irreparable injury to its confidential, proprietary, and trade secret information.

40.     As a result of these breaches, IST has suffered damages in an amount that cannot presently be determined and Glynn has been unjustly enriched.

## SECOND COUNTERCLAIM
### [Breach of Contract – Purchase Agreement]

41.     IST incorporates by reference its allegations set forth in paragraphs 1 through 40 as if fully restated herein.

42.     The Purchase Agreement between the Sellers of DEI, including Glynn, and IST is a valid and enforceable contract, supported by proper consideration.  IST has honored its obligations under the Purchase Agreement and the Schedules attached thereto.

43.     Glynn agreed and expressly recognized that the Purchase Agreement and the Schedules attached thereto were supported by proper consideration and that the covenants therein were reasonable.

44.     Glynn has breached, is currently breaching, and, absent an injunction, will continue to breach his obligations under the Purchase Agreement, including in particular the agreement that all DEI assets, property, and information, belong exclusively to IST and may not be used, appropriated, or retained by Glynn or any other DEI Seller for their own use.

45.     Glynn's conduct has caused and stands to cause IST substantial and immediate irreparable injury, including but not limited to the actual and potential loss of business and contractual relationships, the loss of goodwill among IST's current and prospective vendors, customers, and employees, and the loss of IST property and rights of exclusive ownership over this property.  Glynn's conduct also has caused and stands to cause IST substantial and immediate irreparable injury to its confidential, proprietary, and trade secret information.

46.     Glynn has also been unjustly enriched by his conduct by depriving IST of its rights of exclusive ownership over DEI property, assets, and information and by unjustly extracting royalty payments for such property.

47.     As a result of these breaches, Defendants have suffered damages in an amount that cannot presently be determined.

### THIRD COUNTERCLAIM
### [Misappropriation of Trade Secrets / Violation of N.H. Rev. Stat. Ann. § 350-B]

48.     IST incorporates by reference its allegations set forth in paragraphs 1 through 47 as if fully restated herein.

49.     IST's designs, machines, devices, modules, components, schematics, instructions, pricing and charge information, key customer and vendor contact information, and other confidential and proprietary information constitute trade secrets belonging to IST as defined by the New Hampshire Uniform Trade Secrets Act, N.H. Rev. Stat. Ann. § 350-B:1.

50.     IST developed and acquired these trade secrets with significant expenditures of time and money, as well as extended efforts generating business and goodwill.  Additionally, IST continues to invest considerable amounts of time and money acquiring, developing, and creating confidential information, trade secrets, and good will.

51.    These trade secrets derive substantial actual and potential economic value from not being generally known to or readily ascertainable by the public by proper means, and IST has taken reasonable steps to secure and maintain the secrecy of these trade secrets under the circumstances.

52.    These trade secrets and confidential information are the sole and exclusive property of IST.

53.    During his employment with IST, Glynn enjoyed a position of trust and confidence with IST and was privy to these trade secrets and confidential information.

54.    As part of his Employment Agreement, Glynn agreed to and executed a confidentiality and non-disclosure covenant, giving rise to a duty to maintain the secrecy of IST's trade secrets, confidential information, and confidential communications.  Under this covenant, Glynn also agreed to refrain from disclosing, using, or allowing access to these trade secrets, confidential information, and confidential communications.  Glynn also covenanted to return any of IST's trade secrets, confidential information, and confidential communications in his possession upon termination of his employment.

55.    Glynn has used and disclosed, and continues to use and disclose IST's trade secrets and confidential and proprietary information without IST's express or implied consent.

56.    Glynn's conduct constitutes misappropriation of trade secrets and violates the New Hampshire Uniform Trade Secrets Act.

57.    Glynn's conduct has caused and will cause substantial and irreparable damage to IST.  Unless enjoined, Glynn and the individuals and entities with whom he acts will continue to misappropriate IST's trade secrets.

58.    Glynn's disclosures, use, and misappropriation were willful and malicious, entitling IST to an award of punitive damages and recovery of their attorneys' fees pursuant to N.H. Rev. Stat. Ann. § 350-B:3-4.

## FOURTH COUNTERCLAIM
### [Breach of Fiduciary Duty]

59.    IST incorporates by reference its allegations set forth in paragraphs 1 through 58 as if fully restated herein.

60.    During his employment with IST, Glynn was employed as a Senior Principal Engineer and held a supervisory position.  As a Senior Principal Engineer, Glynn occupied a position of trust and served as a fiduciary of IST.

61.    By virtue of this position and the high degree of trust reposed in him, Glynn owed IST a duty of loyalty.

62.    Prior to his termination, Glynn intentionally engaged in conduct specifically designed to compete with, injure, and usurp business opportunities from IST.  This conduct included, but was not limited to:  (1) downloading, emailing, and stealing confidential, proprietary, and trade secret information belonging to IST; (2) soliciting IST's current employees and encouraging them to breach their employment agreements with IST; (3) soliciting the business of IST's key vendors; (4) soliciting the business of IST's customers; (5) engaging in activities on IST time to establish a competing company or a relationship with an entity that directly competes with IST; (6) holding himself out as an agent of IST when making inquiries to vendors and members of the government contractor business community solely on his own behalf and for his own competitive purposes; and (7) failing to devote proper attention to his IST work.

63.     By intentionally engaging in such conduct during and after his employment with IST, Glynn breached his duty of loyalty to IST.

64.     As a result of this breach, IST has suffered damages and has been and will continue to be substantially and irreparably damaged.

## FIFTH COUNTERCLAIM
### [Conversion]

65.     IST incorporates by reference its allegations set forth in paragraphs 1 through 64 as if fully restated herein.

66.     While employed and subsequent to his employment with IST, Glynn copied, downloaded, emailed, and stole various items belonging to IST, included but not limited to proprietary documents, employee information, technology designs and schematics, contact lists, vendor and pricing information, and other trade secrets and non-trade secret proprietary and confidential information.  Glynn also took sensitive information that could implicate national security concerns.

67.     Glynn has retained these IST trade secret and non-trade secret proprietary, confidential, and classified information and items.

68.     Despite repeated demands, Glynn has failed to return IST's property.

69.     Glynn's assumption and exercise of dominion and control over this trade secret and non-trade secret proprietary and confidential information was unauthorized by IST.

70.     As a result of Glynn's conversion, IST has suffered and will continue to suffer damages, including substantial and irreparable damages.

## SIXTH COUNTERCLAIM
### [Defamation]

71.     IST incorporates by reference its allegations set forth in paragraphs 1 through 70 as if fully restated herein.

72.     Glynn intentionally, knowingly, and maliciously made false statements of fact about IST to third parties.

73.     These statements include but are not limited to:  (1) Glynn's disparaging and false statements made to IST's employees, during and subsequent to his employment; (2) Glynn's disparaging and false statements made to external vendors, during and subsequent to his employment, that IST's products or services were flawed or deficient; (3) Glynn's disparaging and false statements made to customers and other members of the government contractor business community, subsequent to his employment with IST, including statements made in January 2008 to a military customer of IST that IST's product is defective and/or deficient.

74.     Glynn was without authorization, justification, excuse, or privilege to make these statements.

75.     By intentionally making such false statements to third parties during and after his employment with IST, Glynn has defamed and continues to defame IST.

76.     Glynn's false and defamatory statements constitute defamation *per se* because they relate to and cause injury to Defendant's trade and business.

77.     As a result of Glynn's false and defamatory statements, IST has suffered damages and have been and will continue to be substantially and irreparably damaged.

## SEVENTH COUNTERCLAIM
### [Tortious Interference With Contractual And/Or Advantageous Relations]

78.     IST incorporates by reference its allegations set forth in paragraphs 1 through 77 as if fully restated herein.

79.     IST has had substantial and on-going contractual, economic, business and/or advantageous relationships with its customers, vendors, and employees and prospective customers, vendors, and employees.

80.     Glynn is aware of these relationships and has actively and intentionally taken actions to interfere with these relationships and divert business and other opportunities from IST.

81.     These intentional acts include but are not limited to:  (1) contacting IST's vendors and customers to solicit their business and attempt to persuade them to cease doing business with IST; (2) making disparaging and false statements to IST's vendors, customers, and employees; and (3) soliciting IST employees and encouraging them to breach their employment agreements with IST.

82.     By engaging in this conduct, Glynn has intentionally and unjustifiably interfered with IST's contractual, economic, business and/or advantageous relationships, resulting in damages to Defendant.

83.     Glynn's conduct constitutes willful misconduct, malice, fraud, wantonness, oppression and/or such gross indifference and recklessness as to amount to a wanton or willful disregard of IST's rights and therefore Defendant are entitled to an award of punitive damages.

84.     Unless enjoined, Glynn's unlawful tortious interference will continue to substantially and irreparably harm Defendant, with no adequate remedy at law.

**EIGHTH COUNTERCLAIM**
**[Violation of New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A]**

85.     IST incorporates by reference its allegations set forth in paragraphs 1 through 84 as if fully restated herein.

86.     Glynn has engaged in and continues to engage in unethical, unfair, deceptive and misleading acts that violate the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:1 et seq. ("CPA"), including but not limited to:  (1) making disparaging and false statements to IST's vendors and customers, and other members of the government contractor business community; (2) causing likelihood of confusion or misunderstanding that he was associated with or acting on behalf of IST when he made inquiries to vendors and members of the government contractor business community exclusively on his own behalf and for his competitive purposes; and (3) wrongfully appropriating IST's ideas in designing his own products.

87.     Glynn's conduct as set forth above constitute unfair methods of competition and/or unfair or deceptive acts or practices that violate the CPA.

88.     Glynn's conduct was carried out for the purpose of competing unfairly with IST.

89.     Glynn's conduct was intentional, willful, and knowing.

90.     Glynn's violations of the CPA have caused and will cause damage to IST and, absent an injunction, will continue to cause substantial and irreparable damage to IST.

91.     Glynn's violations of the CPA were willful and knowing, entitling IST to an award of punitive damages and recovery of their attorneys' fees and costs pursuant to N.H. Rev. Stat. Ann. § 358-A:10.

## PRAYER FOR RELIEF

WHEREFORE, as to all Counterclaims, IST prays as follows:

1.     That Plaintiff takes nothing by reason of the Third Amended Complaint and that

Plaintiff's claims against Defendants be dismissed with prejudice;

2.     That IST be awarded preliminary and permanent injunctions restraining and

enjoining Plaintiff and those acting in concert with him from:

(a)     Using, disclosing, misusing, or further converting in any manner or in any form any of IST's trade secrets or confidential or proprietary information for a period consistent with the terms of the Employment Agreement;

(b)     Destroying, damaging or otherwise disposing of any of IST's trade secrets or confidential or proprietary information;

(c)     Competing against IST in violation of the terms of the restrictive covenants in Plaintiff's Employment Agreement;

(d)     Soliciting IST's employees in violation of the terms of the restrictive covenants in Plaintiff's Employment Agreement;

(e)     Making disparaging or false statements about IST, its employees, or its products and services; and

(f)     Hiding or destroying any documents or other evidence in any way that concerns the allegations in IST's counterclaims.

3.     That IST be awarded preliminary and permanent injunctions ordering Plaintiff to:

(a)     Return to IST any and all IST property he has taken or received from others, including but not limited to IST's trade secrets or confidential or proprietary information;

(b)     Abide by the terms of Plaintiff's Employment Agreement and the covenants contained therein; and

(c)     Permit IST or its agents to inspect Plaintiff's home computers, office computers, laptop computers, storage devices and any other property of Plaintiff containing or with the potential to contain or conceal electronic information constituting IST property.

4.      That IST be awarded money damages, costs, and interest to compensate IST for

Plaintiff's injuries caused by virtue of the wrongful acts described herein;

5.      That IST be awarded punitive damages, attorneys' fees, and costs pursuant to

N.H. Rev. Stat. Ann. § 350-B:3-4 and/or N.H. Rev. Stat. Ann. § 358-A:10 and/or applicable law.

6.      For such other and further relief, legal or equitable, as the Court deems just and

proper.

### <u>DEMAND FOR JURY TRIAL</u>

IST demands a jury for all claims triable by a jury.


Dated:  April 11, 2008


Respectfully submitted,

_____/s/_____
William M. Sullivan, Jr., Esq.
    DMD Bar No. 17082
    E-mail: wsullivan@winston.com
Connie N. Bertram, Esq.
     E-mail: cbertram@winston.com
**Winston & Strawn LLP**
1700 K Street, N.W.
Washington, D.C.  20006
(202) 282-5000 Telephone
(202) 282-5100 Facsimile

*Counsel for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 11, 2008, a copy of the foregoing *IMPACT SCIENCE &*

*TECHNOLOGY, INC.'S COUNTERCLAIMS* were filed electronically.  In compliance with Local

Civil Rule 102(1)(c), service required by Fed. R. Civ. P. 5(a) has been made, as notice of

electronic filing will be electronically mailed to the following:

> Robert Scott Oswald, Esq.
> Gregory Robert Sharma-Holt, Esq.
> The Employment Law Group, PC
> 888 17th Street, Suite 900
> Washington, DC 20006
>
> *Counsel for Plaintiff*




_____/s/_____
Connie N. Bertram

*Counsel for Defendant*

DC:551419.7