IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DENNIS P. GLYNN       *
      *
      *
     v.       *      Civil No. JFM-07-01660
      *
EDO CORPORATION, *et al.*       *
      *
     ******

OPINION

Plaintiff Dennis Glynn sued Defendants Impact Science & Technology, Inc. ("IST") and EDO Corporation ("EDO"),[1] which counterclaimed and crossclaimed against Glynn, Saltwhistle Technology, LLC ("SWT"),[2] and others. Some of these claims were subsequently dismissed in *Glynn v. EDO Corp.*, 536 F. Supp. 2d 595, 599–600 (D. Md. 2008) and *Glynn v. EDO Corp.*, 641 F. Supp. 2d 476, 480 (D. Md. 2009). IST now moves for sanctions against Glynn and Glynn's counsel, The Employment Law Group ("TELG"), based on alleged misconduct before and during the three-year pendency of this litigation. On June 17, 2010, IST, Glynn, and TELG presented oral arguments on this motion. I now find that Glynn and TELG committed misconduct and I will impose a sanction of $20,000, for which Glynn and TELG will be jointly and severally responsible. I reject, however, IST's request to impose the more dramatic sanction of dismissal or default judgment.

I.

"Glynn began working for IST in March 2004, after IST acquired Dedicated Electronics, Inc. ("DEI"), a privately held company co-owned by Glynn and three others." *Glynn*, 641 F.

---

[1] EDO acquired IST in late 2006. For ease of reading, IST/EDO is referred to as "IST" throughout this opinion.
[2] SWT is an LLC owned and operated by Glynn.

Supp. 2d at 480. Glynn worked as an engineer for IST, "overs[eeing] the production of various IST modules and components that are designed to counter Improvised Explosive Devices ("IEDs")." *Id.* Glynn's work for IST was subject to an Employment Agreement which, among other things, included non-compete and non-disclosure provisions. (*See* IST's Mot. for Sanctions ("IST Mot."), Ex. 2.)

In the summer of 2006, Glynn and his co-workers allegedly discovered problems with the counter-IED ("C-IED") technology IST was developing, which Glynn brought to the attention of his supervisors. Later that fall, in response to his impression that IST management was not taking these problems seriously, Glynn notified a government investigator—in the Inspector General's Office of the Department of Defense ("DOD")—about his concerns, which prompted DOD personnel to make an unannounced visit to IST to test IST's products. *See Glynn*, 536 F. Supp. 2d at 599–600. On December 14, 2006, IST terminated Glynn's employment. The reasons for this termination are hotly disputed: IST alleges Glynn neglected his job responsibilities, made false statements about IST management, and misappropriated IST proprietary information; Glynn alleges he was fired as retaliation for his whistleblowing. *See Glynn*, 641 F. Supp. 2d at 480–81.

After his termination, Glynn communicated regularly with James Martin, a friend and then-current IST employee who would later work for SWT. Glynn's email conversations with Martin often concerned their mutual distaste for IST management, Glynn's efforts to work as an engineer designing C-IEDs, and Martin's plans to leave IST. Amidst these discussions, Martin sent Glynn internal IST documents and emails, some of which Glynn forwarded to TELG. Martin also began communicating with and providing information to TELG directly.

Eventually, on June 21, 2007, Glynn filed suit against IST alleging retaliation under the

False Claims Act ("FCA")—which, among other things, requires Glynn to prove he acted as a

whistleblower in furtherance of a *qui tam* suit[3]—and wrongful discharge.[4] On April 11, 2008,

IST counterclaimed and crossclaimed against Glynn and SWT. IST's claims would eventually

include breach of contract, misappropriation of trade secrets, breach of fiduciary duty,

conversion, defamation, tortious interference, violation of New Hampshire's consumer

protection statute, unjust enrichment, and civil conspiracy.

II.

This Court "has the inherent authority in appropriate cases to . . . impose . . . sanctions

against a litigant or a member of the bar who has acted in bad faith, vexatiously, wantonly, and

for oppressive reasons." *Sanford v. Commonwealth of Virginia*, 689 F. Supp. 2d 802, 805 (E.D.

Va. 2010) (internal marks omitted) (quoting *Williams v. Family Dollar Servs.*, 327 F. Supp. 2d

582, 585 (E.D. Va. 2004)). This authority "ought to be exercised with great caution, in

circumstances such as those involving the very temple of justice being defiled." *Id.* (internal

---

[3] The FCA "allows individuals with 'direct and independent' knowledge of false claims to the Government to file so-called *qui tam* complaints on their own behalf and on behalf of the federal Government." *United States ex rel. Mayman v. Martin Marietta Corp.*, 886 F. Supp. 1243, 1245 (D. Md. 1995). The FCA also prohibits retaliation against an "employee[] who assist[s] in or bring[s] *qui tam* actions." *Zahodnick v. Int'l Bus. Mach. Corp.*, 135 F.3d 911, 914 (4th Cir. 1997).

[4] The Government Accountability Project, the National Whistleblower Legal Defense and Education Fund, and the Project on Government Oversight (collectively "proposed *amici*") have moved for leave to file an *amicus* brief. I will grant this motion. *Bryant v. Better Bus. Bureau of Greater Maryland, Inc.*, 923 F. Supp. 720, 728 (D. Md. 1996) (noting that a district court's decision to grant leave to an *amici* is discretionary, though "[it] should not be granted unless the court deems the proffered information timely and useful . . . ." (internal citations and marks omitted)). However, this brief is of limited helpfulness because, instead of addressing the alleged litigation misconduct at issue, it focuses on the implications of enforcing confidentiality agreements on whistleblowers.

Similarly, the United States has submitted a Statement of Interest ("Statement") pursuant to 28 U.S.C. § 517 because "[it] has a strong interest in its citizens undertaking appropriate investigations of possible fraud on the government and reporting their findings to the United States." This proposition is supported by case law holding that certain employment agreements are void as against public policy and by discussion of the FCA. The Statement acknowledges, however, that the United States lacks "complete knowledge" of the facts of this case. In fact, the Government's concerns speak more directly to the underlying issues of the case and not the motion for sanctions.

marks omitted) (quoting *Royal Ins. v. Lynnhaven Marine Boatel, Inc.*, 216 F. Supp. 2d 562, 567 (E.D. Va. 2002)). "[U]nlike the rule-based and statutory authorities such as Rule 11, Rule 37, and § 1927, which concern themselves with specific types of misconduct[,]" a court's inherent authority to impose sanctions "covers every type of litigation misconduct . . . ."[5] *Id.*; *accord United States v. Shaffer Equip. Co.*, 11 F.3d 450, 458 (4th Cir. 1993) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)). Courts have "considerable discretion" in choosing the appropriate sanction under this inherent authority and may, for example, dismiss claims, enter default judgment, and award attorneys' fees and costs. *See, e.g.*, *Shaffer Equip.*, 11 F.3d at 461–62; *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 285 (E.D. Va. 2001).

In addition to the inherent authority held by this Court, the Federal Rules of Civil Procedure empower me to impose sanctions for a party's failure to provide court-ordered discovery. *See* FED. R. CIV. P. 37(b)(2); *Sadler v. Dimensions Health Corp.*, 178 F.R.D. 56, 59 (D. Md. 1998). Possible sanctions under Rule 37 include default judgment, prohibiting the introduction of certain evidence, striking pleadings, etc. *See* FED. R. CIV. P. 37; *Sadler*, 178 F.R.D. at 59.

Whether it is sought under the Federal Rules of Civil Procedure or pursuant to this Court's inherent power, the precise burden of proof in a motion for sanctions is unclear in the Fourth Circuit. However, proving misconduct occurred by "clear and convincing" evidence, as opposed to by a mere preponderance, certainly suffices. *See Lahiri v. Univ. Music and Video Distrib. Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010) ("The burden of proof issue need not be resolved here because the district court's bad faith finding is supported by clear and convincing evidence." (internal citations omitted)); *Shepherd v. ABC, Inc.*, 62 F.3d 1469, 1476–78 (D.C.

---

[5] IST did not move for sanctions under either 28 U.S.C. § 1927 or Federal Rule of Civil Procedure 11.

Cir. 1995) (citing several other circuits in holding that the "clear and convincing" standard is required to impose default judgment, whereas preponderance is the standard for imposing less dramatic sanctions); *Balcar v. Bell and Assoc., LLC*, 295 F. Supp. 2d 635, 640–41 (N.D.W. Va. 2003) ("Because the court's inherent power to sanction should be exercised with caution and discretion, some circuits have held that clear and convincing evidence of bad faith and vexatious behavior is required for a court to exercise its inherent authority to sanction. Although the Fourth Circuit appears not to have addressed the issue, this Court believes it, too, would adopt the clear and convincing evidence standard with regard to the Court's inherent power to sanction." (internal citations omitted)). Regardless of whether the preponderance standard or the clear and convincing standard is applied, the outcome of this motion would remain the same.

III.

Because they (1) improperly received internal IST documents from Martin and (2) asserted the common interest privilege in bad faith, I will impose a $20,000 sanction against Glynn and TELG to deter future misconduct and mitigate any prejudice suffered by IST.[6]

 a. <u>The Improper Receipt of IST Information Warrants Sanctions</u>

Because they improperly received internal IST information from Martin, Glynn and TELG should be subject to some sanction, but not dismissal or default judgment.[7]

---

[6] IST also alleges misconduct on the part of Glynn's other counsel, Bacon Thornton and Palmer LLP ("BTP"). These allegations are more limited, however, and obtaining sanctions against BTP would be inappropriate based on the arguments presented in IST's motion and at the hearing.

[7] IST cites dozens of allegations of Glynn and TELG "stealing" IST property. These charges fall into one of two sub-charges: (1) Glynn "stole" IST property by improperly retaining IST proprietary and confidential information after his termination, and TELG received and utilized that information; (2) after Glynn stopped working for IST, Glynn and TELG "stole" IST property by soliciting and receiving IST proprietary and confidential information from Martin.

 The former sub-charge—which may require an analysis of the substance and validity of the Employment Agreement and a document-by-document analysis of which information retained by Glynn is proprietary or confidential—is inappropriate for resolution at this stage of the litigation. Rather, these issues are intertwined with

Under its inherent powers, a district court may sanction a party for wrongfully obtaining the property or confidential information of an opposing party. *See Jackson v. Microsoft Corp.*, 211 F.R.D 423, 430–32 (W.D. Wash. 2002), *aff'd* 78 Fed. App'x 588 (9th Cir. 2003); *Fayemi v. Hambrecht and Quist, Inc.*, 174 F.R.D. 319, 323–25 (S.D.N.Y. 1997) (M.J.); *Ashman v. Solectron Corp.*, 2008 WL 5071101, *2 (N.D. Cal. 2008) (unpublished); *cf. Shaffer Equip.*, 11 F.3d at 461 ("Due to the very nature of the court as an institution, it must and does have an inherent power to impose order, respect, decorum, silence, and compliance with lawful mandates."). Although courts have significant discretion in fashioning an appropriate sanction, dismissal or default judgment should only be imposed "when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process . . . ." *Shaffer Equip.*, 11 F.3d at 462.

> [B]efore exercising the inherent power to dismiss a case, a court must consider the following factors: (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that we seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest.

*Id.* at 462–63.[8]

---

the merits of IST's substantive counterclaims, and are therefore best left to be addressed, if necessary, after the merits of those counterclaims have been resolved. *Cf. United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 2009 WL 3723087 (D. Ariz. 2009) (unpublished) (where the outcome of a motion for sanctions depended in part on merits of the underlying substantive claims and defenses, addressing motion for sanctions after judgment had been entered on the underlying claims and noting "[t]he Court declined to entertain a motion for sanctions at the time the *qui tam* action was adjudicated to avoid likely duplication of effort[]"). In contrast, the latter sub-charge— that Glynn and TELG inappropriately obtained IST documents from Martin—prompted me to entertain the Motion for Sanctions in the first place and can be resolved now.

[8] I believe that accusations of self-help discovery and wrongful acquisition of an opposing party's property should be analyzed pursuant to the Court's inherent authority, as opposed to under Rule 37. Regardless, if these charges were evaluated under Rule 37, the outcome would remain the same, as the analysis of whether dismissal is warranted, and the sanctions available to the court, are quite similar. As with the Court's inherent authority to sanction, "[w]hen dismissal is contemplated [under Rule 37] . . . the district court's discretion is limited, since its 'desire to enforce its discovery orders is confronted head-on by the party's rights to a trial by jury and a fair day in court.'" *Sadler*, 178 F.R.D. at 59 (quoting *Mut. Fed. Sav. & Loan v. Richards & Assoc.*, 872 F.2d 88, 92 (4th Cir. 1989)). Moreover, the factors a district court considers when exercising its inherent authority are very similar to

A review of a handful of district court opinions outside the Fourth Circuit suggests that even where a party steals property or information, dismissal or default judgment is only warranted in extreme circumstances. Although none of these cases invoked the exact same factors articulated in *Shaffer*, their analyses revolved around the same basic principles. For example, in *Jackson v. Microsoft*, the plaintiff, a former Microsoft employee suing for discrimination, obtained thousands of documents—including trade secrets and material covered by the attorney-client privilege—from a former supervisor's computer without permission. 211 F.R.D. at 425–27. The plaintiff also acquired Microsoft personnel records and emails that were widely distributed among Microsoft employees, and physically altered some hard copies of emails in his possession to obscure who had provided them to him. *Id.* Plaintiff failed to disclose his possession of this information for ten months and repeatedly gave untruthful answers under oath about how he obtained and used these documents. *Id.* at 425–30. The court concluded that the plaintiff's conduct was in bad faith, "egregious in the extreme," and that the document theft alone would suffice to warrant dismissal. *Id.* at 431. The court went on to hold that, considering the plaintiff's theft and dishonesty, dismissal was appropriate because he had undermined the "truth-finding function of the court," and "no sanctions . . . would cure plaintiff's extensive access to [Microsoft's] privileged and confidential materials and . . . would assure plaintiff's honesty in the proceedings to come." *Id.* at 432.

those it considers when deciding which sanctions to impose under Rule 37: (1) "whether the noncomplying party acted in bad faith"; (2) the "prejudice the noncompliance has caused the adversary"; (3) "the need for deterring the particular type of noncompliance"; (4) "the effectiveness of less drastic sanctions"; and (5) whether, if possible, the court had preceded dismissal with an "'explicit and clear' threat to a party that failure to meet certain conditions could result in dismissal . . . ." *See id.* (citing *Mut. Fed. Sav. & Loan*, 872 F.2d at 92; *Wilson v. Volkswagen of Am., Inc.*, 561 F.2d 494, 503–06 (4th Cir. 1977); *Hathcock v. Navistar Int'l Transp. Corp.*, 53 F.3d 36, 40–41 (4th Cir. 1995)) (other citations omitted). In fact, courts in a few other circuits have noted that "the Court's analysis appears to be the same when considering sanctions pursuant to its inherent powers as it is when considering sanctions pursuant to Fed. R. Civ. P. 37(b)." *Jackson*, 211 F.R.D. at 431 n.7 (citing *Toth v. Trans World Airlines, Inc.*, 862 F.2d 1381, 1385 (9th Cir. 1988); *accord Webb v. District of Columbia*, 189 F.R.D. 180, 185 (D.D.C. 1999) ("[A]s the Court of Appeals noted, the appropriate standard under either the rules of civil procedure or the Court's inherent powers is essentially the same.").

Similarly, in *Perna v. Elec. Data Sys. Corp.*, a plaintiff surreptitiously rifled through and copied documents in defendants' counsel's briefcase. 916 F. Supp. 388, 392–93 (D.N.J. 1995). The court found the misconduct particularly "extraordinary" because the plaintiff himself was an experienced attorney acting with "a willful and improper design." *Id.* at 399–402. The court accepted the magistrate judge's recommendation granting the motion to dismiss the offending plaintiff's claim because any lesser sanction would not sufficiently condemn and deter such outrageous conduct, which threatened the integrity of the judicial system. *Id.*

In *Ashman v. Solectron Corp.*, on the other hand, the court did not dismiss plaintiff's claims after the plaintiff stole documents—using his old sign-in information to access certain computers—from his former employer (the defendant). 2008 WL 5071101, at *2–*3. Although the plaintiff was convicted of theft for this activity, the court held that dismissal was "too severe" in light of the public policy favoring resolving disputes on their merits, the lack of actual prejudice to the employer from the theft ("most if not all" documents stolen would have been turned over in discovery), and the availability of less dramatic sanctions as a sufficient remedy. *Id.* Instead, the court ordered the plaintiff to return all documents within seven days and barred him from using or referencing any privileged material in the documents. *Id.* at *4–*5.

Similarly, in *Fayemi v. Hambrecht and Quist, Inc.*, the plaintiff obtained purportedly confidential documents about his former employer's employee bonus structure by, without permission, entering his supervisor's office and printing documents from either the supervisor's computer or a disk the supervisor kept in his office. 174 F.R.D. at 321–24. Considering only two factors, "the severity of the wrongdoing and the prejudice to the adversary," the court held that dismissal would be too drastic: because the stolen information probably would have been disclosed during discovery, there was insufficient prejudice to the employer-defendant to

warrant dismissal. *Id.* at 325–26. Rather, the sanction of precluding the plaintiff from using the wrongfully obtained information sufficed to "prevent the plaintiff from benefiting from his wrongdoing and . . . ameliorate any prejudice to the defendants."[9] *Id.* at 326.

TELG and Glynn wrongfully obtained internal IST documents. Although many of IST's allegations of misconduct appear trivial or exaggerated, (*see, e.g.*, IST Mot., Ex. 24 (mass email announcing a company outing), Ex. 65 (in an effort to help Glynn establish jurisdiction, Martin forwarding business card of an EDO employee), Ex. 78 (email "detail[ing] IST's strategy for migrating 'impactsci.com' email addresses to 'edocorp.com' email addresses")), IST has proved by clear and convincing evidence that TELG and Glynn wrongfully acquired non-public, internal IST information from Martin on at least a few occasions:[10]

- February 20, 2007: Martin forwarded to Glynn an internal IST email discussion about the design, specifications, and production of an IST product, which months later Glynn forwarded to Scott Oswald at TELG. (*Id.*, Ex. 21, Ex. 28.)

- April 7–9, 2007: EDO in-house counsel Sean Smith sent an email to roughly twenty employees, including Martin, describing what types of documents and files should be preserved for this litigation. This email eventually made its way to Glynn, presumably via Martin, and Glynn forwarded it to Oswald at TELG.[11] (*See* TELG Response, Ex. 9.)

---

[9] In the end, the Court refused to impose any sanctions because of the employer-defendant's "unclean hands." *Fayemi*, 174 F.R.D. at 326–27.

[10] Some of IST's allegations of wrongful receipt of IST information rely, in part, on the declaration of Jonathan P. Fowler, a Senior Regional Practice Leader in the Computer Forensics Practice at First Advantage Litigation Consulting (which IST retained to conduct the Computer Forensic Protocol ("CFP")). Fowler purports to be experienced in electronic data retrieval, investigating data destruction, and computer forensics. (*See* Fowler Decl. ¶ 1–5.) He has never been deposed or cross-examined by Glynn, and has not been certified as an expert in this case. Accordingly, as I noted in the hearing, I will not consider Fowler's statements in determining whether, and to what extent, Glynn or TELG should be sanctioned. Even if I did consider those statements, however, his testimony would not cause me to change my ultimate decision about the appropriate sanction. That is, even if I considered Fowler's conclusions about the wrongful receipt of IST information, and his conclusions about Glynn's spoliation of evidence, a $20,000 sanction would still suffice.

[11] Interestingly, on April 17, Martin emailed Oswald, copying Glynn, indicating which specific IST employees Sean Smith was planning to interview about issues pertaining to this litigation. Oswald responded that Martin should cooperate fully with EDO investigators and tell the truth. (IST Mot., Ex. 52.)

- August 21, 2007: Martin forwarded to Glynn an internal IST email which included IST's government investigations policy. Glynn subsequently forwarded this email to TELG. (*See id.*, Ex. 21, Ex. 64.)

- September 18, 2007: Martin emailed Gregory Sharma-Holt, at that time an associate at TELG, various IST documents (listed below). In one email, Martin explained "I was unable to get any data regarding payment arrangement between IST and Wayne, but I keep digging. . . . Let me know if I can help with any other details, or if I have forgotten something we discussed last week." Sharma-Holt responded—copying Oswald, Jason Zuckerman, and Glynn—writing, "[y]our emails from last night are very helpful. Thanks for pulling the material together." Sharma-Holt also asked some clarifying questions about the documents Martin had forwarded, but he did not expressly ask Martin to obtain any other documents. (*See id.*, Ex. 72.)
    - o Internal IST emails which Martin believed helped establish jurisdiction in Maryland, but also included IST design and other technical information (*Id.*, Ex. 66, Ex. 67, Ex. 68.)
    - o Internal IST email concerning IST's sexual harassment prevention training (*Id.*, Ex. 69.)
    - o IST's affirmative action/equal opportunity monitoring data form, prominently stamped "CONFIDENTIAL" (*Id.*, Ex. 70.)

- February 5, 2008: Martin emailed Glynn an internal IST email exchange discussing the design and specifications of an IST product. (*Id.*, Ex. 79.)


The parties dispute whether the information listed above is proprietary, confidential, or protected by the attorney-client or work product privileges. I need not resolve these issues because, regardless of their merits, I believe it was inappropriate for Glynn and TELG to surreptitiously acquire these internal IST documents outside of the normal discovery channels. It was not for Glynn and TELG to unilaterally decide whether the documentation Martin was funneling to them from IST computers was proprietary, confidential, or privileged. Rather, those decisions are best resolved through the formal discovery process. *Cf. In re Shell Oil Refinery*, 143 F.R.D. 105, 108 (E.D. La. 1992), *amended by* 144 F.R.D. 73 ("[T]he PLC's receipt of Shell's proprietary documents in this manner was inappropriate and contrary to fair play. . . . The PLC has effectively circumvented the discovery process and prevented Shell from being able to argue against production. Had the PLC sought to obtain these documents through

the discovery process, Shell would have had the opportunity to seek a protective order pursuant to the Federal Rules of Civil Procedure."); *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253 (4th Cir. 1998) (in a Title VII case, noting that the following amounted to theft: plaintiff, in an effort to support a third party's retaliation claim, copying and transmitting to the third party a document she had discovered on her supervisor's desk "[d]uring the course of her regular duties"); *Cafasso*, 2009 WL 3723087, at *6 (criticizing a party's efforts to "free[] her[self] of the inconvenience of doing discovery through the ordinary process, and depriv[ing] [the opposing party] of the protections of judicial mediation over what evidence and documents must be produced[]"). In short, considering the purposes behind court-mediated discovery, it is an improper litigation tactic to use a disgruntled employee to secretly obtain non-public internal business documents from an opposing party, and some sanction against Glynn and TELG is therefore warranted.

Further, I reject the argument that Maryland Rule of Professional Conduct 4.2 authorized the receipt of this type of information from Martin. IST does not appear to contest that Rule 4.2 permitted communication between TELG and Martin, even while Martin was employed by IST. *See* MD. RULE PROF. CONDUCT 4.2(a)–(b) ("[A] lawyer shall not communicate about the subject of the representation with a person who the lawyer knows is represented in the matter by another lawyer unless the lawyer has the consent of the other lawyer or is authorized by law or court order to do so. . . . *If the person represented by another lawyer is an organization, the prohibition extends to each of the organization's (1) current officers, directors, and managing agents and (2) current agents or employees who supervise, direct, or regularly communicate with the organization's lawyers concerning the matter or whose acts or omissions in the matter may bind the organization for civil or criminal liability. . .*

." (emphasis added)). Permitting communication between Glynn/TELG and Martin is materially different, however, from permitting Martin to secrete documents from IST and transmit them to Glynn or TELG, and Rule 4.2 says nothing about authorizing the latter conduct. *See In re Shell Oil Refinery*, 143 F.R.D. at 108 ("PLC has not just communicated with a Shell employee, but has surreptitiously obtained from this employee proprietary documents belonging to Shell. Regardless of whether the PLC's communication with the Shell employee was in violation of [Louisiana's] Rule 4.2, the PLC's receipt of Shell's proprietary documents in this manner was inappropriate and contrary to fair play. . . . The PLC has effectively circumvented the discovery process and prevented Shell from being able to argue against production.").

All that said, the aforementioned misconduct does not warrant the extraordinary sanction of dismissal or default judgment. First, IST has not proved that it was, or will be, sufficiently prejudiced to trump the important public policy of resolving the claims at issue on their merits. Aside from the potentially privileged documents that were obtained, I cannot see how Glynn's use of the information that was wrongfully acquired from Martin will continue to prejudice IST if this litigation moves forward: any documents that were in fact helpful to Glynn presumably would have been disclosed in discovery anyway. And to the extent that Glynn and TELG obtained privileged information which would not have been disclosed in discovery, IST has not explained exactly how it was prejudiced by the acquisition of that information. In fact, TELG's and Glynn's access to this allegedly privileged information was limited to a handful of IST documents, which is a far cry from the "extensive" access to privileged documents in *Jackson*, or the briefcase of privileged documents accessed in *Perna*.

Second, the degree of culpability of Glynn and TELG is substantially less than in most cases where dismissal has been imposed. Glynn and TELG wrongfully acquired a handful of

12

IST documents, over the course of a year, amidst numerous appropriate contacts with Martin. Although Glynn and TELG wrongfully accepted the information from Martin, IST has not presented conclusive evidence that either TELG or Glynn expressly requested that Martin acquire this information on more than a few occasions (if ever). The nefariousness of this conduct pales in comparison to the plaintiff's theft of thousands of documents in *Jackson*, or the plaintiff's theft of the contents of opposing counsel's briefcase in *Perna*.

      b.   The Bad Faith Assertion of the Common Interest Privilege Warrants Sanctions

During discovery, Glynn claimed the common interest privilege over various communications—which were accordingly listed on a privilege log compiled by TELG— between Glynn and Martin. The privilege log claimed that these shielded communications were "work product" involving "[c]orrespondence with Jim Martin in anticipation of litigation and regarding common interest in protecting against retaliation . . . ." Last December, I rejected application of this privilege to communication occurring prior to formation of the June 2008 joint defense agreement. IST now argues that asserting the common interest privilege over pre-agreement communication amounted to bad faith warranting sanctions.

To be protected under the common interest privilege, "shared or jointly created information," or communication between the parties, "must first satisfy the traditional requisites for the attorney-client or work product privilege . . . ." *Minebea Co., Ltd. v. Papst*, 228 F.R.D. 13, 16 (D.D.C. 2005); *see also Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B*, 230 F.R.D. 398, 415–16 (D. Md. 2005). Additionally, the proponent of the privilege must at least demonstrate that (1) the communicating parties shared an identical legal interest, (2) the communication was made in the course of and in furtherance of the joint legal effort, and (3) the privilege had not been waived. *See Grand Jury Subpoenas 89-3 and 89-4,*

*John Doe 89-129*, 902 F.2d 244, 248–49 (4th Cir. 1990); *Neuberger*, 230 F.R.D. at 415–16;

*Minebea Co.*, 228 F.R.D. at 16.

Most of Glynn's pre-June 2008 common interest claims were not asserted in bad faith.

Eighteen of the emails covered involved discussion between Glynn or Martin and Glynn's

counsel, or otherwise pertained to Glynn's legal efforts. Beyond just being unconvincing, the

privilege claim over these eighteen emails was extremely weak: Glynn and Martin lacked a joint

defense agreement, lacked identical legal interests, and any discussion of legal issues focused

on Glynn's efforts, not potential retaliation against Martin. Nonetheless, the fact that they

pertained, at least in part, to legal action and involved two individuals who eventually signed a

joint defense agreement precludes a bad faith finding as to these eighteen email exchanges.

That said, a handful of Glynn's common interest privilege claims were in fact submitted

in bad faith because they covered emails that TELG and Glynn could not have reasonably

believed furthered any ongoing legal effort. First, Glynn claimed the privilege over a January

23, 2007 email—six months before litigation was commenced and eighteen months before the

common defense agreement was signed—between Glynn, Martin, and Martin's wife. Although

it included some discussion about whether Glynn's formation of SWT violated the Employment

Agreement, nothing in this exchange could reasonably be characterized as furthering a joint

legal effort to protect against retaliation. In fact, the discussion consisted primarily of Glynn,

Martin, and Martin's wife criticizing IST management's decision to take employees on a

recreational outing. (*See* IST Mot., Ex. 83 at 1–2.) Similarly, Glynn claimed the privilege over a

February 1, 2007 email in which Glynn forwarded to Martin an email exchange he had with a

representative of LCF Enterprises about developing C-IED technology, which had nothing to do

with defending against retaliation. (*See id.*, Ex. 83 at 27.) Lastly, Glynn inappropriately asserted

the privilege over emails suggesting Glynn was soliciting an IST employee, Lorraine Wolfram, in violation of the Employment Agreement. Glynn claimed the privilege over an email between himself and Wolfram in which they set up a time to speak over the phone (*see id.*, Ex. 83 at 4), and an email sent to him by Steven Neill containing nothing more than a PDF attachment of Wolfram's contact information. (*See id.*, Ex. 83 at 28.) Inexplicably, Glynn claimed these two email exchanges, like others on the privilege log, were "[c]orrespondence with Jim Martin in anticipation of litigation and regarding common interest in protecting against retaliation . . . ."[12]

Having found that TELG and Glynn asserted the common interest privilege in bad faith, the question becomes what sanction is warranted. *Cf. Am. Nat'l Bank and Trust Co. of Chicago v. Equitable Life Assurance Soc'y of the United States*, 406 F.3d 867, 877–78 (7th Cir. 2005) (noting, where a party moved for sanctions under Rules 26 and 37, that bad faith privilege assertions on a privilege log may warrant sanctions). Whether sanctions for bad faith assertions of privilege should be determined under Rule 37 or this Court's inherent authority, the factors to consider in deciding whether dismissal or default judgment is appropriate are similar: the egregiousness of the offending party's misconduct, the prejudice suffered by the other party, the ability of lesser sanctions to adequately remedy the harm and deter future misconduct, and the

---

[12] IST also argues that Glynn and TELG "withheld from the Glynn Privilege Log every single document which in any way suggested or revealed TELG's receipt of stolen IST information or TELG's affirmative solicitations (to Glynn or Martin) for such stolen information." Glynn and TELG counter that most of the documents IST refers to were created after the initiation of litigation, and documents created post-litigation are not listed on privilege logs. The general practice in this Court is, as Glynn and TELG assert, to not require logging post-litigation documents over which the attorney-client privilege or work product doctrine has been asserted. Accordingly, it was appropriate for Glynn and TELG to omit material created after the litigation was instituted on June 21, 2007. Although some communications revealing Glynn's inappropriate receipt of IST information were created before June 21, but were not listed on the privilege log, (*see, e.g.*, TELG Mot., Ex. 9 (document preservation email sent by in-house counsel to EDO employees on April 7, 2007, and subsequently forwarded by Glynn to TELG); IST Mot., Ex. 83 (Glynn privilege log)), most such communications occurred after that date. Moreover, at least one of the documents IST alleges Martin and Glynn stole—an email about a company outing—was in fact logged. (IST Mot., Ex. 83 at 1.) Consequently, I do not believe there was any far-reaching effort to intentionally fail to log material that revealed Martin's activity.

public interest.[13] *See supra* note 8. *Compare Shaffer Equip.*, 11 F.3d at 462–63 (articulating

factors under this Court's inherent authority), *with Sadler*, 178 F.R.D. at 59 (articulating factors

under Rule 37).

Any bad faith assertion of privilege demands serious attention as it undermines

confidence in the discovery process. Nevertheless, IST can only prove this misconduct in

relation to a handful of documents. Moreover, the prejudice to IST has been mitigated by IST's

discovery of this inappropriately shielded information, which it may now use to defend against

Glynn's claims and advance its own counterclaims. Consequently, neither dismissal nor default

judgment is necessary based on these bad faith privilege assertions alone. Rather, some

monetary sanction against Glynn and TELG suffices to "rectify the wrong by punishing the

---

[13] Although IST does not mention it, Federal Rule of Civil Procedure 26(g) may be the most appropriate mechanism for imposing sanctions for inappropriate privilege claims. *See Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 265 (D. Md. 2008) (Grimm, M.J.) ("Counsel should be wary of filing a response to a Rule 34 document production request that asserts privilege/protection as a basis for refusing to make requested production without having a factual basis to support each element of each privilege/protection claimed for each document withheld, because doing so is a sanctionable violation of FED. R. CIV. P. 26(g)."). Rule 26 provides that:

> [E]very discovery request, response, or objection must be signed by [an attorney or party] . . . .
> [who] certifies that to the best of the person's knowledge, information, and belief formed after a
> reasonable inquiry . . . [the objection is] consistent with these rules and warranted by existing law
> or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for
> establishing new law. . . . If a certification violates this rule without substantial justification, the
> court, on motion or on its own, must impose an appropriate sanction . . . The sanction may
> include an order to pay the reasonable expenses, including attorney's fees, caused by the
> violation.

FED. R. CIV. P. 26(g).

Assuming TELG certified the claims listed in the log, the bad faith privilege assertions appear to warrant sanctions under Rule 26(g): they were inconsistent with existing law, they cannot be fairly characterized as nonfrivolous arguments to modify the law, and Glynn and TELG were "without substantial justification" for advancing them. *Cf. St. Paul Reinsurance Co., Ltd. v. Commercial Fin. Corp.*, 197 F.R.D. 620, 645 (N.D. Iowa 2000) (imposing sanctions under Rule 26 because "continued assertion of privileges, after once being warned of the impropriety of their assertions, was without 'substantial justification.'" (citation omitted)). I need not decide, however, which specific mechanism is most appropriate for imposing sanctions for the particular privilege assertions at issue here. The goals to be furthered via sanctions are similar under Rule 26, Rule 37, and this Court's inherent authority. Moreover, nothing in Rule 26 makes it easier to impose dismissal or default judgment, and nothing in Rule 26 alters the analysis below about the proper monetary sanction. That is, regardless of whether Rule 26 is utilized, the end result would be the same: a $20,000 sanction for the entirety of the misconduct of Glynn and TELG.

culpable person[] . . . [and] compensating the harmed persons." [14] *See Shaffer Equip.*, 11 F.3d at 462–63.

c. The Entirety of the Misconduct by Glynn and TELG Warrants Monetary Sanctions, but Not Dismissal or Default Judgment

Just as Glynn's and TELG's self-help discovery and bad faith privilege assertions do not independently warrant dismissal or default judgment, I do not believe the aggregate of those two categories of misconduct justifies dismissal or default judgment. This misconduct does, however, warrant a $20,000 sanction, for which Glynn and TELG will be jointly and severally responsible.

Again, this Court should not impose a sanction that deprives Glynn of his right to have this dispute resolved on the merits unless absolutely necessary. In other words, though the Fourth Circuit demands that I consider the various aforementioned factors in fashioning a sanction, courts rarely impose dismissal or default judgment unless (1) the misconduct was so extraordinarily egregious that dramatic sanctions are necessary to deter future misconduct and preserve the integrity of the litigation process, or (2) the misconduct created prejudice to a party that cannot be cured through a less dramatic sanction. *See, e.g.*, *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 593 (4th Cir. 2001); *Jackson*, 211 F.R.D 423; *Perna*, 916 F. Supp. 388.

---

[14] In addition to hiding information via bad faith privilege claims, IST alleges that Glynn and TELG "deliberately obstructed discovery by hiding documents and electronic devices in clear violation of the Federal Rules of Civil Procedure and numerous Orders of this Court." Again, in addition to its inherent authority, this Court may impose sanctions under Rule 37 "when a party fails to provide court-ordered discovery . . . ." *See Sadler*, 178 F.R.D. at 59. Aside from documents IST alleges were hidden through the bad faith privilege assertions, IST has not convinced me that Glynn or TELG failed to comply with either a court order or court-ordered discovery. First, whether Glynn failed to turn over IST "property" as required by my July 29, 2008 order is inappropriate for resolution at this stage of the litigation, as that question turns on issues that go to the underlying merits of IST's counterclaims. *See supra* note 7. Second, IST never sufficiently explained how the failure to turn over any other documents, or meta-data, violated court-ordered discovery. Finally, IST has simply not proved that Glynn or TELG intentionally hid any electronic storage devices which they were required to turn over by my July 29, 2008 order (Glynn acknowledges having misplaced one CD-ROM). Accordingly, these allegations of discovery suppression cannot serve as a basis for imposing sanctions.

Neither of these two circumstances exist in this case. First, for reasons similar to those explained in Sections III.a and III.b, the misconduct of Glynn and TELG, even when viewed in its entirety, was not extraordinarily egregious. Amidst a year of contact with Martin, TELG and Glynn inappropriately obtained only a handful of internal IST documents. Although the bad faith assertion of the common interest privilege is more troubling, as it is probative of an intent to hide evidence, IST has only proved that TELG and Glynn asserted this privilege in bad faith over a few communications. Second, IST has not persuaded me that the aggregate of the misconduct created any substantial, irreparable prejudice. As discussed above, IST has not demonstrated that it suffered incurable prejudice from the wrongful acquisition of various IST documents. Moreover, the overwhelming majority of the information inappropriately shielded via the bad faith privilege claims has in fact been retrieved by IST.

Nonetheless, there is no doubt Glynn and TELG engaged in serious misconduct in this litigation. Whether this misconduct should be considered a violation of court-ordered discovery sanctionable under Rule 37, or a form of bad faith litigation misconduct sanctionable under my inherent powers to manage litigation, or both, it cannot be tolerated. Although the prejudice suffered by IST may have been slight, surreptitiously acquiring documents from an opposing party and asserting a privilege in bad faith indisputably undermines the efficacy of the discovery process and this Court's ability to resolve litigation in a fair and orderly manner. Without some mutual trust that the parties will act in good faith, the discovery process would become unmanageable. Consequently, Glynn and TELG should be subject to some sanctions.[15]

---

[15] IST also alleges another independent basis for imposing sanctions: TELG and Glynn hid their spoliation and theft via perjury, subornation of perjury, and making misrepresentations to this Court and opposing counsel. Notably, as with IST's other allegations of misconduct, many of the perjury and misrepresentation claims hinge on whether Glynn inappropriately retained or disclosed IST property; that is, IST alleges Glynn and TELG suborned perjury and made misrepresentations to this Court by denying that Glynn improperly retained IST proprietary information after his termination. Again, any claim of misconduct that depends on a finding that Glynn wrongfully

I believe $20,000 suffices to both punish Glynn and TELG for their wrongdoing and

deter similar misconduct in the future. This sum also adequately mitigates the prejudice suffered

by IST. That is, regardless of how much it actually spent, IST deserves to be compensated for

what would be the reasonable cost of bringing a motion for sanctions appropriately tailored to

the misconduct that occurred. This compensation must, however, be offset by the cost Glynn

and TELG incurred responding to the extraneous arguments in the unnecessarily broad motion

that IST in fact filed. Although calculating this figure with precision is difficult, $20,000 is my

best estimate of what this figure would be.

IV.

TELG asserts that IST's counsel engaged in significant misconduct throughout this

litigation and therefore IST's "unclean hands" preclude this Court from imposing sanctions

against Glynn and TELG. The unclean hands doctrine precludes "equitable relief where [the

party seeking such relief] has itself acted unconscionably in relation to the matter at issue to the

detriment of the other party." *Fayemi*, 174 F.R.D. at 326–27 (holding that unclean hands

doctrine precluded sanctions against plaintiff where defendant improperly destroyed the very

---

retained IST proprietary material involves unresolved questions of law and fact which are inappropriate for
resolution in this Motion for Sanctions. *See supra* note 7.

      As for the allegations unrelated to Glynn post-termination retention of IST information, IST has not
proved any of these charges, and they therefore cannot serve as part of the basis for imposing sanctions. "A witness
that testifies under oath or affirmation commits perjury if he: 1) gives false testimony; 2) concerning a material
matter; 3) with the willful intent to deceive, rather than as a result of confusion or mistake." *United States v. Stotts*,
113 F.3d 493, 497 (4th Cir. 1997). A lawyer suborns perjury when he "procures" testimony which he should have
known or had good reason to know was false. *See United States v. Washington*, 398 F.3d 306, 313 n.8 (4th Cir.
2005); *Petite v. United States*, 262 F.2d 788, 794 (4th Cir. 1959) (citing 70 C.J.S. 1951 PERJURY § 79), *vacated on
other grounds by* 361 U.S. 529 (1960). Although IST has pointed to multiple occasions in which Glynn or Martin
made incorrect statements under oath, IST has not met its burden of proving that these statements were made with
the intent to deceive or that TELG knowingly procured false testimony.

      Similarly, IST has not convinced me that Glynn and TELG should be sanctioned for intentionally
misrepresenting material facts to me or opposing counsel. Again, IST is able to cite various inaccuracies in TELG's
statements and Glynn's interrogatory responses. These inaccuracies, however, are just as plausibly explained as
TELG and Glynn asserting positions of law and fact that have yet to be definitively resolved, or Glynn and TELG
misremembering details of events that took place months prior to the purported misstatements.

documents that plaintiff had stolen and copied); *see also Big Top USA v. The Wittern Group*, 183 F.R.D. 331, 343 (D. Mass. 1998) (while dismissing plaintiff's action against some defendants under Rule 37, refraining from dismissing the action against one of the defendants because the court "refuse[d] to allow [that defendant] to benefit from [plaintiff's] indiscretion when it has not acted in a manner that advanced the truth-seeking function of discovery[]"). *But see Faurie v. Berkeley Unified School Dist.*, 2008 WL 1886011, * 10 (N.D. Cal. 2008) (Henderson, J.) (unpublished) (in response to an effort to defend against sanctions using the unclean hands doctrine, noting that "the Court's inherent power to police itself is distinct from its equitable power concerning relations between the parties[]").

Assuming that the unclean hands doctrine can operate to preclude the imposition of sanctions, TELG has failed to prove facts that, if true, would trigger the doctrine. That is, TELG has failed to prove IST committed misconduct or otherwise "dirtied" its hands. Moreover, the idea that a district court would be precluded from imposing sanctions if the benefiting party had unclean hands is in significant tension with the Fourth Circuit's pronouncement about a district court's inherent authority to manage litigation. *See Shaffer Equip.*, 11 F.3d at 450 ("Due to the very nature of the court as an institution, it must and does have an inherent power to impose order, respect, decorum, silence, and compliance with lawful mandates. This power is . . . necessary to the exercise of all other powers." (citing *Chambers*, 501 U.S. at 43–44)).


DATE: August 20, 2010                                    _____/s/_____

                                                                  J. Frederick Motz
                                                                  United States District Judge