# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DENNIS P. GLYNN,
    Plaintiff and Counter-Claim Defendant,   \*
                                      \*

    v.                                          \*        Civil No. JFM-07-1660
                                        \*

IMPACT SCIENCE & TECHNOLOGY, INC.,  \*
    Defendant and Counter-Claimant,        \*
                                        \*

    v.                                          \*
                                        \*

SALTWHISTLE TECHNOLOGY, LLC,     \*
    Counter-Claim Defendant,          \*
                                        \*

    and                                      \*
                                        \*

EDO CORP.,                            \*
    Defendant.                       \*
                                        \*
                                        \*

                                  \*\*\*\*\*\*

## OPINION

Plaintiff Dennis Glynn ("Glynn") filed suit against Defendants, Impact Science & Technology, Inc. ("IST") and EDO Corporation ("EDO"),[1] on June 21, 2007, alleging, *inter alia*, retaliation in violation of the False Claims Act ("FCA"), post-termination FCA retaliation, declaratory judgment, and a *Haddle* claim under 42 U.S.C. § 1985(2).[2] In turn, IST filed counterclaims against Glynn and Saltwhistle Technology, LLC ("SWT")[3] on April 11, 2008, which would eventually include breach of contract, misappropriation of trade secrets, breach of

---

[1] EDO acquired IST in late 2006. For ease of reading, IST/EDO is referred to as "IST" throughout this Opinion.

[2] The Fourth Amended Complaint as originally filed included claims for wrongful discharge under Maryland law (Count II) and injunctive relief (Count IV), which were dismissed on February 27, 2008. *See Glynn v. EDO Corp.*, 536 F. Supp. 2d 595 (D. Md. 2008). Summary Judgment was entered in favor of IST regarding wrongful discharge under New Hampshire law (Count III) on January 25, 2011. *See Glynn v. Impact Sci. & Tech., Inc.*, 2011 U.S. Dist. LEXIS 7422 (D. Md. Jan. 25, 2011).

[3] SWT is a limited liability company owned and operated by Glynn.

fiduciary duty, conversion, defamation, tortious interference, violation of New Hampshire's consumer protection statute, unjust enrichment, and civil conspiracy.

Now pending is Glynn and SWT's Motion for Summary Judgment requesting that this Court enter judgment that as a matter of law, Glynn engaged in protected activity and there is direct evidence of retaliation against Glynn by IST. In addition, Glynn and SWT move for summary judgment on IST's breach of the Employment Agreement (Count I), breach of the Asset Purchase Agreement ("APA") (Count II), misappropriation of trade secrets (Count III), breach of fiduciary duty (Count IV), conversion (Count V), tortious interference (Count VII), violation of New Hampshire's consumer protection statute (Count VIII), unjust enrichment (Count IX), and civil conspiracy (Count XI) counterclaims.[4] Also pending is IST's Cross-Motion for Summary Judgment on Plaintiff's FCA retaliation (Count I), post-termination FCA retaliation (Count V), declaratory judgment (Count VI), and *Haddle* (Count VII) causes of action, as well as summary judgment on IST's breach of contract (Counts I and II) and tortious interference with advantageous relations (Count VII) counterclaims. A hearing on these motions was held on July 15, 2011.

For the following reasons, I deny Glynn's Motion for Summary Judgment as to the protected activity and retaliation claims, and I grant IST's Motion for Summary Judgment as to Glynn's FCA retaliation, post-termination FCA retaliation, declaratory judgment, and *Haddle* claims (Counts I, V, VI, and VII). I also grant summary judgment to IST on its counterclaim for breach of the Employment Agreement (Count I), and deny its Motion for Summary Judgment as to its counterclaims for breach of the APA and tortious interference (Counts II and VII). I grant

---

[4] The Second Amended Counterclaim includes a Ninth and Eleventh counterclaim, but curiously omits a Tenth. (*See* IST Mot. Leave to File Second Am. Countercls. and Cross-cls., Ex. C, ECF No. 145.)

summary judgment to Glynn on IST's counterclaims for breach of the APA, breach of fiduciary duty, conversion, tortious interference, unjust enrichment, and civil conspiracy (Counts II, IV, V, VII, IX, and XI), and deny Glynn's Motion for Summary Judgment as to IST's counterclaims for breach of the Employment Agreement, misappropriation of trade secrets, and violation of New Hampshire's consumer protection statute (Counts I, III, and VIII). The result of this decision is that solely IST's counterclaims for misappropriation of trade secrets, defamation,[5] and violation of New Hampshire's consumer protection statute (Counts III, VI, and VIII) survive summary judgment and will proceed to trial.

## I. Background

### A.

Glynn began working for IST in February 2004 after IST acquired Dedicated Electronics, Inc. ("DEI"), a privately held company owned, in part, by Glynn. (Glynn Mot. Summ. J., Ex. 1 ¶¶ 17, 78.) Glynn worked as a Principal Engineer for IST, in the Information Warfare Group ("IW Group"), with the primary responsibility of designing various modules and components for IST's Mobile Multi-Band Jammer systems ("MMBJs"), which counter Improvised Explosive Devices ("IEDs") by interfering with signals sent to trigger the IEDs. (*See id.*, Ex. 1 ¶¶ 17-19, 21.)

Each MMBJ system contains a component part known as a "module," which is designed to emit a radiofrequency that jams the receivers of nearby IEDs and prevents them from receiving signals that would cause them to detonate. As IST continued to tweak and develop its designs over the years, it regularly created updated versions of the modules used in its counter-IED ("C-IED") systems. For example, an earlier module, known as the MBTNS module, was

_____

[5] Neither Glynn nor IST moved for summary judgment on IST's counterclaim for defamation (Count VI).

used by IST until 2005. At that point, an updated module design, the DDS module, was introduced to replace the MBTNS module. (*Id.*, Ex. 45, IST Dep. 181:9-183:1, Nov. 17, 2010.) Although the DDS module was thought to be superior to the MBTNS module in terms of performance, it encountered "producibility issues" and was replaced by the DRU module in 2007. (*Id.*, Ex. 55, Murrin Dep. 154:7-155:20, Nov. 16, 2010.) The DRU module was used by IST "into the 2008 time frame and possibly beyond." (*Id.*, Ex. 45, IST Dep. 183:14-15.)

Beginning in 2004, Glynn alleges that he became concerned with the C-IED technology IST was developing because Glynn believed the MMBJ devices would fail under extreme temperatures. (*See id.*, Ex. 1 ¶¶ 22-23.) Glynn claims that he brought his concerns to the attention of his supervisors and IST management at various points throughout 2004, 2005, and 2006. (*Id.*, Ex. 1 ¶¶ 23, 25, 31, 37-39.) On September 13, 2006, Glynn contacted the U.S. Attorney's office to raise his concerns. (*Id.*, Ex. 1 ¶ 59.) Glynn also met with a government investigator from the Department of Defense ("DOD") (*id.*, Ex. 1 ¶¶ 60-66), prompting DOD personnel to make an unannounced visit to IST to test IST's products in October 2006. (*Id.*, Ex. 1 ¶ 68.)

On December 14, 2006, IST terminated Glynn's employment. (Fourth Am. Compl. ¶ 94.) The reasons for this termination are the subject of intense dispute: IST alleges Glynn engaged in "continued and escalating bad behavior," creating a "toxic" environment, "all while exhibiting pervasive negativity, disrespect, and insubordination at IST." (IST Mem. 1.) Glynn alleges he was terminated by IST in retaliation for his whistleblowing. (*See* Fourth Am. Compl. ¶¶ 5-6.)

**B.**

At the commencement of his employment at IST, Glynn entered into an Employment Agreement which, among other things, included noncompete, nonsolicitation, and nondisclosure provisions. (*See* IST's Rule 56 Statement of Facts at ¶ 36). The terms of these provisions

expressly stated that they would remain in effect beyond the termination of Glynn's employment with IST.[6] (IST Mot. Summ. J., Ex. 37, Employment Agreement §§ 6, 7.) On January 4, 2007, approximately three weeks after his termination, Glynn incorporated Saltwhistle Technology, LLC, his own company that, like IST, focused on designing C-IED devices for use by the United States government. (IST Mot. Summ. J., Ex. 9, Saltwhistle Technology Press Release.) Over the next two years, Glynn and SWT collaborated with Foster-Miller Inc. ("FMI") to secure two government contracts to supply C-IED devices to Naval Sea Systems Command ("NAVSEA"), a specific acquisition group within DOD. (IST Mot. Summ. J., Ex. 15, FMI Dep. 106:2-109:13, June 18, 2008.) Around the time that Glynn was setting up SWT, IST began attempts to recover copies of proprietary electronic files that had been retained by Glynn after his termination. Following a court-ordered computer forensics protocol, which involved a search of Glynn's computers, hard drives, and storage devices, IST eventually recovered numerous IST files with titles such as "IST_Transceivers," "IST_NOISE_SOURCE_MODULE," and "IST_MULTI-BAND_ TUNABLE_NOISE_SOURCE." (IST Mot. Summ. J., Ex. 118, Fowler Decl. ¶ 53.) The protocol also turned up copies of DEI design schematics and a file entitled "dei library," which clearly dated back to Glynn's prior company, DEI, that was sold to IST in 2004. (*Id.*)

## C.

On June 21, 2007, Glynn filed suit against IST alleging retaliation under the FCA and wrongful discharge. (*See* Compl. ¶¶ 79-97.) On April 11, 2008, IST filed counterclaims against Glynn and SWT. (ECF. No. 60.) IST's claims would eventually include breach of contract (Counts I and II), misappropriation of trade secrets (Count III), breach of fiduciary duty (Count

---

[6] By the terms of the Employment Agreement, the noncompete and nonsolicitation restrictions expired two years from the date of Glynn's termination. (IST Mot. Summ. J., Ex. 37, Employment Agreement §§ 6, 7.)

IV), conversion (Count V), defamation (Count VI), tortious interference (Count VII), violation of New Hampshire's consumer protection statute (Count VIII), unjust enrichment (Count IX), and civil conspiracy (Count XI). (*See* IST Mot. Leave to File Second Am. Countercls. and Cross-cls., Ex. C, ECF No. 145.)

## II. Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal

quotations omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

### III. Glynn's Claims

Glynn moves this Court for summary judgment on "several issues related to Glynn's retaliation claims." (Glynn Mem. 1.) Specifically, Glynn requests that this Court enter judgment that as a matter of law, Glynn engaged in protected activity and there is direct evidence of retaliation against Glynn by IST. (*See* Glynn's Proposed Order 1-2, Ex. 59.) At the same time, IST moves this Court for summary judgment on all of the claims in Glynn's Fourth Amended Complaint that have survived my earlier rulings: FCA Retaliation (Count I), Post-Termination FCA Retaliation (Count V), declaratory judgment (Count VI), and *Haddle* claim (Count VII). I take up each of these claims separately.

### A. FCA Retaliation (Count I)

The FCA is a statutory scheme designed to discourage fraud against the federal government. *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994). It was promulgated during the Civil War in response to contractors who perpetrated "massive frauds" against the Union Army, and continues to serve as a safeguard against unscrupulous government contractors. *See Wilkins v. St. Louis Hous. Auth.*, 314 F.3d 927, 933 (8th Cir. 2002). The key provision of the FCA prohibits any person from presenting "a false or fraudulent claim for payment or approval" to the United States. 31 U.S.C. § 3729(a). There are two enforcement mechanisms to police this prohibition. First, the Attorney General can bring a civil action to remedy violations of § 3729. 31 U.S.C. § 3730(a). Second, a private party can bring a qui tam

action, which is an action brought in the name of the United States.[7] 31 U.S.C. § 3730(b); *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 412 (2005).

Congress amended the FCA in 1986, adding an anti-retaliation provision to protect whistleblowers. False Claims Amendments Act of 1986, Pub. L. No. 99-562, § 4, 100 Stat. 3153, 3157-58. The relevant part of this provision states:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h). The purpose of § 3730(h), or the whistleblower provision, is to promote enforcement of the FCA by "assur[ing] those who may be considering exposing fraud that they are legally protected from retaliatory acts." S. Rep. No. 99-345, at 34 *reprinted in* 1986 U.S.C.C.A.N. 5266, 5299 (1986). In amending the FCA, Congress sought "to halt companies and individuals from using the threat of economic retaliation to silence 'whistleblowers.'" *Id.* Accordingly, section 3730(h) creates a cause of action for employees who experience retaliation for their efforts to prevent contractor fraud against the United States.

---

[7] A qui tam action is a whistleblower claim brought by an informer, under a statute which establishes a penalty for the commission or omission of a certain act, and provides that the same shall be recoverable in a civil action, part of the penalty to go to any person who will bring such action and the remainder to go to the state or some other institution. Black's Law Dictionary 1251 (6th ed. 1990). Qui tam is derived from the "Latin phrase 'qui tam pro domino rege quam pro si ipso in hac parte sequiter' meaning 'Who sues on behalf of the King as well as for himself.'" *Id.*

Employees seeking to bring a cause of action under § 3730(h) must meet three elements derived from the statutory text. *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 343 (4th Cir. 2010). An "employee must prove that (1) he took acts in furtherance of a qui tam suit [i.e., engaged in protected activity]; (2) his employer knew of these acts; and (3) his employer took adverse action against him as a result of these acts." *Id.* In the instant action, all three elements are at issue and, therefore, are discussed in turn.

### 1. Protected Activity

Glynn claims that he engaged in protected activity by "performing an investigation of IST's submission of defective MMBJ devices to [United States Special Operations Command ("SOCOM")], opposing IST's submission of false claims to SOCOM, [and] initiating government investigations of IST's fraudulent conduct . . . ." (Glynn Mem. 7.) IST flatly denies that Glynn engaged in protected activity, maintaining that Glynn never subjectively believed that he was investigating fraud or false claims by IST (IST Reply 14), any concerns of fraud that Glynn now claims he had were not objectively reasonable (*id.* at 15-22), and the disclosures Glynn made to the Government were not objectively reasonable (*id.* at 22).

For purposes of the FCA whistleblower provisions, to take action in furtherance of an FCA claim, a plaintiff-employee need not actually file a qui tam suit. *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 867 (4th Cir. 1999). Perhaps the most typical conduct that is considered action in furtherance of an FCA claim occurs when a plaintiff investigates conduct by his employer. *See Eberhardt*, 167 F.3d 861 (4th Cir. 1999) (plaintiff formally investigated fraudulent billings); *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731 (D.C. Cir. 1998) (plaintiff collected evidence from other employees to corroborate his claims of false billing and took pictures of property that plaintiff believed was being appropriated for personal

use). Of course, investigation is not the only manner in which an employee can act in furtherance of an FCA claim, Section 3730(h) contains a non-exhaustive list of actions that employees may take, including, "investigation for, initiation of, testimony for, or assistance in an action." 31 U.S.C. § 3730(h).

Courts draw the line, however, when plaintiffs simply report their concerns to a supervisor, finding that such conduct does not raise a "distinct possibility" of a suit under the FCA. *See Zahodnick v. Int'l Bus. Mach. Corp.*, 135 F.3d 911, 914 (4th Cir. 1997) (plaintiff who reported his co-workers' false billings to his supervisor did not take acts "in furtherance of a qui tam suit" as "the record disclosed that [he] merely informed a supervisor of the problem and sought confirmation that a correction was made. . . . Simply reporting his concern of a mischarging to the government to his supervisor does not suffice to establish that Zahodnick was acting 'in furtherance of' a qui tam action"); *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 516 (6th Cir. 2000) (plaintiff who informed supervisors, union stewards, and BellSouth auditors about the falsification of repair records was not engaged in protected activity because "[a]lthough internal reporting may constitute protected activity, the internal reports must allege fraud on the government" and legal action was not a reasonable or distinct possibility where the plaintiff was "merely reporting wrongdoing to supervisors").

An employee-plaintiff claiming protected activity must show not only that his acts were in furtherance of an FCA claim, rather than mere reporting of concerns to supervisors, but also that these acts raised a "distinct possibility" of a qui tam suit. *Id.* at 515 (citations omitted); *see also Eberhardt*, 167 F.3d at 870 (adopting the "distinct possibility" standard in the Fourth

Circuit).[8] The "distinct possibility" standard serves a gatekeeping function, permitting only "situations in which litigation could be filed legitimately" and excluding those in which "an employee . . . fabricates a tale of fraud to extract concessions from the employer, or . . . just imagines fraud but lacks proof." *Neal v. Honeywell Inc.*, 33 F.3d 860, 864 (7th Cir. 1994), *abrogated on other grounds by Graham Cnty.*, 545 U.S. at 416-17. "The distinct possibility standard is an objective one. . . . [T]he consensus view is that this standard requires that

---

[8] The parties disagree over the application of the "distinct possibility" standard, both citing language from Judge Wilkinson's opinion in *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338 (4th Cir. 2010) to support their position. Accordingly, a brief discussion of that opinion is necessary. Crucially, the only element of the FCA retaliation claim at issue in *Mann* was whether the plaintiff engaged in protected activity, not the employer's knowledge of the plaintiff's acts, and not whether the employer's knowledge caused the employer to take adverse action against the employee. *See id.* at 343. The *Mann* Court noted that while some courts apply the "distinct possibility" test from the perspective of the employee, considering only those facts known to the employee during the course of the alleged protected activity, other courts take the employer's perspective, considering the facts known to the employer at the time of the alleged retaliation. *See id.* at 344.

The *Mann* Court concluded that "[t]his apparent disagreement is illusory. Courts who take the employer's perspective are merely combining the first element of § 3730(h), that the employee engaged in protected activity, with the second element, that the employer is aware of the employee's conduct." *Id.* The *Mann* Court described this approach as "perfectly reasonable" when, as here, both the protected activity and employer knowledge elements are in dispute. *Id.* However, when only the protected activity element is at issue, the Fourth Circuit only "appl[ies] the distinct possibility standard from the perspective of the facts known by the employee at the time of the protected conduct" so as to not render the employer knowledge element superfluous. *Id.* The *Mann* Court also noted that when only the protected activity element is at issue, viewing the distinct possibility standard from the employer's perspective "would deny protection to an employee who acted reasonably if the employer happened to know additional facts that defeat the possibility of an FCA action. Such a result would certainly not be consistent with Congress's intent that the FCA shield employees who take reasonable measures to oppose fraud." *Id.*

Accordingly, the *Mann* decision applied to the instant case serves only to sanction the "perfectly reasonable" approach of combining the protected activity and employer knowledge elements by considering the facts known to employee at the time of the alleged protected activity, as well the facts known to the employer at the time of the alleged retaliation to determine whether the protected activity relates to company conduct that involves an objectively reasonable possibility of an FCA action. *Id.* Although that approach may be perfectly reasonable, I choose to consider the protected activity and employer knowledge elements separately, and therefore consider Glynn's perspective at the time of the alleged protected activity only in analyzing whether Glynn engaged in protected activity. I will consider the perspective of IST at the time of the alleged retaliation in analyzing whether IST had knowledge of Glynn's acts.

protected activity relate to company conduct that involves an objectively reasonable possibility of an FCA action." *Mann*, 630 F.3d at 344. Although the distinct possibility standard is objective, it is applied from the perspective of the employee at the time of the alleged protected activity. *See id.*[9] Analysis of the protected activity element of an FCA retaliation action can thus be distilled to the requirement that an employee-plaintiff make two showings: (1) the employee took action in furtherance of an FCA claim that (2) raised a distinct possibility of suit, from the perspective of the employee at the time.

Here, Glynn claims that he engaged in protected activity by: (i) investigating and opposing IST's provision of defective MMBJ devices to SOCOM, (ii) investigating and opposing IST's false certification of compliance with the requirements in the MMBJ contract, and (iii) initiating government investigations of IST's fraudulent conduct. (Glynn Mem. 7.)

a. IST's provision of "defective" MMBJ devices to SOCOM

Though the archetypal qui tam action is filed by an employee who discovers that his employer has falsely billed under a government contract, FCA actions have also been sustained in situations where a contractor knowingly supplies the government a substandard product. *See United States v. Aerodex*, 469 F.2d 1003, 1008 (5th Cir. 1973) (contractor supplying deliberately

---

[9] *But see Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir. 2004) ("[T]he relevant inquiry to determine whether an employee's actions are protected under § 3730(h) is whether: '(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government.'") (citing *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002); *Wilkins v. St. Louis Hous. Auth.*, 314 F.3d 927, 933 (8th Cir. 2002) (adopting the *Moore* standard); *McNeil v. Empl. Sec. Dep't*, 2002 Wash. App. LEXIS 1900, at *15-16 (D.C. Cir. Aug. 9, 2002) (same)). Consistent with this standard, IST argues that Glynn never subjectively believed that he was investigating fraud or false claims by IST (IST Reply 14), and that any concerns of fraud that Glynn now claims he had were not objectively reasonable (*id.* 15-22). Consistent with Fourth Circuit precedent, however, I only consider whether, from Glynn's perspective at the time of the alleged protected activity, it was objectively reasonable for Glynn to believe that IST's conduct raised a distinct possibility of an FCA action. *See Mann*, 630 F.3d at 344.

mislabeled aircraft bearings to Navy that did not meet the specifications required by contract was liable for full amount of contract under the FCA). Glynn therefore claims that his investigation of the performance of the MMBJ-1a devices at high temperatures is protected activity under § 3730(h). (Glynn Mem. 8.) In stating that conclusion, Glynn skips the intermediate but necessary steps of demonstrating that he was in fact engaged in an investigation and that this investigation raised a distinct possibility of an FCA suit.[10] Therefore, the first inquiry is whether Glynn's actions, expressing concerns about the performance of a device to his supervisors and suggesting a recall, can be characterized as an investigation of company conduct. Or whether, consistent with the *Zahodnick* and *McKenzie* opinions, Glynn was simply reporting concerns to his supervisors. If Glynn was investigating company conduct, the follow-up inquiry is whether that conduct raised a distinct possibility of an FCA action from Glynn's perspective at the time he was performing the investigation.

With regard to Glynn's actions, there is no dispute that Glynn was vocal about his temperature testing concerns. Glynn claims he began reporting his concerns about the impact of high temperatures on the performance of the MMBJ devices as early as 2004. (Glynn Mot. Summ. J., Ex. 17, Glynn Dep. 357:5-357:15, June 30, 2008.) On August 23, 2005, Glynn wrote an email to Program Manager, Mike Caprario; Head of the IW Group, Dean Puzzo; and Lead Systems Engineer, Scott Traurig regarding power amplifier testing that Glynn had been conducting. Glynn reported that,

---

[10] Importantly, Glynn did not file a qui tam action under 31 U.S.C. § 3729, asserting that IST supplied the government with substandard products and therefore made a false claim for payment. Rather, he filed for protection under the FCA whistleblower provision, 31 U.S.C. § 3730(h), alleging that he engaged in protected activity and his employer retaliated against him as a result. In order to invoke the protection of the FCA whistleblower provision, Glynn must show "that his actions were aimed at conduct raising a distinct possibility of fraud against the United States," *Mann*, 630 F.3d at 350, not that IST's conduct is actionable under the FCA.

> [w]ithin a few minutes after the RF is turned on the temperature of the plate the amplifier is mounted to gets hot. Since the MMBJ units already have temperature sensors located close to the power amps, a simple confidence test (software only) could be developed that would measure the temperature rise in the power amps when the RF was turned on. . . . It is my recommendation that a test of this nature be developed and shipped with the systems as quickly as possible. This will give the operator the means to evaluate if the system is functional out in the field.

(*Id.*, Ex. 19.) Glynn continued to raise his concerns about the performance of the MMBJ units at high temperatures in 2006. (*See id.*, Ex. 10, Caprario Dep. 119:8-120:10, June 17, 2008; Ex. 20, Murrin Dep. 47:5-9, Nov. 16, 2010; Ex. 8, Traurig Dep. 48:17-49:18, July 23, 2008.) IST first performed the temperature testing that Glynn recommended in June 2006. (IST Rule 56 Statement Facts ¶ 59.)

IST responds that many of the decisions its management made regarding temperature testing boiled down to "producibility," which is distinct from performance. Producibility refers to the cost-effective rate at which a module or system can be produced such that it passes all tests on the first pass without need for rework. (IST Mem. 4.) Indeed, both IST and Glynn were concerned with producibility. Glynn explained during his deposition that though IST required that the MBTNS module be tested at 85 degrees Celsius, Glynn had instructed one of the employees he supervised to pass the MBTNS modules at less than 85 degrees Celsius. (IST Mot. Summ. J., Ex. 61, Glynn Dep. 395:13-396:15, June 30, 2008.) Glynn did so in order to increase producibility. (*Id.* at 395:13-396:15.)

Because some MBTNS modules were failing their RF output level requirements, in June 2006, IST performed testing on the MMBJ devices to determine whether there was adequate RF output power on the A, B, and E-bands. (*Id.*, Ex. 61, Glynn Dep. 398:3-399:5; Ex. 51, Traurig Dep. 32:12-33:6, July 23, 2008.) The tests revealed that though the MMBJ systems

met the internal IST and government specifications at the system level, many MBTNS modules were failing their module test before going to system level assembly because the E-band level was not driving the output power amplifier appropriately, while the A- and B-bands were likely being overdriven. (*See id.*, Ex. 61, Glynn Dep. 398:3-399:13; Ex. 51, Traurig Dep. 171:16-172:13.)

As a result, "[t]here was a change made to the MBTNS module whereby a particular component was added into the design to provide improved producibility. . . . [I]t involved placing a temperature-sensitive component into the – into the path that involves the generation of the E-band signal." (*Id.*, Ex. 51, Traurig Dep. 35:3-6, 19-22.) An Engineering Change Order ("ECO") was issued to add this temperature-sensitive component to the MBTNS, making the MBTNS module and the MMBJ device more producible. (*Id.*, Ex. 51, Traurig Dep. 35:16-22.) IST asserts that it did not inform SOCOM of this ECO because it only affected producibility, not performance, and it was IST's practice to only inform the government of ECO's that affect performance.[11] (*See id.*, Ex. 76, December 12, 2006 email from IST to members of SOCOM

---

[11] Glynn disputes that the testing performed in June 2006 revealed producibility issues. Rather, he claims the tests revealed performance defects. (Glynn Mem. 6.) During the motions hearing on July 15, 2011, Glynn claimed again that there were issues with the MMBJ devices' performance, not producibility. (7/15/2011 Hr'g Tr. 35:21-22.) In support, Glynn cited to an email sent by John Joseph on June 9, 2006, with the subject line: Result of MIA Output Power Test. (*Id.* at 36:1-8.) Glynn emphasizes that under "Results," the email states, "E Output: The system as is failed at 65C. Peak power is > 2 dB low and average power is > 1 dB low. The system (tested without the diplexer) failed peak power at room temp and just passed average power." (Glynn Opp'n, Ex. 56; *see* 7/15/2011 Mot. Hr'g Tr. 36:1-8.) This language, read in isolation, does indicate that the testing done on the MMBJ devices in June 2006 revealed performance defects. However, read in the context of the entire email, the language commands the conclusion that the June 2006 testing revealed producibility issues, not performance defects.

While the language emphasized by Glynn does say that "the system as is failed at 65C," read in conjunction with the other "Results," it becomes clear that the term "system" refers to each output, rather than the MMBJ device as a whole. Before the "E Output" results, are the "A & B Outputs" results, which state, "The system as is has substantial margin." (Glynn Opp'n, Ex. 56.) The "F Output" results state, "The system as is passed at 65C with < 1 dB margin in peak

15

documenting a discussion that "as agreed, [DOD-SOCOM is] to receive notification of any significant ECO, i.e., an ECO that changes unit performance in some manner. [DOD-SOCOM] will not be receiving ECOs . . . unless they change unit performance.")

Glynn told Caprario that based on test data, IST should recall the units. (Glynn Mot. Summ. J., Ex. 17, Glynn Dep. 418:1-419:7; *Id.*, Ex. 25, Dokmo Dep. 83:1-6, June 18, 2008.) IST concluded there was no need to recall the MMBJ-1a systems, however, because all the shipped systems and their MBTNS modules had been fully tested. (IST Mot. Summ. J., Ex. 51, Traurig Dep. 36:14-18.) That is, while testing demonstrated that the producibility could be increased, the performance of the systems that had already been shipped had not been compromised and IST concluded there was no reason for a recall.

It is important to consider the context: the MMBJ devices were part of a quick-reaction design, development, and deployment process that was subject to continuous improvement. In the engineering field, it is common practice to continually improve and modify a device or system in order to provide a better product. (*See, e.g.*, *id.*, Ex. 15, FMI Dep. 105:18-22.) Glynn was concerned that the MMBJ devices were not being sufficiently tested at elevated temperatures. He raised these concerns with his supervisors and IST management. IST was not immediately responsive, but eventually conducted temperature testing in 2006. That testing revealed that though the producibility of the MMBJ devices could be improved, the performance

---

power and < ½ dB margin in average power." (*Id.*) Logically, these different results indicate that the term "system" refers to each output only, as the same system could not simultaneously fail at 65C, have substantial margin, and pass at 65C with < 1 dB margin. This email thus serves to confirm the conclusion stated above: many MBTNS modules were failing their module test before going to system level assembly because the E-band level was not driving the output power amplifier appropriately, while the A- and B-bands were likely being overdriven.

The same email by John Joseph outlines the steps necessary to rework the MBTNS modules before the MMBJ systems could be shipped. As IST's counsel stated during the motions hearing, "[T]hat rework process is producibility." (7/15/2011 Mot. Hr'g Tr. 51:11-12.)

of the devices was satisfactory. As such, IST decided to not recall the devices it had already

shipped to SOCOM. IST issued an ECO in order to add a temperature-sensitive component to the

MBTNS to make it more producible and did not inform SOCOM as it was not an issue affecting

performance. Noticeably absent from this chain of events is the appearance of fraud on the

government.

The FCA is intended to protect the treasury against the claims of unscrupulous

contractors, not to penalize employee disagreements over matters of commercial judgment. *See*

*United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contr. Co.*, 612 F.3d 724, 734 (4th

Cir. 2010). Simply put, false statements sufficient to support a claim of fraud are different from

honest disagreements and routine adjustments. "Bad math is no fraud, proof of mistakes is not

evidence that one is a cheat, and the common failings of engineers and other scientists are not

culpable under the [FCA]." *Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465, 1478 (9th

Cir. 1996) (citation omitted). I do not find that Glynn, by introducing concerns over temperature

testing, or suggesting a recall of the MMBJ devices shipped before the temperature testing in

2006, was investigating fraud on the government.[12] Rather, Glynn appears to have been

performing his job function as a Principal Engineer by reporting concerns and suggesting

modifications to his supervisors. Such activity is not protected by the FCA whistleblower

provision. *See Zahodnick*, 135 F.3d at 914. Accordingly, I deny Glynn's Motion for Summary

---

[12] I do not intend to minimize Glynn's concerns over the potential risk to military lives. Glynn
may well have held the sincere belief that the MMBJ devices were not sufficiently tested at
elevated temperatures before being shipped to SOCOM and sent out into the field. However, in
order to avail himself of the whistleblower provision of the FCA, § 3730(h), Glynn had to be
engaged in protected activity—that is, he had to be investigating fraud or false claims on the
government—not simply reporting his concerns over the adequacy of testing to his supervisors.
It is worth noting that, thankfully, not a single military life has been lost as a result of IST's
MMBJ devices and that upon testing, all devices met their specifications at the system level.
(7/15/2011 Mot. Hr'g Tr. 52:14-19; IST Mot. Summ. J., Ex. 51, Traurig Dep. 171:16-172:13.)

Judgment insofar as he moves this Court to find that he engaged in protected activity by investigating and opposing IST's provision of "defective" devices to SOCOM.

        b. <u>IST's false certification of compliance with the requirements in the MMBJ contract</u>

As Glynn emphasizes, qui tam actions under the FCA have been sustained under the theory of false certification. *See, e.g.*, *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 791 (4th Cir. 1999); *United States v. Hibbs*, 568 F.2d 347, 349 (3d Cir. 1977). Glynn must demonstrate, however, that he acted in furtherance of a qui tam suit based on false certification to invoke the protection of the FCA whistleblower provision. Again, these actions must have raised a "distinct possibility" of such litigation in order to be protected under 31 U.S.C. § 3730(h).

IST had two contracts with SOCOM: Contract No. USZA26-03-C-1002, which was awarded on April 16, 2003; and Contract No. H92236-05-D-1001, which was awarded on December 17, 2004. (*See* Glynn Mot. Summ. J., Exs. 2 & 3.) Contract No. USZA26-03-C-1002 required that IST "prepare an Acceptance Test Plan to assess [the] effectiveness of the MMBJ system." (*Id.*, Ex. 2 at Bates No. EL000986.) The contract also required that IST "provide a monthly status report that detailed progress made and any issues encountered during the reporting period that have any impact on production, quality, or delivery of the jammers." (*Id.*, Ex. 2 at Bates No. EL000993.) Additionally, IST was required to prepare an Acceptance Testing Report to certify that it had conducted "performance validation tests and system's performance during testing of prototype and subsequent production tests." (*Id.*, Ex. 2 at Bates No. EL000996.) Contract No. H92236-05-D-1001 contained similar requirements.

Glynn claims that he "investigated and opposed IST's failure to meet [the contract] requirements" and therefore engaged in protected activity. (Glynn Mem. 13.) In support, Glynn cites to his own deposition and the depositions of other employees and supervisors at IST stating

that Glynn raised concerns about the lack of temperature testing. (*Id.*) As discussed above, however, raising concerns about the lack of temperature testing alone does not raise a distinct possibility of litigation. Importantly, though, Glynn claims that in addition to his requests that IST perform temperature testing on the MMBJ devices, he raised concerns over IST's lack of specifications for the design and manufacture of the MMBJ device. (*Id.*) Glynn claims that in 2004 he complained to Puzzo about the lack of specifications and he asked Traurig to see the contract specifications for the modules he was designing. (Glynn Mot. Summ. J., Ex. 17, Glynn Dep. 367:6-20; 369:16-17.) Again in 2006, Glynn claims that he requested the contract specifications from Puzzo and Caprario, who refused Glynn's request. (*Id.* at 421:14-422:14.)

Caprario, however, had a different recollection of Glynn's request to see the contracts. During his deposition, he testified, "[h]e basically came into my office and asked to see the contract documents. I don't remember the exact substance, but I offered to open the safe and show him whatever was available in there in terms of the statement of work or the spec or that kind of thing, but I told him as far as contracts go, that was really up to the front office to make that determination." (IST Mot. Summ. J., Ex. 49, Caprario Dep. 218:16-219:1, June 17, 2008.) Similarly, Warren Murrin, President of IST, testified that,

> Dennis [Glynn] had been offered to see the specifications and statement of work, which are classified, that Dean [Puzzo] offered to open up the safe and show them to him. Dennis [Glynn] wanted to see the contract. Like I said, the first few pages of a contract, all they are are pricing information, contact information, signature pages. There's no need for anyone to see that type of information – for the general employee to see that type of information. But the bulk of the work – the bulk of the document in a contract is the specifications, statement of work that the engineers are building to, how many units, what is it supposed to do, what temperatures, what's this, what environment should it be tested in, what is the quality plan supposed to be like. . . . All that. So he had access to all that.

(*Id.*, Ex. 5, Murrin Dep. 50:4-21, Nov. 16, 2010.) Further, it is IST's contention, through its corporate designee, that "Mr. Puzzo asked Mr. Glynn if you want to see those specifications, to actually send him a request in writing and that he would provide them. And, to the best of my knowledge, Mr. Glynn never asked via E-mail or via written request." (*Id.*, Ex. 4, IST Dep. 120:13-18, November 17, 2010.)

While there is a factual dispute regarding whether Glynn was permitted to see the contract specifications, it is undisputed that Glynn made a verbal request to see them. By raising concerns about temperature testing and asking to see the contract specifications, Glynn was engaged in more than simple reporting of a concern to supervisors. Glynn's actions constituted an investigation. The inquiry thus becomes whether this investigation was aimed at conduct that raised a distinct possibility of an FCA action for false certification, given what Glynn knew at the time of his investigation.

It is undisputed that Glynn never saw the contract specifications before discovery commenced. However, Glynn claims that,

> he knew from his approximately 19 years of working for defense contractors that IST would have been required by its military customer to adopt and maintain a written Quality Assurance Program. Glynn also knew that defense contractors were required to implement configuration management plans to track revisions to designs and therefore he reasonably believed that IST was defrauding the Government by billing for CIED jammers that were produced without both a quality assurance and configuration management plan.

(Glynn Opp'n 16.) During his June 30, 2008 deposition, Glynn testified regarding his perception of the management of the contract that, "I didn't believe adequate configuration control or quality assurance was being performed on those systems, and I can't imagine that any government contract wouldn't require those types of things." (Glynn Mot. Summ. J., Ex. 17, Glynn Dep. 434:15-19.)

During Glynn's deposition on June 19, 2008, Glynn was shown four documents, which he claimed he had never seen prior to his FOIA request. Glynn described one as "related to the quality assurance plan and the acceptance test procedure for the MMBJ-1A," another as "one of the appendixes to the Quality Assurance Manual." (IST Mot. Summ. J., Ex. 24, Glynn Dep. 193:3-5; 197:21-22, June 19, 2008.) When asked if he had been involved in the drafting of a quality assurance plan, Glynn responded,

> A. No I was not. Mr. Caprario used – I believe used the boiler plate of Dedicated Electronics quality assurance plan when he crafted this ATP
> Q. And what leads you to believe that he did that?
> A. Because I recall giving him a copy of mine and then in the time period, he indicated to me that he had to submit one to the government and I remember seeing remnants of a modified plan by the copy machine, so I believe that he did.
> Q. And did you ever – other than what you saw around the copy machine, did you ever see the [quality assurance plan][13] that Mr. Caprario prepared?
> A. No, I hadn't, and that was surprising . . .

(IST Mot. Summ. J., Ex. 24, Glynn Dep. 196:18-197:10.)

Glynn admitted that when it came to what he perceived to be a loosely managed contract, "I didn't know whether or not it was a problem with IST or whether or not it was a problem at SOCOM" and that he "wasn't necessarily complaining that IST was doing something wrong. I was definitely complaining that the result were systems that would likely put our troops in harm's way." (Glynn Mot. Summ. J., Ex. 17, Glynn Dep. 434:19-435:2.) These admissions cast doubt on whether Glynn's investigation of false certification raised a distinct possibility of an

---

[13] There was slight confusion during this deposition regarding whether it was a quality assurance plan or an accepted test procedure. Later in the deposition, however, it was clarified that Glynn had supplied Caprario with a Dedicated Electronics Quality Assurance Plan to use in drafting a similar plan for IST. (*See* IST Mot. Summ. J., Ex. 24, Glynn Dep. 199:14-16, "I had no direct involvement other than supplying Mike Caprario with the Dedicated Electronics Quality Assurance Plan.")

FCA suit from his perspective. *See Green v. St. Louis*, 507 F.3d 662, 668 (8th Cir. 2007) ("[I]f [employee] had no reason to believe there was a false or fraudulent statement, he is not protected from retaliation under the False Claims Act" even if he thought employer's certifications were "flawed").

It is undisputed that Glynn did not see the contracts and the specifications they contained. Without knowledge of the contract requirements, it is very difficult to characterize as objectively reasonable Glynn's belief that IST was falsely certifying its compliance with the contract requirements. *See, e.g.*, *Mann*, 630 F.3d at 345 ("[plaintiff's] admission that he never read the final version of the bid until the onset of this litigation casts some doubt on his claims . . . [his belief of purported fraud] may well be his sincere belief, but it is not an objectively reasonable one.")

Glynn's position is that based on his experience in the industry, he believed that IST would be required to have a quality assurance and configuration management plan in place. Glynn claims that he believed that IST had not established such plans because he was never provided any contract specifications with which to work. The objective reasonableness of Glynn's belief is severely undermined, however by Glynn's testimony that he provided Caprario with a boilerplate Quality Assurance Plan and that he saw a modified version of this plan around the copy machine. Combined with the fact that Glynn had never seen the contracts, Glynn's testimony compels my decision to deny Glynn's Motion for Summary Judgment insofar as he claims he engaged in protected activity by investigating IST's false certification of compliance with the MMBJ contracts.

c. <u>Initiation of government investigations into IST's fraudulent conduct</u>

The plain language of § 3730(h) protects employees who initiate actions under the FCA. Additionally, "supplying information that set[s] off an investigation" is considered an investigatory activity. *Neal v. Honeywell Inc.*, 33 F.3d 860, 864 (7th Cir. 1994). Glynn contacted the U.S. Attorney's office to raise concerns about IST's device testing on September 13, 2006. (Glynn Mot. Summ. J., Ex. 17, Glynn Dep. 425:14-19.) Glynn then met with investigators from the Inspector General's office of DOD, during which Glynn claims to have "raised the concerns related to the fraud that I believe IST has committed on the MMBJ contracts." (*Id.*, Ex. 9, Glynn Dep. 223:3-8, June 19, 2008.) Glynn was referred to Agent Benjamin Hochberger, a Special Agent with the Inspector General's office of DOD, with whom he had frequent contact during October 2006. (*Id.*, Ex. 17, Glynn Dep.440:21-441:6.)

Glynn claims that he communicated to Agent Hochberger his concerns over:

> 1) IST's falsely billing SOCOM for research and development costs by 'amortizing the development cost into the unit price' of the dual band transceiver and then billing 'the government for the units at the inflated price'; 2) IST's failure to test the MMBJ devices; 3) IST's failure to implement a quality control system with respect to the MMBJ devices; 4) IST's failure to recall MMBJ-1A devices shipped prior to July 25, 2006 and retrofit them to ensure they met the operating requirements at temperature for the E-band; and 5) IST's failure to inform SOCOM of the inability of the MMBJ-1A to perform at its operating requirements for temperature.

(Glynn Mem. 15.)

Certainly, by communicating with the U.S. Attorney's office and the Inspector General's office of DOD, Glynn engaged in either initiation of an action or an investigatory activity. But the question remains whether Glynn's acts were aimed at company conduct that raised a distinct possibility of an FCA action given what Glynn knew in September 2006. By that time, IST had performed temperature testing on the MMBJ devices and found that the MMBJ systems met the internal IST and government specifications at the system level. (*See id.*, Ex. 51,

Traurig Dep. 171:16-172:13.) Glynn was aware that the MMBJ systems that had shipped before the temperature testing in June 2006 had passed the tests. (*See* IST Mot. Summ. J., Ex. 77.) Therefore, given what Glynn knew at the time he contacted the U.S. Attorney's office in September 2006, the company conduct alleged by Glynn—that IST failed to test, failed to recall, and failed to inform SOCOM of defects—did not raise an objectively reasonable, distinct possibility of an FCA action.

Regarding the portion of Glynn's report that claimed IST falsely billed SOCOM for research and development costs by "amortizing the development cost into the unit price" of the dual band transceiver and then billed "the government for the units at the inflated price," the only evidence presented on the summary judgment record concerning the reasonableness of this allegation is Glynn's own email sent to Agent Hochberger asserting false billing. It is well-settled in this Circuit, however, that a mere self-serving opinion is insufficient at the summary judgment phase. *See Williams v. Giant Food, Inc.*, 370 F.3d 423, 433 (4th Cir. 2004) (citing *Nat'l Enters., Inc. v. Barnes*, 201 F.3d 331, 335 (4th Cir. 2000); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996)). Importantly, it is undisputed that Glynn himself had not seen the contract before making this report of false billing to Agent Hochberger. Glynn has thus introduced no evidence, aside from his own opinion stated in his email to Agent Hochberger, regarding whether IST's billing raised an objectively reasonable, distinct possibility of an FCA action.[14] Without knowledge of the terms of the contract, and no other stated basis for

---

[14] Glynn does cite to Agent Hochberger's email response, which corroborates Glynn's report to an extent, stating, "[l]ooking at the attachment, . . . It looks like the type of cost that is not allowable in most DoD contracts," but Agent Hochberger continues, "[h]owever, I would have to see the contract to know for sure." (Glynn Mot. Summ. J., Ex. 32 at Bates No. EL000266.) Setting Agent Hochberger's tentative opinion aside, however, Glynn claims to have engaged in protected activity by initiating a government investigation into IST's conduct. Accordingly, it was the initiation of the investigation that must have raised a distinct possibility of an FCA

his belief that IST was engaged in false billing, Glynn's report of false billing cannot be labeled objectively reasonable and, therefore, could not have raised the distinct possibility of an FCA action.

That leaves only Glynn's report to Agent Hochberger that IST failed to implement a quality control system with respect to the MMBJ devices. As discussed above, the fact that Glynn had provided a boilerplate for a Quality Assurance Plan to Caprario and saw "remnants of a modified plan" around the copy machine belies the existence of an objectively reasonable basis for Glynn to believe in late 2006, when he communicated with Agent Hochberger, that IST's conduct raised a distinct possibility of an FCA action. I therefore deny Glynn's Motion for Summary Judgment insofar as he claims he engaged in protected activity by initiating government investigations of IST's conduct.

In sum, Glynn has failed to demonstrate that as a matter of law he engaged in protected activity that raised a distinct possibility of an FCA suit. Accordingly, I deny Glynn's Motion for Summary Judgment with respect to the protected activity element. It follows from this conclusion that summary judgment for IST on Glynn's FCA retaliation claim is proper. *See Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 343 (4th Cir. 2010) ("Employees seeking to bring a cause of action under § 3730(h) must meet three elements derived from the statutory text.") (citation omitted); *Luckey v. Baxter Healthcare Corp.*, 2 F. Supp. 2d 1034, 1051 n.12 (N.D. Ill. 1998) ("[I]f the first element, which requires an employee to engage in 'protected activity,' is not met, then neither the second nor the third elements, which assume 'protected

---

action. At the time that Glynn initiated the government investigation, he did not know Agent Hochberger's opinion, nor was he aware of the contents of IST's contracts, rendering his report of IST's false billing objectively unreasonable.

activity,' can possibly be met."), *aff'd*, 183 F.3d 730 (7th Cir. 1999). Nevertheless, I will discuss the remaining two elements of a prima facie claim under § 3730(h).

### 2. IST's Knowledge

The second element of a cause of action under § 3730(h) is that "the employer knew of these acts [taken by the employee in furtherance of a qui tam suit]." *Mann*, 630 F. 3d at 343. Knowledge is required because "[w]ithout evidence of any knowledge on the part of [the employer], [an employee] cannot establish the necessary causal connection between the alleged protected activity and [the employee's] termination of employment . . . ." *Zahodnick*, 135 F.3d at 914. The employer must have knowledge of more than the employee's acts; the employer must have known that these acts raised a distinct possibility of a FCA suit. *See Yesudian*, 153 F. 3d at 742 ("[T]he kind of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged. What defendant must know is that plaintiff is engaged in protected activity as defined above–that is, in activity that reasonably could lead to a False Claims Act case."); *Luckey*, 2 F. Supp. 2d at 1051 n.12 ("[W]ith respect to the second element, it is easy for the employer to know about an employee's activities, but the element requires more. The employer must also know that these activities constitute 'protected activity.'")

At the time Glynn was conducting what he labels an investigation of IST's provision of substandard MMBJ devices to SOCOM, IST had no knowledge that Glynn suspected fraud or illegality. Glynn admits that he did not tell IST management that he felt the company was making false claims to the government (IST Mot. Summ. J, Ex. 61, Glynn Dep. 382:21-383:3, 386:11-387:11, 423:8-14), although Glynn did make his concerns about temperature testing known to IST management (*see id.*, Ex. 10, Caprario Dep. 119:8-120:10; Ex. 20, Murrin Dep. 47:5-9; Ex. 8, Traurig Dep. 48:17-49:18). IST expected Glynn "to suggest technical

improvement and raise concerns related to technical performance" as an engineer tasked with designing key modules and components. (IST Mem. 24.) IST management thus understood Glynn to be raising concerns inherent to his engineering responsibilities, not concerns about fraud.[15] *See Owens*, 612 F.3d at 735 ("Any enterprise depends on communication, so it is hardly surprising that [plaintiff] at times reported problems he thought he saw on the site. That he did so does not, of itself, indicate an investigation into possible wrongdoing."); *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 733 (7th Cir. 1999) ("An employer is entitled to treat a suggestion for improvement as what it purports to be rather than as a precursor to litigation.").

On June 9, 2006, Glynn told Lewis Dokmo, Vice President of IST, that Glynn and other employees were having trouble sleeping at night because they worried that soldiers' lives were being put at risk. (Glynn Mot. Summ. J., Ex. 17, Glynn Dep. 419:22-420:5; Ex. 27, Notes of June 9, 2006 Meeting.) However, Glynn also told Dokmo that he did not want Dokmo to relay his concern to other members of IST management. (*See* IST Mot. Summ. J., Ex. 4, IST Dep. 119:1-2 ["Mr. Glynn said 'I do not want you to do anything at this time.'"].) Of course, a few months later, in the fall of 2006, several employees at IST learned second- or third-hand that

---

[15] The scope of Glynn's duties as an engineer did not include investigating fraud. Only in cases where a "fraud-alert" employee is conducting an FCA investigation have courts required the heightened notice requirement that the employee use words like "illegal" or "unlawful" to describe the  concerns to the employer in order for the employer to be placed on notice under § 3730(h). *See Eberhardt*, 167 F.3d at 867-68; *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1523 n.7 (10th Cir. 1996); *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951-52 (5th Cir. 1994). In the context of an employee who does not have such investigatory duties there are no "magic words," and an employee need only show that the employer was aware of the employee's investigation. *See Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 484 (7th Cir. 2004) (employee's report to company management that he had met with a federal official and the company's initiative was "unallowable" was sufficient to place the company on notice of employee's investigation). Glynn, however, never used language approximating "unallowable" and unlike the plaintiff in *Fanslow*, he never told IST management at the time he was "investigating" their provision of "defective" MMBJ devices to the government that he had or planned on meeting with federal officials.

Glynn had raised concerns with the government over the performance of the MMBJ units at high temperatures. (*See e.g.*, Glynn Mot. Summ. J, Ex. 11, Dokmo Dep. 54:14-21, June 13, 2008; Ex. 16, Puzzo Dep. 37:12-39:9, June 16, 2008.) Therefore, IST management at least had knowledge that Glynn had reported his concerns about temperature testing and the quality of the MMBJ devices to the government in late 2006. *See Yesudian*, 153 F. 3d at 743 ("Merely grumbling to the employer about job dissatisfaction or regulatory violations does not satisfy the requirement– just as it does not constitute protected activity in the first place. Threatening to file a qui tam suit or to make a report to the government, on the other hand, clearly is one way to make an employer aware.").

When Glynn requested the MMBJ contracts, engaging in what he maintains was an investigation of IST's false certification of compliance with the MMBJ contract requirements, Glynn did not express a concern to management that IST was engaging in fraud or failing to comply with its contractual requirements. (*See* IST Mot. Summ. J., Ex. 49, Caprario Dep. 218:7-11; Ex. 5, Murrin Dep. 51:8-15.) IST management thus had no knowledge that Glynn was investigating what he perceived to be false certification. In fact, Puzzo testified that he became concerned when Glynn requested the MMBJ contracts that Glynn might be trying to compete with IST because Glynn requested not just the technical portions of the contract, but the entire contract, which contained pricing, cost, and customer information. (*See id.*, Ex. 36, Puzzo Dep. 42:12-43:6, June 16, 2008.)

Regarding Glynn's initiation of a government investigation, as stated above, prior to Glynn's termination, several employees at IST learned that Glynn had raised concerns with the government over the performance of the MMBJ units at high temperatures. (*See, e.g.*, Glynn Mot. Summ. J, Ex. 11, Dokmo Dep. 54:14-21; Ex. 16, Puzzo Dep. 37:12-39:9.) The IST

employees were informed of Glynn's actions by Phil Joseph, in whom Glynn had confided, asking Joseph to not disclose the information to anyone at IST. (*See id.*, Ex. 17, Glynn Dep. 426:10-429:15.) Puzzo testified that he was told around the end of September or early October 2006 that Glynn had made a disclosure to the government "questioning the integrity of the MMBJ system." (*Id.*, Ex. 16, Puzzo Dep. 37:12-39:9.) Puzzo explained that Caprario immediately told his point of contact with the customer, SOCOM, that there was a potential claim of this nature and the customer came to do an assessment, so Puzzo felt there was no need to initiate any further action to address Glynn's concerns. (*Id.*, Ex. 16, Puzzo Dep. 40:9-21.) Indeed, while IST management knew that Glynn had contacted the government regarding the quality of the MMBJ devices, as of November 8, 2006, IST management does not appear to have had any knowledge that Glynn had initiated an investigation of an FCA claim. Agent Hochberger wrote to Glynn on that day:

> [W]e haven't done anything overt yet to signal to the company that we're interested in them at all. *In fact, they don't know anybody in the government is interested in them*, beyond the customer who they notified themselves. *As far as they know, the customer has tested their products based upon the concerns IST initiated itself*. The only thing I can pass along is already known to the company and perhaps to yourself. The customer recalled a sample of earlier versions of the unit (prior to design modifications) and ran that sample through the same temperature testing protocol as the first sample. *Those units passed as well*.

(IST Mot. Summ. J, Ex. 177 at Bates No. EL000251) (emphasis added). Accordingly, though members of IST management knew that Glynn had reported to the government concerns over the integrity of the MMBJ devices, IST did not have knowledge that Glynn was initiating a government investigation in furtherance of a qui tam suit.

In sum, even were Glynn to have demonstrated that he engaged in protected activity and therefore acted in furtherance of a qui tam suit, the facts appear undisputed that except for

knowledge of Glynn's communication with the government over the quality of the MMBJ devices, IST did not have knowledge of what Glynn labels his protected activity. At most, then, IST knew that Glynn had reported to the government his concerns over temperature testing and what he perceived to be defective devices. To make out a claim for FCA retaliation, however, Glynn must demonstrate that not only did IST have knowledge of Glynn's reports of concern to the government, but also that IST took adverse action against Glynn as a result.

### 3. Causation

The third element of a cause of action under § 3730(h) requires an employee-plaintiff to prove that "his employer took adverse action against him as a result of these acts." *Mann*, 630 F.3d at 343. The FCA's legislative history requires an employee to show that "the retaliation was motivated, at least in part, by the employee's engaging in protected activity. Once [this] element[] [has] been satisfied, the burden of proof shifts to the employer to prove affirmatively that the same decision would have been made even if the employee had not engaged in protected activity." S. Rep. No. 99-345 at 35, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5300.[16] The Sixth Circuit has thus observed that "[a]n employee must supply sufficient facts from which a

---

[16] The parties dispute whether a mixed-motive or pretext analysis is appropriate in FCA cases. Glynn applies a mixed-motive theory in his Motion for Summary Judgment. (*See* Glynn Mem. 15-18.) IST responds, however, that the Fourth Circuit has never indicated that the mixed-motive standard applies to cases filed pursuant to the FCA, and argues that where an employer articulates a legitimate, non-pretextual reason for termination in an FCA retaliation case, summary judgment is proper. (IST Mem. 27 n.17.) *See United States ex rel. Phillips v. Pediatric Serv. Of Am., Inc.*, 142 F. Supp. 2d 717, 734-35 (W.D.N.C. 2001) (no FCA retaliation where employer came forward with legitimate explanation for termination).

    Certainly, the FCA's legislative history directs a pretext analysis. *See* S. Rep. No. 99-345 at 35, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5300. Indeed, many of the courts considering FCA retaliation claims apply a pretext analysis similar to the *McDonnell Douglas* framework. *See Phillips*, 142 F. Supp. 2d at 734-35; *Liburd v. Bronx Lebanon Hosp. Ctr.*, 372 F. App'x 137, 139 (2d Cir. 2010); *Scott v. Metro. Health Corp.*, 234 F. App'x 341, 346 (6th Cir. 2007); *Faldetta v. Lockheed Martin Corp.*, 2000 U.S. Dist. LEXIS 16216, at *45 (S.D.N.Y. Nov. 9, 2000). I therefore find it appropriate to apply a pretext analysis here.

reasonable jury could conclude that the employee was discharged because of activities which gave the employer reason to believe that the employee was contemplating a qui tam action against it." *United States ex rel. McKenzie v. Bellsouth Telecomms., Inc.*, 123 F.3d 935, 944 (6th Cir. 1997). In other words, an employee must provide some evidence that would allow a reasonable jury to draw the required causal inference. Such evidence is absent on the summary judgment record.

Glynn asserts he has ample direct evidence of retaliation in his Motion for Summary Judgment. Yet the evidence he trots out in his motion is neither ample nor direct. Glynn claims the following:

> (1) IST's Program Manager Mike Caprario was "angry" and "disappointed" by the fact that Glynn had made a disclosure to the Department of Defense.
> (2) Mike Caprario was "frustrated" by Glynn's complaint and Caprario indicated to John Joseph that Caprario thought it was inappropriate for Glynn to go to the DOD.
> (3) IST's CEO Warren Murrin was also "upset" at learning that Glynn had raised concerns with the Government.
> (4) Murrin admitted that his reason for terminating Glynn's employment from IST was because of the "resentment" other IST employees, including Puzzo, Caprario and Traurig, harbored for Glynn.
> (5) IST Supervisor John Joseph conveyed to Lorraine Wolfram that IST's decision to bar Glynn from entering the assembly room and from directly communicating with the assemblers was because Glynn had reported his concerns to the government that the MMBJ devices were faulty.

(Glynn Mem. 16.) Unfortunately for Glynn, stray or isolated comments unconnected to the employment decision do not constitute direct evidence of retaliation. *O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 548-49 (4th Cir. 1995) ("[T]he decisional law clearly reflects that isolated and ambiguous statements are too abstract, in addition to being irrelevant and prejudicial, to support a finding of [] discrimination." (internal quotations and citations omitted)), *rev'd on other grounds*, 517 U.S. 308 (1996).

Glynn claims that "[w]ith the foregoing direct evidence, [he] has demonstrated enough to show that his protected activity was a motivating factor in his termination from IST." (Glynn Mem. 17.) I disagree. Even assuming *arguendo* that Glynn engaged in protected activity, and that IST had knowledge of Glynn's protected activity, the fact that members of IST management expressed feelings of disappointment, frustration, or anger upon learning of this activity does not supply sufficient facts from which a reasonable jury could conclude that the employee was discharged because of the activity. *See Owens*, 612 F.3d at 736 ("To suggest that a coworker's taking umbrage at [plaintiff's] criticism of his work is sufficient to show that [the employer] was attempting to punish [plaintiff] for investigating fraud borders on the frivolous.").

Moreover, even had Glynn provided some evidence that would allow a reasonable jury to draw a causal inference between Glynn's discharge and the acts he claims were protected, IST easily demonstrates that it had a legitimate, non-pretextual reason for terminating Glynn: his bad behavior. Of course, Glynn claims that IST's allegation of bad behavior is pretextual and that IST discharged him in retaliation for engaging in protected activity. (*See* Glynn Opp'n 22.) Glynn asserts that he can make this showing in "at least twenty different ways." (*Id.*) Of Glynn's twenty points, however, several serve only to rehash arguments made separately in his motion,[17] and others are undeserving of analysis.[18] Glynn's point that most directly contests IST's stated

---

[17] (*See, e.g.*, Glynn Opp'n 32 "IST Knew of Glynn's Protected Activity"; *id.* at 34 "IST Brought Baseless Claims Against Glynn and FMI"; *id.* at 35 "IST Hid the Contracts Away from Glynn.")
[18] (*See, e.g.*, Glynn Opp'n at 34 "IST Managers Changed Their Demeanor Toward Glynn"; *id.* at 35 "IST Viewed With Suspicion Anyone Friendly to Glynn.") Glynn stands to benefit from the advice imparted in *Settle v. Baltimore County*, 34 F. Supp. 2d 969 (D. Md. 1999): "while it is certainly true that a court should examine instances of alleged discriminatory treatment holistically and not atomistically, this does not mean that evidence of a large number of meritless claims (or non-cognizable allegations) attains probative value when such claims are aggregated." *Id.* at 985 (citation and quotation omitted).

reason for his termination, that his "Alleged Performance and Behavior Issues Only Arose After Glynn Engaged in Protected Activity," (*id.* at 26) is belied by the record.

Glynn cites his two positive performance evaluations in 2005 and 2006 to support his position that IST never took issue with his behavior before he engaged in protected activity. (*See* Glynn Opp'n 26.) However, these performance evaluations took place in April of each year, and April 2006 came a full eight months before Glynn was terminated and four months before the Director of Human Resources, Gloria Jacobson and Puzzo received complaints about Glynn from two of the assemblers he supervised. (*See* 7/15/2011 Mot. Hr'g Tr. 21:6-22.) "A satisfactory performance review may be used to show that an employee was meeting expectations. But, [the employee] must also show that he was meeting expectations at the time of the adverse employment action." *Pilger v. D.M. Bowman, Inc.*, 2011 U.S. Dist. LEXIS 59720, at *14-15 (D. Md. 2011) (internal quotation and citation omitted); *see O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 547 (4th Cir. 1995) (employee's 1989 performance review was irrelevant to determination of whether his performance was satisfactory when he was terminated in 1990), *rev'd on other grounds*, 517 U.S. 308 (1996). Glynn's behavior became increasingly problematic throughout the course of 2006, prompting IST to terminate him in December 2006, and rendering Glynn's April 2006 performance review only marginally relevant.

In August of 2006, two assemblers, Michele Russell and Lindsey Monahan, requested an off-site meeting with Puzzo, and then met with Jacobson to lodge complaints about Glynn.[19] Jacobson's notes from these meetings state that the assemblers complained that Glynn was

---

[19] Glynn denies many of the allegations that the assemblers made in their complaint to Jacobson. (*See* Glynn Opp'n 25 n.29.) The probative value of these complaints, however, is that they were made at all. While Glynn may take issue with the veracity of the employees' complaints, the Fourth Circuit has repeatedly held that "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000).

obsessed with control, would not allow them to make suggestions, refused to allow them to help others, was a chauvinist, yelled at them, and created a very difficult work environment.[20] (*See* IST Mot., Ex. 93 at Bates No. D-00000122-124.)

Jacobson called Ted Gorski, an outside behavior analyst, to work with the IW Group in the Spring of 2006. Gorski asked managers at IST, including Glynn, to participate in an online assessment, which evaluated the managers' personality traits, communication style, and interactive abilities. (*See* IST Mot., Ex. 98, Gorski Decl. ¶ 5.) The April 12, 2006 online assessment found that, among other traits, Glynn has a tendency to have trouble delegating, be argumentative, lack tact and diplomacy, and push and pull rather than motivate in directing people. (*Id.*, Ex. 98, Gorski Decl. ¶ 6.) After meeting Glynn, Gorski states that he believed the online assessment accurately described Glynn's negative attributes. (*Id.*, Ex. 98, Gorski Decl. ¶ 6.) Gorski contends that he had phone conversations with Jacobson in August about Glynn's negative attitude and behavior.[21] (*Id.*, Ex. 98, Gorski Decl. ¶ 7.)

On August 23, 2006, Jacobson sent Puzzo and Murrin a memo stating, among other things, that "Dennis [Glynn] is no longer worthy of remaining as Team Leader. . . . He demonstrates behaviors that are not only against company policies, but may also be considered

---

[20] During the motions hearing on July 15, 2011, Glynn argued that the complaints were made about Dan Rice's behavior, not Glynn's. (*See* Mot. Hr'g Tr. 32:10-13.) While Jacobson's notes do contain complaints about Dan Rice, they also clearly reference Dennis Glynn and contain extensive complaints regarding Glynn's behavior. (*See* IST Mot., Ex. 93 at Bates No. D-00000121-24.)

[21] Glynn objects to Gorski's account because Gorski is not an expert witness, claiming that Gorski's opinions must be disregarded as inadmissible. (Glynn Opp'n 31 n. 39.) I do not rely on the content of Gorski's assessment of Glynn's behavior as an expert's opinion, however. Rather, I am focusing on the time period during which Gorski gave his assessment. Gorski was hired by IST in the Spring of 2006 and had conversations with Jacobson about what they perceived to be Glynn's negative behavior in August 2006. All of this occurred prior to Glynn's report to the government on September 13, 2006. Moreover, Gorski's assessment was before IST employees when they made the decision to terminate Glynn.

illegal. His autocratic behavior is counter-productive and not representative of the way we treat people here at IST. It affects our professionalism and the production of our workforce." (IST Mot., Ex. 92 at Bates No. 00000279.) It is undisputed that on September 12, 2006, Jacobson, Puzzo, and Gorski met with Glynn to remove him as supervisor over the three assemblers and Dan Rice. (*See* IST Statement of Facts ¶ 116; Glynn Opp'n, Ex. 2, Glynn Response to IST Facts ¶ 116.) The next day, September 13, 2006, Glynn began his external reporting to the government. (*See* IST Statement of Facts ¶ 119; Glynn Statement of Facts ¶ 56.)

This series of events ranging from Spring through Fall of 2006, contradicts Glynn's assertion that his "Alleged Performance and Behavior Issues Only Arose After Glynn Engaged in Protected Activity." (Glynn Opp'n 26.) IST employees and decisionmakers viewed Glynn's behavior as problematic well before Glynn first reported his concerns to the government, severing the nexus between Glynn's termination and his reports to the government, which he alleges to be protected activity.[22] *See Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2005) ("[A]ny inference of causation that might arise out of the temporal proximity is more than rebutted by the facts that, prior to the protected activity, [plaintiff] had been told that her performance was sub-par and that she should prepare to leave . . . ."); *Scott v. Metro. Health Corp.*, 234 F. App'x 341, 348-51 (6th Cir. 2007) (affirming summary judgment for employer with respect to employee's FCA retaliation claim and finding no pretext where employer had several reasons to terminate plaintiff based on numerous complaints about plaintiff's conduct both before and after alleged protected activity).

---

[22] If anything, the one-day time lapse between the removal of Glynn's supervisory duties on September 12, 2006 and Glynn's report to the government on September 13, 2006 demonstrates a potential motivating factor behind Glynn's decision to contact the government.

It is perfectly legitimate for an employer to terminate an employee who proves toxic to a work environment. *See Collier v. Charlottesville Sch. Bd.*, 218 F. App'x 244 (4th Cir. 2007) (per curiam) (upholding district court's grant of summary judgment for employer on employee's discrimination and retaliatory discharge claim as "the record is replete with evidence of [the employee's] history of poor work habits, attitude, and work ethic"); *cf. Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 278-81 (4th Cir. 2000) (poor performance was a legitimate, non-pretextual reason for discharging employee). IST has provided ample evidence that Glynn was such an employee. Accordingly, I find that IST terminated Glynn legitimately, and without pretext, based on Glynn's poor behavior.

Even assuming *arguendo* that Glynn engaged in protected activity by reporting his concerns about the MMBJ devices to the government, and that IST had knowledge of this protected activity, Glynn has failed to set forth facts demonstrating that his discharge was motivated, even in part, by protected acts. Even if he had, IST has easily met its burden of proof that the same decision would have been made despite these protected acts. None of Glynn's twenty assertions as to pretext is sufficient to create a genuine issue of material fact as to pretext, or to avert summary judgment. I therefore deny Glynn's Motion for Summary Judgment as to retaliation and grant IST's Motion for Summary Judgment as to Glynn's FCA Retaliation claim (Count I).

**B. Post-Termination FCA Retaliation (Count V)**

To establish a claim for post-termination retaliation, Glynn must demonstrate that IST's counterclaims were brought "with a retaliatory motive and without a reasonable basis in fact or law." *Darveau v. Detecon, Inc*., 515 F.3d 334, 341 (4th Cir. 2008) (citing *Bill Johnson's Rests.,*

*Inc. v. N.L.R.B.*, 461 U.S. 731, 743 (1983)).[23] IST moves this Court to grant summary judgment in its favor, stating that "Glynn cannot make either of these mandatory showings, compelling summary judgment for IST . . . ."[24] (IST Mem. 36.)

Indeed, the only allegation Glynn makes that IST's counterclaims are "without a reasonable basis in fact or law" is "[w]hen IST brought its counterclaims, it was unable to identify any evidence to support the claims. For example, at a Rule 30(b)(6) deposition and in interrogatory responses, it could not identify any damages sustained as a result of Glynn's conduct, any competitive threat posed by Glynn and could not identify a single 'trade secret.'" (Glynn Opp'n 39.) Yet, as this Court noted during the July 28, 2008 hearing regarding Glynn's Motion for Preliminary Injunction,

> I've certainly heard plenty of things during the course of this hearing to say that [Glynn] became a disgruntled employee, and any reasonable employer would have said enough is enough, we can't put up with it anymore. Knowing there's a risk for a retaliation suit, they discharge him. And they certainly are perfectly free, after they learn what they've learned during the course of this case, to say, look, we've got claims against him, then pursue them. And there's nothing wrong with that.

(7/28/08 Mot. Hr'g Tr. 189:11-19.) IST claims that during the course of discovery, IST formed the opinion that "Glynn had breached its Employment Agreement, taken IST's confidential information, and made efforts to compete against IST, using its technology for his own purposes

---

[23] It is worth noting that at least two district courts have found that FCA § 3730(h) does not provide remedies for post-termination retaliation. *See Wright v. Cleo Wallace Ctrs.*, 132 F Supp.2d 913, 928 (D. Colo. 2000) ("Section 3730(h) specifically provides remedies for retaliatory discharge but not for acts of retaliation subsequent to termination. [Plaintiff] provides no authority for such a broad reading of the provision or for his efforts to graft the law of Title VII retaliation onto the FCA."); *Lehoux v. Pratt & Whitney*, 2006 U.S. Dist. LEXIS 5452, at *5-7 (D. Me. Feb. 8, 2006). *But see Darveau v. Detecon, Inc.*, 515 F.3d 334, 342 (4th Cir. 2008) (observing in a FLSA suit the "almost uniform practice of courts in considering the authoritative body of Title VII case law when interpreting the comparable provisions of other federal statutes." (citations omitted)).

[24] IST also asserts that summary judgment is proper because IST had to assert its counterclaims or risk waiving them entirely under Fed. R. Civ. P. 13(a).

and enlisting the support of Jim Martin . . . ." (IST Mem. 36.) As a result, IST claims it "requested that Glynn comply with his contractual obligations and return IST property in his possession . . . . When Glynn refused to do so, IST took the necessary step of filing suit to recover and secure its property, and protect its rights." (*Id.* at 36-37.)

The information made available to IST during discovery regarding Glynn's retention of IST documents, potential breach of employment and non-compete agreements, as well as Glynn's competitive activities, provides legitimate, non-retaliatory bases for IST's counterclaims. *See Timmerman v. U. S. Bank, N.A.*, 483 F.3d 1106, 1123 (10th Cir. 2007) (Defendant instituted its counterclaims only after it was revealed in discovery that plaintiff had taken money that ostensibly belonged to defendant. Defendant thus had a legitimate and non-discriminatory reason for filing counterclaims against the plaintiff). IST's ability to support its counterclaims with respect to the issues that Glynn raises: damages sustained as a result of Glynn's conduct, competitive threat posed by Glynn, and identification of trade secrets, poses a separate question that is discussed below in the context of the parties' motions for summary judgment on IST's counterclaims. Because I find that Glynn has not created a genuine issue of material fact regarding IST's counterclaims, which, based on the information made available to IST during discovery, had a "reasonable basis in fact or law," I grant IST's Motion for Summary Judgment as to Glynn's Post-Termination Retaliation Claim (Count V).[25]

---

[25] Because I find that IST's counterclaims had a reasonable basis in fact and law, I do not reach the question of IST's motive in filing the counterclaims. Glynn, however, trains his focus on the "motive" question. He cites as examples of retaliatory motive:

- IST has repeatedly used heavy-handed bullying tactics to try to dissuade Glynn from engaging in further protected conduct, including threatening to have Glynn criminally prosecuted.
. . .
- IST repeatedly tried to deny Glynn counsel by lodging numerous false accusations against his counsel, inventing an alleged "conflict" between

## C. Declaratory Judgment (Count VI)

Glynn's Count VI seeks declaratory judgment that the restrictive covenants in Glynn's Employment Agreement with IST are unenforceable based on four theories: it is invalid on its face, IST has unclean hands, IST breached the Employment Agreement, and there is a vital national security interest in permitting Glynn to develop innovative C-IED technology. (Fourth Am. Compl. ¶¶ 239-243.) Glynn seeks declaratory judgment that the restrictive covenants are unenforceable under 28 U.S.C. §§ 2201, 2202. (*Id.* ¶ 239.) IST moves this Court to grant summary judgment in its favor with respect to the claim, arguing that "Glynn's Employment Agreement and the restrictive covenants therein are valid and enforceable as a matter of law.

---

> Glynn and his counsel and demanding that Glynn's counsel withdraw from this proceeding.
> - IST brought wholly gratuitous and meritless claims against FMI and then agreed to settle its claims against FMI at no cost provided that FMI discontinue all work with Glynn and/or SWT and cease use of the SWT-1000 and SWT-2000. Glynn had invested hundreds of unpaid hours in his work for FMI and borrowed money to purchase testing equipment to perform that work. IST has nearly driven Glynn to insolvency.

(Glynn Opp'n 39.) With respect to Glynn's first assertion that IST threatened him with criminal prosecution, Glynn cites to IST's Omnibus Sanctions Motion, which simply states that the Department of Justice has brought criminal prosecutions on similar facts, though IST itself was asking for civil remedies. (*See* ECF No. 328 at 3 "Considering that, as set forth below, the Department of Justice has frequently—and successfully—brought criminal prosecutions upon similar factual records, nothing short of the full panoply of civil remedies is warranted in this matter.") Glynn's second assertion demonstrates nothing more than the litigious and grudging character that can be ascribed to both parties throughout this protracted lawsuit. Glynn's third assertion, that IST's claims against FMI were "wholly gratuitous and meritless," is unsupported. In fact, IST contends that "FMI continued to work with Glynn after IST filed its counterclaims and cross-claims, and that FMI, on its own, decided not to work with Glynn after determining itself that Glynn acted unlawfully." (IST Mem. 38 n.27). In support, IST attaches the declaration of Steven Edelson who asserts that after FMI compared designs with IST, FMI concluded that Glynn's designs had substantive similarities to IST's technology, and FMI decided to end its relationship with Glynn and SWT. (IST Mot. Summ. J., Ex. 35, Edelson Decl. at ¶¶ 6, 11.) Accordingly, even if there were a question as to whether IST's counterclaims had a reasonable basis in fact and law, I would nevertheless grant IST's Motion for Summary Judgment as to Count VI because Glynn has failed to put forth facts that demonstrate there is a genuine issue for trial regarding IST's motive.

Thus, IST is [] entitled to summary judgment on Glynn's Sixth Cause of Action for Declaratory Judgment." (IST Mem. 40 n.29.) Moreover, IST calls attention to the fact that Glynn "has *not* made [the] argument [that the restrictive covenants are void ab nitio and unenforceable] in his summary judgment motion and has thus abandoned it." (*Id.* at 42 n.31.) IST sets forth New Hampshire law on the enforceability of contract provisions regarding confidentiality (*id.* at 41) and non-compete (*id.* at 52) clauses.

The closest approximation to an argument Glynn makes that the restrictive covenants in his Employment Agreement are unenforceable appears in his Opposition. There, Glynn claims that "the confidentiality provision in the contract is not enforceable to begin with to the extent it prohibits Glynn from reporting unlawful conduct to the government," (Glynn Opp'n 49), and "IST goes to great pains in its Motion to discuss the enforceability of the non-compete provision . . . . Glynn does not agree with IST's position . . . ." (*id.* at 54).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Here, Glynn has failed to set forth facts sufficient to show that the restrictive covenants in his Employment Agreement are unenforceable, a matter on which Glynn bears the burden of proof at trial. Glynn states only that he does not agree with IST's position that the restrictive covenants are enforceable and makes an irrelevant assertion with respect to the confidentiality provision.[26]

---

[26] IST has never argued that the confidentiality agreement prohibits Glynn from reporting unlawful conduct to the government. (*See* IST Reply 40 ["IST has not sought to enforce the confidentiality provisions binding Glynn with respect to any of the documents Glynn provided to any government investigators."].) Rather, IST claims that Glynn breached the confidentiality provision of his Employment Contract by retaining 1,100 files that are IST property (IST Mem.

"In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23. As a result, I grant IST's Motion for Summary Judgment as to Count VI.

### D. *Haddle* Claim (Count VII)

In order to prevail on a so-called *Haddle* claim, named after *Haddle v. Garrison*, 525 U.S. 121 (1998), and brought under 42 U.S.C. § 1985(2),[27] a plaintiff must prove: (1) a conspiracy, (2) to deter testimony by force or intimidation, and (3) injury to the plaintiff." *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1126 (10th Cir. 1994). IST moves this Court to grant summary judgment in its favor because "Glynn cannot satisfy the elements of the claim as a matter of both undisputed fact and law." (IST Mem. 39.)

Setting aside the element of conspiracy, which Glynn alleges occurred between IST and EDO, Glynn has failed to set forth facts demonstrating that there is a genuine issue for trial regarding the second element of his *Haddle* claim—that a conspiracy was perpetuated by threat or intimidation to deter Glynn from appearing or testifying in court. Glynn's allegations of threat and intimidation pivot on IST's decision to file counterclaims. (Fourth Am. Compl. ¶ 247; Glynn Opp'n 40.) Glynn claims that "IST has pursued its counterclaims against Glynn in a retaliatory and heavy-handed manner, and without basis in law or fact for doing so," and, accordingly, because "Glynn asserts that IST's intent in so doing was to prevent Glynn from further testifying

---

42), wrongfully obtaining IST documents (*id.* 43), and disclosing or allowing access to confidential IST information (*id.* 44).

[27] Section 1985(2), in relevant part, proscribes conspiracies to "deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified." 42 U.S.C. § 1985(2).

against IST . . . Glynn is entitled to a jury trial on his *Haddle* claim." (Glynn Opp'n 40.) Yet, as stated above, based on what IST learned during the course of discovery, IST had a reasonable basis in fact and law to pursue counterclaims against Glynn. Courts have held that "[l]egal claims possessing a reasonable basis in law and fact simply do not constitute the 'force or intimidation' necessary to satisfy § 1985(2)." *Mitchell v. Johnson*, 2008 U.S. App. LEXIS 17194, at *13 (5th Cir. Aug. 8, 2008) (citing *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1124 (10th Cir. 2007)). Accordingly, I grant IST's Motion for Summary Judgment as to Glynn's *Haddle* claim (Count VII).

## IV. IST's Counterclaims

IST has asserted ten counterclaims against Glynn and SWT (numbered as Counts I – IX and Count XI). Glynn moves for summary judgment on all counterclaims except Count VI (defamation). IST cross-moves for summary judgment on Counts I, II, and VII. For the reasons that follow, I grant summary judgment to Glynn on Counts II, IV, V, VII, IX, and XI and deny his motion for summary judgment as to Counts I, III, and VIII. I also grant summary judgment to IST on Count I and deny its motion for summary judgment as to Counts II and VII. Because genuine issues of material fact still remain with regards to Counts III, VI, and VIII, these counts will proceed to trial.

### A. Breach of Contract (Count I)

In Count I of its Second Amended Counterclaims, IST alleges that Glynn breached the terms of his Employment Agreement in the months following his departure from the company. (Second Am. Countercls. ¶¶ 51-61.) Specifically, IST argues that Glynn violated the terms of the Employment Agreement in three ways: (1) by using, disclosing, and failing to return confidential information in breach of a nondisclosure provision; (2) by soliciting other IST employees to leave the employ of IST and join him in a business venture in breach of a nonsolicitation

provision; and (3) by providing business services to certain customers with whom he had worked while employed by IST in breach of a noncompete provision. Glynn and IST have filed cross-motions for summary judgment on Count I. Having reviewed the submissions of both parties and the evidence in the record, I grant summary judgment to IST and hold that Glynn is liable for breach of contract, but only for an amount equal to the cost incurred by IST in recovering its confidential documents (approximately $88,000).

Under New Hampshire law, a breach of contract claim contains four elements: (1) a valid contract; (2) breach of that contract; (3) damages; and (4) proximate causation, meaning that harm to the plaintiff was reasonably foreseeable at the time of contracting. *See Indep. Mech. Contractors, Inc. v. Gordon T. Burke & Sons, Inc.*, 635 A.2d 487, 488 (N.H. 1993). I address each of these elements in turn below.

### 1. Enforceability

The Employment Agreement contains provisions imposing nondisclosure, nonsolicitation, and noncompete obligations upon Glynn. (IST Mot. Summ. J., Ex. 37, Employment Agreement §§ 6, 7.) There is no genuine dispute that these provisions are enforceable under New Hampshire law. "Restrictive covenants are . . . valid and enforceable if the restraint is reasonable, given the particular circumstances of the case." *ACAS Acquisitions (Precitech), Inc. v. Hobert*, 923 A.2d 1076, 1084 (N.H. 2006.) To determine whether a restrictive covenant is reasonable, New Hampshire courts examine whether the provision is broader than necessary to protect the employer's interest, whether it places an undue burden on the employee, and whether it injures the public interest. *Id.* The New Hampshire Supreme Court has applied this same test to nondisclosure, nonsolicitation, and noncompete restrictions. *Id.* at 1086-87, 1089.

The nondisclosure, nonsolicitation, and noncompete provisions contained in Glynn's Employment Agreement are fairly standard restrictions, and similar contractual provisions have repeatedly been upheld under New Hampshire law in other cases. *See, e.g.*, *Contour Design v. Chance Mold Steel Co.*, No. 09-451, 2010 WL 4774283 (D.N.H. Oct. 22, 2010) (upholding a nondisclosure provision and twenty-year noncompete restriction); *ACAS Acquisitions*, 923 A.2d at 1083-90 (upholding two-year nonsolicitation and noncompete provisions and a broad nondisclosure provision); *Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.*, 789 F. Supp. 1201, 1210-11 (D.N.H. 1992) (upholding nationwide noncompete restraint that restricted the employee "from competing in the very business that [the employer] employed him in"). Moreover, aside from two passing comments mentioned above in Part III.C., Glynn does not contest the enforceability of these contractual restrictions in his opposition to IST's motion. Glynn's acknowledgement of that point is correct, as I find that the contractual provisions at issue in this case are enforceable.

### 2. Breach

IST argues that Glynn violated the nondisclosure, nonsolicitation, and noncompete provisions of his Employment Agreement. For the reasons that follow, I agree that Glynn violated the nondisclosure and nonsolicitation provisions of his Employment Agreement, but I find that he did not violate his noncompete obligations under that contract.

### a. Nondisclosure Provision

It is beyond genuine dispute that Glynn breached his confidentiality obligations under the Employment Agreement. The nondisclosure provision states that Glynn "shall not, for any reason whatsoever, during or after the termination of his employment with the Employer, use, disclose or allow access to, for his own benefit or for that of another, the Confidential

Information." (IST Mot. Summ. J., Ex. 37, Employment Agreement § 6.) The agreement further states that "[u]pon termination of this Agreement by either party for any reason, the employee shall return to the Employer any of the Confidential Information . . . then in the Employee's possession." (*Id.*) The contract goes on to define *confidential information* as "oral, written or electronically stored information relating to the Employer's products, designs, methods, manufacture, or research, . . . [and] information relating to the Employer's business operations, such as its marketing plans, customer lists, business contacts and pricing methods, as well as its personnel and organizational data." (*Id.*)

IST alleges that Glynn breached the nondisclosure provision repeatedly in the months following his termination. Glynn does not dispute these allegations, a fact that is unsurprising in light of the overwhelming evidence in the record that he misappropriated and disclosed IST's confidential information. Glynn admits that he retained and failed to return 1,134 of IST's electronic files after being fired by the company.[28] (Glynn Mem. re. Computer Forensics Protocol, Nov. 6, 2009, ECF No. 281, at 39, 41.) Among the documents retained by Glynn were files titled "IST_Transceivers," "IST_NOISE_SOURCE_MODULE," and "IST_MULTI-BAND_TUNABLE_NOISE_SOURCE." (IST Mot. Summ. J., Ex. 118, Fowler Decl. ¶ 53.) Glynn also created a folder named "Saltwhistle_Technology" that contained photographs of designs created by IST for use in their C-IED devices. (*Id.* ¶ 54.) In addition to these technical materials, the record also demonstrates that Glynn accessed and disclosed to his attorneys

---

[28] Glynn has maintained that some of these files were "simply old work product" that were already on his computer when IST purchased DEI and were never deleted. But because these files became IST property when IST purchased DEI, and because Glynn had a duty to return all IST property upon leaving the company, it is unclear how, if at all, this distinction aids Glynn's argument. In any event, the distinction is academic, as Glynn himself admits that at least 287 of the documents he retained do not fall into this "old work product" category and instead are "actually case-related." (Glynn Mem. Re. Computer Forensics Protocol, Nov. 6, 2009, ECF No. 281, at 41.)

confidential internal IST documents—specifically, the evaluations of seven IST employees—after his departure from the company. (*Id.*, Ex. 125, Glynn Dep. 167:11-15, Jan. 17, 2011.)[29] In light of these examples of misconduct, which are illustrative and not exhaustive, there can be no genuine dispute that Glynn breached the confidentiality obligations imposed by the Employment Agreement.

### b. Nonsolicitation Provision

The Employment Agreement also contains a nonsolicitation provision, which declares that for two years after leaving IST, Glynn "shall not solicit any of the Employer's employees or former employees . . . to leave the employment of the Employer or to become involved in a business venture." (IST Mot. Summ. J., Ex. 37, Employment Agreement § 7.) Again, the record is replete with evidence that Glynn breached this duty. IST alleges that Glynn solicited Jim Martin, an engineer employed by IST, to leave his job at the company. For support, IST points out that just weeks after his termination—and immediately after Martin helped Glynn set up the website for his new company—Glynn sent Martin an email stating, "I really don't want you there helping the arrogant 3," a statement which Martin understood to mean that Glynn "really didn't want [Martin] there at IST helping Dean Puzzo, Mike Caprario, and Scott Traurig." (*Id.*, Ex. 13, Martin Dep. 87:15-88:20, Jan. 20, 2011.) Although it is true, as Glynn points out, that this

---

[29] I note that I have previously held in an earlier opinion that Glynn and his attorneys, The Employment Law Group ("TELG"), "wrongfully acquired non-public, internal IST information from Martin on at least several occasions" after Glynn was fired by IST. *Glynn v. EDO Corp.*, No. 07-1660, 2010 WL 3294347, at *4-5 (D. Md. Aug. 20, 2010). For this misconduct and abuse of the discovery system, as well as for a bad faith assertion of the common interest privilege, I imposed a $20,000 sanction against Glynn and TELG. *Id.* at *8-9.

exchange does not amount to a direct solicitation to leave IST, one can infer that this was Glynn's intention from the language and timing of the statement.[30]

Nonetheless, I need not rest my determination that Glynn violated the nonsolicitation provision on this basis because the record provides damning evidence that Glynn solicited Martin and fellow IST employee Lorraine Wolfram to "become involved in a business venture." (*Id.*, Ex. 37, Employment Agreement § 7.) Glynn testified that Martin set up and made changes to the SWT website at his request, and Martin even created the email address "jdmartin@saltwhistle.com." (*Id.*, Ex. 125, Glynn Dep. 31:9-41:6; Ex. 13, Martin Dep. 19:4-21:22.) Moreover, by March 2007—just three months after Glynn's departure from IST—Glynn and SWT had already entered into a commercial relationship with CadQal Development, Inc. ("CadQal"), a corporate alter ego of Jim Martin.[31] (*Id.*, Ex. 13, Martin Dep. 142:3-12.) As for Wolfram, Glynn admits that he expressly asked her to work for SWT in early 2007. (*Id.*, Ex. 19, SWT Dep. 41:11-42:15, June 30, 2008 ["I asked [Wolfram] whether or not she would consider doing some part-time assembly work for me."].) This admission in itself amounts to a breach of Glynn's duty not to solicit IST employees to "become involved in a business venture."[32]

---

[30] The record also strongly suggests that Glynn solicited Peter Tengstrand and Lorraine Wolfram to leave IST in violation of Section 7 of the Employment Agreement. Tengstrand sent Martin his resume via an email titled, "Just In Case Someone Asks For It." In the body of the email, Tengstrand wrote, "Here is some 'unsolicited' info for your 'reference.'" Martin responded by promising to "forward it to the man," and then promptly forwarded the email and attached resume to Glynn. (IST Mot. Summ. J., Ex. 125, Glynn Dep. 27:9-31:5 & Dep. Exs. 102-03.) Similarly, Glynn also appears to have recruited Wolfram—again, through Martin—to join SWT while she was still employed by IST. (*See* IST Mot. Summ. J., Ex. 125, Glynn Dep. at Ex. 141 [email from Martin to Glynn, with Wolfram's resume attached, in which Martin writes, "Here's Lorraine's resume. She says she's in NO hurry."].)

[31] Martin himself described CadQal as "basically a one-man corporation." (IST Mot. Summ. J., Ex. 13, Martin Dep. 81:9.)

[32] In the face of this one-sided evidence, Glynn half-heartedly argues that he did not breach his nonsolicitation duties because Martin and Wolfram left IST because they were unhappy there, not because Glynn solicited them to leave. (Glynn Opp'n at 50-53.) This argument is

c. Noncompete Provision

The Employment Agreement also contains a noncompete provision, which for a two year period prohibits former IST employees from "directly or indirectly providing . . . services to any customers of [IST] with whom the Employee conducted business while employed by the Employer." (IST Mot. Summ. J., Ex. 37, Employment Agreement § 7.) The parties contend that whether Glynn breached this provision of his employment contract depends on the interpretation of the term *customer*. IST maintains that while employed at the company, Glynn conducted business with DOD, which IST identifies—along with SOCOM, NAVSEA, and the rest of DOD's subsidiary commands—as a single customer. (*See id.*, Ex. 3, IST Dep. 36:8-16, June 18, 2008.) Accordingly, IST argues that Glynn was barred from doing business with DOD (or any of its subsidiary commands) for two years after his termination, and that Glynn violated this restriction in 2007-08 when he partnered with Foster-Miller Inc. ("FMI") to secure two government contracts to supply C-IED devices to NAVSEA, a systems command within DOD.[33] (IST Mem. 53-54; *see also* IST Mot. Summ. J., Ex. 15, FMI Dep. 106:2-109:13.) Glynn, however, maintains that all of the work he undertook at IST was in connection with a contract for SOCOM, an operations command within DOD. Glynn argues that SOCOM—and not DOD as a

_____

unpersuasive for two reasons. First, the subjective motives of Martin and Wolfram in leaving IST are irrelevant. What matters is whether Glynn solicited one or both of them to leave, and as discussed above, there is no genuine dispute that he did. Second, and more importantly, Glynn's argument fails to account for his breach of the prohibition on soliciting IST employees to "become involved in a business venture." That is, even if Glynn did not solicit Martin and Wolfram to leave IST, it is still beyond dispute that he solicited them to "become involved in a business venture" in violation of the Employment Agreement.

[33] Further complicating this issue was DOD's creation of the Joint IED Defeat Organization ("JIEDDO"), an agency within DOD in which C-IED procurement efforts were centralized. IST maintains that after its creation in 2006, JIEDDO handled the procurement of C-IED technology for all of the various commands within DOD, including SOCOM and NAVSEA. Accordingly, IST argues that JIEDDO should also be considered one of its *customers*, meaning that Glynn was barred from conducting business with JIEDDO or any of the specific commands it represents, including NAVSEA.

whole—is the *customer* with whom he conducted business while at IST. Accordingly, Glynn asserts that when he partnered with FMI to secure a bid on a contract for NAVSEA, he did not breach his contractual noncompete duties because SOCOM and NAVSEA, although both under the broad organizational umbrella of DOD, are actually separate customers.

Whether SOCOM and NAVSEA should be considered two divisions of the same customer or two separate customers is a close question. Nonetheless, in light of the definitive deposition testimony of Lewis Dokmo, IST's designated 30(b)(6) representative, and Murrin, President of IST, I am inclined to agree with Glynn that NAVSEA and SOCOM are properly deemed two separate and distinct customers. In Dokmo's deposition, he agreed that "SOCOM and NAVSEA [are] two different and distinct customers of IST." (Glynn Opp'n, Ex. 1, IST Dep. 168:6-18, Nov. 17, 2010.) Murrin echoed this sentiment in his own deposition, stating that he considered SOCOM to be a "distinct and separate customer from . . . NAVSEA" because "they're different contracts." (*Id.*, Ex. 17, Murrin Dep., at 151:12-19, Nov. 16, 2010.) Accordingly, because Glynn worked only for SOCOM while at IST and did not conduct business with NAVSEA,[34] his collaboration with FMI to secure a NAVSEA contract does not appear to violate the terms of the Employment Agreement's noncompete clause.

### 3. Damages

In addition to establishing that Glynn breached his Employment Agreement, IST must also prove damages in order to recover on its breach of contract counterclaim. To this end, IST

---

[34] Although Dokmo testifed that Glynn "provide[d] support" on a NAVSEA contract awarded to IST in August 2006, (IST Mot. for Summ. J., Ex. 3, IST Dep. 157:1-4), he later admitted that Glynn "didn't have to necessarily work directly on the contract." (IST Mot. for Summ. J., Ex. 4, IST Dep. 275:21-276:1.) Indeed, the only connection Glynn had to the NAVSEA contract was that he had previously worked on the DDS module that was to be tested under the contract. This module was not developed specifically for the NAVSEA contract, however, and Glynn never billed any of his time to NAVSEA while working at IST. (IST Mot. for Summ. J., Ex. 3, IST Dep. 156:2-158:6.)

advances three theories of damages. First, IST claims that Glynn's breach caused it "harm in the competitive arena" and led to lost profits and other business losses. Second, IST argues that it is entitled to recover damages for breach of contract under an unjust enrichment theory. And third, IST contends that it is entitled to recoup the costs it incurred in recovering confidential information that Glynn had unlawfully taken and retained after being terminated by IST. I now hold that IST has failed to meet its burden of establishing a factual basis for its first two theories of damages. Nonetheless, I find that IST is entitled to summary judgment on its third theory of damages and may recover the costs it incurred in reclaiming its confidential and proprietary information.

### a. Lost Profits

In its Second Amended Counterclaims, IST alleges that Glynn's breach of his Employment Agreement "materially injur[ed] the reputation of the business of IST" and "cause[d] IST substantial and immediate irreparable injury." (Second Am. Countercls. ¶¶ 59-60.) In the four years that this case has been pending, however, IST has yet to identify any actual lost profits or other business loss resulting from Glynn's alleged breach. Because IST has not met its burden of demonstrating by a preponderance of the evidence that it has suffered any business loss, I hold that damages are not recoverable under this theory.

"It is general law that one who claims damages has the burden of proof. He must by a preponderance of the evidence show that the damages which he seeks were caused by the alleged wrongful act and he must show the extent and amount of such damages." *Pugliese v. Town of Northwood Planning Bd.*, 408 A.2d 113, 118 (N.H. 1979); *see also Fitz v. Coutinho*, 622 A.2d 1220, 1223 (N.H. 1993) (holding that the plaintiff had not "carried his burden of proving the fact and amount of damages"); *Whitehouse v. Rytman*, 451 A.2d 370, 372 (N.H. 1982) ("One who

seeks to recover damages has the burden in the first instance of proving the extent and amount of such damages."); *Parem Contracting Corp. v. Welch Constr. Co.*, 512 A.2d 1104, 1107 (N.H. 1986) (same). "In addition to proving the *fact* of lost profits, the plaintiff must establish the *amount* with reasonable certainty." *Coutinho*, 622 A.2d at 1224 (emphasis in original). Of course, "[a] degree of uncertainty is inherent in any projection of future profits," and New Hampshire courts acknowledge that "[p]roof of lost profits is not speculative as a matter of law simply because all conceivable factors have not been assessed." *Indep. Mech. Contractors v. Gordon T. Burke & Sons*, 635 A.2d 487, 491 (N.H. 1993). Still, the plaintiff must provide some reasonable basis for its claimed damages, and the ultimate test is "whether the evidence on lost profits provides enough information under the circumstances to permit the fact finder to reach a reasonably certain determination of the amount of gains prevented." *Id.* Failure to meet this burden of demonstrating actual damages prevents a plaintiff from recovering for lost profits. At most, the plaintiff may recover nominal damages in "the smallest appreciable quantity," typically one dollar. *Pugliese*, 408 A.2d at 118 (holding that nominal damages may be awarded "whenever there has been a breach of a legal duty or invasion of a legal right and no actual damage resulted or was proved").

Throughout the pendency of this litigation, IST has maintained that it would establish both the fact and amount of its damages in a report prepared by its expert witness. (*See* Glynn Mot. Summ. J., Ex. 44, IST's Am. Resp. to Interrogs., at 5-6 ["[Damages] information is contained in the forthcoming report of [IST's] expert."]; Ex. 45, IST Dep. 227:11-12 [Dokmo stating that "the amount of claims that we're asking for is in the expert report"].) However, when that expert, Bruce Dubinsky, released his report, it was silent on the question of lost profits. Instead, the report simply calculated the monies Glynn had received during his three years as an

employee of IST and the money he received from FMI under the 2007 NAVSEA contract, and then added these figures together. (IST Mot. Summ. J., Ex. 33, Dubinsky Report, ¶¶ 10, 27.) Dubinsky himself testified that he never examined or identified any decrease in profits due to the alleged loss of customers, sales, vendors, or employees, and nothing in the report indicates that the figure calculated by Dubinsky has any relation to IST's purported lost profits. (Glynn Mot. Summ. J., Ex. 46, Dubinsky Dep. 52:18-58:2, Feb. 25, 2011.) Indeed, Dubinsky testified that IST specifically contemplated having him examine the possibility of lost profits but ultimately decided not to have him undertake such an analysis:

> Q: Were you ever asked to analyze or assess any business loss of either EDO, ITT, or IST?
> A: There were early discussions regarding the possibility of doing so.
> . . . .
> Q: And what was the result of those discussions?
> A: The result was that I was asked to do the computations that are set forth in the affirmative report. So I didn't embark on any sort of analysis or attempt to do the other.

(*Id.*, Ex. 46, Dubinsky Dep. 52:18-53:14.)[35]

As set forth above, whether a party can recover damages for lost profits depends on "whether the evidence on lost profits provides enough information under the circumstances to permit the fact finder to reach a reasonably certain determination of the amount of gains prevented." *Indep. Mech. Contractors*, 635 A.2d at 491. In this case, IST has failed to adduce any evidence supporting the *fact* of lost profits, let alone the *amount*. IST has not identified a single contract, customer, or sale that it lost as a result of Glynn's breach, and the damages

---

[35] Glynn also criticizes Dubinsky's report because it does not provide "an itemization of damages as related to each of IST's counterclaims." (Glynn Mem. 21.) Although I find Dubinsky's report to be insufficient to demonstrate lost profits damages for the reasons discussed herein, I note that other courts have not required an itemized list of damages on a claim-by-claim basis. *See, e.g.*, *Inter Med. Supplies v. EBI Med. Sys.*, 975 F. Supp. 681, 687 (D.N.J. 1997) ("[R]equiring plaintiffs to itemize their damages as to each legal claim would be unnecessarily confusing to the jury and would risk a double, or even treble, recovery.").

calculations in the expert report bear no relationship to any business loss. Underscoring this point is that although Dubinsky based his estimation of IST's purported damages in part on the award of the 2007 NAVSEA contract to FMI, IST did not even bid on that contract and so cannot claim lost profits based on its award to Glynn/IST. *See Systems 4, Inc. v. Landis & Gyr, Inc.*, No. CCB-97-2117, 1999 U.S. Dist. LEXIS 22657, at *4 (D. Md. Mar. 31, 1999) ("As Systems 4 has chosen not to compete with Landis, it will not be able to establish that it has suffered business losses to Landis.").

In this sense, the instant suit is easily distinguishable from *Independent Mechanical Contractors*, 635 A.2d 487, a case relied on by IST. In that case, the court upheld an award of damages for lost profits, but only after the plaintiff specifically showed that the defendant's breach caused it to suffer a sudden drop in income, disqualified it from obtaining a line of credit, and prevented it from garnering certain jobs even though its bids were competitive. *Id.* at 489. Because IST has not presented similarly detailed and reliable evidence showing damages in this case, the holding of *Independent Mechanical Contractors* has only limited relevance here. A more instructive case is *Fitz v. Coutinho*, 622 A.2d 1220. There, the New Hampshire Supreme Court refused to award damages for lost profits despite acknowledging that the defendant had breached the contract *and* that the record contained "abundant evidence that [the plaintiff] lost an indeterminate amount of profits because of the breach." *Id.* at 1224. The *Fitz* court held that although the plaintiff had established the *fact* of lost profits, it had failed to carry its burden of also proving the *amount* of its business loss with reasonable certainty. *Id.* at 1225. If damages for lost profits were not recoverable in *Fitz*, in which the plaintiff actually proved that it had suffered some amount of lost profits, then they certainly cannot be recovered by IST here, as it has proven neither the fact nor the amount of business losses. In light of the lack of evidence adduced by

IST to support its claim of lost profits, I conclude that IST has failed to carry its burden of establishing lost profits damages by a preponderance of the evidence and is not entitled to damages for lost profits.

b. Restitution

Alternatively, IST argues that it is eligible to recoup almost $700,000 in monies and benefits received by Glynn between 2004 and 2006 as restitution damages. On the same theory, IST further claims that it is entitled to recover approximately $500,000 that was paid to Glynn by FMI in connection with the 2007 NAVSEA contract awarded to FMI. Glynn asserts that an award of restitution damages is unwarranted in these circumstances and has no basis under New Hampshire law. Glynn is correct, and I therefore hold that IST may not recover restitution damages under its breach of contract theory.

"A plaintiff is entitled to restitution for unjust enrichment if the defendant received a benefit and it would be unconscionable for the defendant to retain that benefit." *General Insulation Co. v. Eckman Constr.*, 992 A.2d 613, 620-21 (N.H. 2010). IST states that it is entitled to restitution equal to "the value of the consideration paid to Glynn in connection with his Employment Agreement and the Asset Purchase Agreement." (IST Mem. 61.) Although it does not explain the basis for this claim, presumably IST believes that the monies it paid to Glynn as salary between 2004 and 2006 constitute a benefit that would be unconscionable for Glynn to retain in light of his breach of contract.

IST cites no case law in support of its position, and it admits that "there does not appear to be a New Hampshire opinion explicitly providing for restitution in this context." (IST Reply 41-42.) Nonetheless, IST asserts "it is axiomatic" that restitution damages are available in light of one passage in the Restatement (Second) of Contracts, which provides: "Judicial remedies

under the rules stated in this Restatement serve to protect one or more of the following interests of a promisee: . . . (c) his 'restitution interest,' which is his interest in having restored to him any benefit that he has conferred on the other party." Restatement (Second) of Contracts § 344(c) (1981). This general statement of law stands for the unremarkable proposition that although contract law is usually concerned with a party's expectation interest, in some circumstances it also protects a party's restitution interest. However, IST provides no argument as to why such restitution damages might be appropriate in the context of this suit. This silence is telling, especially given the absence of a restitution award in any similar New Hampshire case.

This is not to say that restitution damages are unheard of in this context. Some states, most notably New York, follow the "faithless servant" doctrine, a common law rule which requires an employee who breaches a fiduciary duty "to forfeit all compensation received after his first disloyal act." *Phansalkar v. Andersen Weinroth & Co.*, 344 F.3d 184, 188 (2d Cir. 2003). New Hampshire has not adopted the faithless servant doctrine or any equivalent, however, and I see no reason to do so for the first time in this case. Moreover, even if the faithless servant doctrine were to apply, it would only entitle IST to recover monies paid to Glynn after his first disloyal act, which did not occur until late in 2006, and it would not permit IST to recover monies paid to Glynn by FMI in connection with the 2007 NAVSEA contract. Accordingly, I I will not award IST restitution damages under its breach of contract claim.

### c. Computer Forensics Protocol Costs

IST's third theory of damages is both more modest and more persuasive. IST asserts that it is entitled to recover $87,983 that it was forced to expend to recover confidential information and documents that Glynn had retained after being terminated by IST. (*See* IST's Mot. for Computer Forensics Protocol Costs, July 30, 2009, ECF No. 247.) IST incurred these costs in

funding a computer forensics protocol, pursuant to which Glynn's computers, hard drives, and other storage devices were searched for confidential IST information. (*Id.* at Ex. A.) The protocol was a court-ordered undertaking, and Glynn does not dispute that it turned up hundreds, if not thousands, of IST's documents still in his possession. (Glynn Mem. re. Computer Forensics Protocol, Nov. 6, 2009, ECF No. 281, at 39, 41.)

IST has met its burden of establishing a reasonably certain basis for the damages it seeks in connection with these document recovery efforts. IST has already provided documentation for the costs that it incurred in the form of a declaration from Jonathan Fowler, a senior practice leader at First Advantage Litigation Consulting. (*See* IST's Mot. for Computer Forensics Protocol Costs, July 30, 2009, ECF No. 247 at Ex. E, ¶ 22.) Moreover, Glynn does not dispute that IST "spen[t] almost $90,000 to search Mr. Glynn's computers." (Opp'n to IST's Mot. for Computer Forensics Protocol Costs, Aug. 17, 2009, ECF No. 259.) Finally, the expenses incurred by IST in funding the protocol are properly considered damages flowing from Glynn's breach of his confidentiality obligations, as the protocol would not have been necessary but for Glynn's retention of IST's confidential documents in violation of § 7 of the Employment Agreement. For all of these reasons, I hold that IST is entitled to recover damages equal to the amount of the costs it incurred in conducting the protocol.

### 4. Foreseeability

Glynn asserts that even if IST is able prove damages, he is still entitled to summary judgment on Count I because IST's injuries were not a reasonably foreseeable consequence of his alleged breach. As the only damages IST has established are the $87,983 it incurred in recovering its confidential documents, I need only address whether these damages were a foreseeable consequence of Glynn's breach.

Under New Hampshire law, "[d]amages are available only if the harm was a reasonably foreseeable result at the time the parties entered into the contract." *Indep. Mech. Contractors, Inc. v. Gordon T. Burke & Sons, Inc.*, 635 A.2d 487, 488 (N.H. 1993). There is little question that this standard is satisfied here. IST claims that it suffered harm to the extent that Glynn's retention of its proprietary documents deprived it of the benefits and value of maintaining the confidence of such data. (IST Mem. 44.) Section 6 of the Employment Agreement emphasizes that "the Confidential Information constitutes a valuable, proprietary, special and unique aspect of [IST's] business," (IST Mot. Summ. J., Empl. Agmt., Ex. 37, § 6.) Given this emphasis on the importance and value of maintaining the confidentiality of its data, the harm suffered by IST was certainly a foreseeable consequence of Glynn's breach. The Employment Agreement goes on to state that in the event of a breach of the nondisclosure agreement contained in Section 6, IST reserves the right to pursue "any other remedies available to the Employer for such breach . . . including, but not limited to, the recovery damages." (*Id.*) In light of this language, it was foreseeable that IST would not only take action to retain these documents, but would also pursue damages for the costs incurred in doing so. Consequently, I hold that the harm and damages suffered by IST were a foreseeable result of Glynn's breach, and I will therefore grant summary judgment to IST on Count I and award damages in the amount of $87,983.

**B. Breach of Asset Purchase Agreement (Count II)**

In Count II, IST asserts that Glynn breached the terms of the Asset Purchase Agreement ("APA") governing the sale of DEI to IST. (Second Am. Countercls. ¶¶ 62-68.) Specifically, IST alleges that Glynn "absconded with a substantial volume of confidential DEI assets" after he left IST, including DEI design schematics and a file entitled "dei library." (IST Reply 42; IST Mot. Summ. J., Ex. 118, Fowler Decl. ¶ 53.) Glynn responds that the APA was not breached because

it required only the transfer of certain assets as part of the sale of DEI, and there is no dispute that these business assets were transferred. (Glynn Opp'n 42.) Moreover, Glynn renews his argument that IST has failed to carry its burden of establishing damages arising from the breach of the APA. (Glynn Opp'n 43-45.) Both parties have filed motions for summary judgment on this count.

Glynn is again correct that IST has failed to establish damages arising from the alleged breach of the APA. "It is general law that one who claims damages has the burden of proof," *Pugliese v. Town of Northwood Planning Bd.*, 408 A.2d 113, 118 (N.H. 1979), and IST has never identified or proven any quantifiable business loss. Yet unlike the Employment Agreement, the APA contains a provision entitling IST to collect "reasonable attorneys' fees" in the event that DEI or Glynn breaches its terms. (IST Mot. Summ. J., Ex. 7, Asset Purchase Agreement, § 12.2.) Accordingly, even though IST cannot prove damages, it would still be permitted to recover reasonable attorneys' fees if Glynn is found to have breached the APA.

Whether Glynn breached the APA presents a difficult conceptual question. Importantly, IST does not allege that Glynn failed to convey DEI's intellectual property at the time of the sale in 2004 or at any time thereafter. Instead, IST argues that Glynn violated the APA by retaining a copy of the DEI documents on his computer beyond the date of his termination, which IST contends denied it "the exclusive ownership of the intellectual property" purchased in the DEI acquisition and thereby "deprived IST of the benefit of the bargain." (IST Reply 42-43.) Under this theory, then, IST does not allege that the APA was breached until after Glynn was fired in December 2006, almost three years subsequent to IST's purchase of DEI.[36]

_____

[36] Presumably, IST does not allege that a breach of the APA occurred at any earlier point because from the time of the sale of DEI in March 2004 until Glynn's termination in December 2006, Glynn was an employee of IST. The mere fact that Glynn may have retained a copy of DEI

This failure to return proprietary documents is a violation of the Employment Agreement's nondisclosure provision, but it is not a breach of the APA. To hold that Glynn, by not returning certain materials upon being fired, suddenly violated the terms of a purchase agreement executed years earlier would stretch the language of the APA too far. Moreover, IST cites no case law or any other authority that would support such an expansive interpretation of the purchase agreement. At bottom, the APA was designed to govern the transfer of certain assets, including intellectual property, from DEI to IST, and there is no dispute that Glynn and DEI transferred all of these assets. To the extent that IST believes that it has been harmed or "denied the benefit of the bargain" by Glynn's failure to turn over proprietary materials, this is exactly the type of harm that the nondisclosure clause in the Employment Agreement was designed to remedy. Although creative, IST's suggestion that the failure to return certain documents also violates a three year-old purchase agreement is unavailing. In short, Count II amounts to a backdoor attempt to recover attorneys' fees by dressing up a claim for breach of the Employment Agreement as a claim for breach of the APA. I hold that IST's theory fails as a matter of law, and I will therefore enter summary judgment on behalf of Glynn on Count II.

## C. Misappropriation of Trade Secrets (Count III)

Glynn also moves for summary judgment on Count III of IST's Second Amended Counterclaims, in which IST asserts that Glynn misappropriated trade secrets in violation of the New Hampshire Uniform Trade Secrets Act ("NHUTSA"), N.H. Rev. Stat. § 350-B. (Second Am. Countercls. ¶¶ 69-79.) The NHUTSA defines the term *trade secret* in the following manner:

> "Trade secret" means information, including a formula, pattern, compilation,

---

documents during this time period did not deprive IST of "exclusive ownership" of the information because Glynn possessed the documents in his capacity as an employee of IST. It is axiomatic that the possession of DEI documents by an IST employee would not disrupt IST's exclusive ownership of those documents.

program, device, method, technique, or process, that:

> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.H. Rev. Stat. § 350-B:1. IST alleges that "Glynn and Saltwhistle have intentionally misappropriated, used and disclosed . . . IST's trade secrets and confidential and proprietary information without IST's express or implied consent." (Second Am. Countercls. ¶ 76.) Glynn has moved for summary judgment on the basis of three arguments. First, Glynn argues that IST cannot establish that it was injured and suffered damages as a result of the alleged misappropriation. (Glynn Mem. 35-36.) Second, Glynn asserts that the information in question does not constitute a trade secret under the NHUTSA because IST failed to take reasonable efforts to maintain the secrecy of the information. (Glynn Mem. 36-37.) And third, Glynn maintains that the information does not meet the statutory definition of a trade secret because it has no actual, current economic value. (Glynn Mem. 37-46.) Because I find each of these arguments to be unavailing, I will deny Glynn's motion for summary judgment as to Count III.

### 1. Damages

Glynn's first argument in support of his motion for summary judgment on Count III is that "IST has failed to provide any evidence that it suffered any injury or damages" under the NHUTSA. (Glynn Mem. 35.) This argument is again based on the contention that the damages report of IST's expert, Bruce Dubinsky, fails to establish that IST suffered any actual loss as a result of the alleged misappropriation. (*Id.* 35-36.) However, the NHUTSA expressly provides that "[d]amages can include both the actual loss caused by misappropriation *and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.*"

N.H. Rev. Stat. § 350-B:3 (emphasis added); *see also* Restatement (Third) of Unfair Competition § 45 (1995) ("One who is liable to another for an appropriation of the other's trade secret . . . is liable for the pecuniary loss to the other caused by the appropriation *or for the actor's own pecuniary gain resulting from the appropriation*, whichever is greater . . . .") (emphasis added). Indeed, in the brief accompanying his motion, Glynn admits that "there is an unjust enrichment provision contained in [NHUTSA] as a potential avenue of recovery." (Glynn Mem. 30.)

IST asserts that Glynn misappropriated its trade secrets and used them in creating his SWT-1000 and SWT-2000 modules, which were then incorporated into FMI's successful bids for the NAVSEA contracts in 2007 and 2008. (IST Mot. Summ. J., Ex. 15, FMI Dep. 106:2-110:3.) IST claims that Glynn was thereby unjustly enriched, and Dubinsky's expert report calculates the amount of compensation received by Glynn under the contracts. (*Id.*, Ex. 33, Dubinsky Report, ¶ 27.) Although IST has adduced no evidence to demonstrate any business loss, this sum calculated by Dubinsky can serve as a basis for an unjust enrichment recovery if IST were to ultimately prevail on its trade secrets claim. Indeed, in a case involving a nearly identical provision of Maryland's Uniform Trade Secrets Act ("MUTSA"), Judge Blake of this court held that although a plaintiff "will not be able to establish that it has suffered business losses," it nevertheless "may seek . . . an amount for unjust enrichment." *Sys. 4 v. Landis & Gyr, Inc.*, Civ. No. CCB-97-2117, 1999 U.S. Dist. LEXIS 22657, at *4 (D. Md. Mar. 31, 1999). Accordingly, I am unconvinced by Glynn's argument that IST has not provided any evidence of damages under the NHUTSA.

### 2. Reasonable Efforts to Maintain Secrecy

Glynn's second argument in support of his motion for summary judgment on IST's trade secrets claim is that the allegedly proprietary pieces of information upon which IST bases its

claim are not trade secrets at all because IST failed to comply with the NHUTSA's requirement that it make "efforts that are reasonable under the circumstances to maintain [the information's] secrecy." N.H. Rev. Stat. § 350-B:1. This argument is belied by the record, however, as it is beyond dispute that IST protected its information and proprietary materials in fourteen separate ways.[37] (IST Mot. Summ. J., Ex. 4, IST Dep. 39:3-48:19, 54:3-55:14, 63:1-64:20, 147:2-149:4, 239:2-240:20.) Glynn does not deny that IST took these steps, and neither does he identify a single instance in which IST shared any of its confidential information with a third party. *Cf. Contour Design, Inc. v. Chance Mold Steel Co.*, No. 09-451, 2010 U.S. Dist. LEXIS 10026, at *26 (D.N.H. Jan. 14, 2010) (holding that a counterclaimant was likely to succeed on the merits of its trade secrets claim where it "had never . . . disclosed any of its confidential information to any third parties.").

In the face of this evidence, Glynn makes two arguments to support his assertion that IST failed to take reasonable steps to protect its trade secrets. First, he maintains that "no one on

---

[37] These steps include: (1) requiring every employee to read and reaffirm their understanding of IST's non-disclosure policies on an annual basis (IST Mot. Summ. J., Ex. 4, IST Dep. 39:13-22, 63:10-20); (2) "control[ling] access to the [IST] building at all times" through the use of alarm systems and secure areas (*id.* 40:4-20); (3) distributing photo identification cards encoded with personal ID numbers to authorized employees (*id.* 40:21-41:15); (4) employing a security department headed by Joe Richards, IST's security manager (*id.* 41:18-20, 54:11-16); (5) labeling proprietary documents as "company confidential" and ensuring that they remain "locked up when they're not being accessed" (*id.* 44:18-45:9, 54:19-20); (6) requiring visitors to check in, obtain a visitor badge, and be escorted on IST premises (*id.* 45:20-46:10); (7) prohibiting anyone—both employees and visitors—from bringing cell phones into secure areas (*id.* 46:2-4, 54:3-10); (8) limiting employee access to portions of IST's computer network on an as-needed basis and requiring the use of an encrypted access from offsite (*id.* 46:11-48:3); (9) password protecting all IST computers (*id.* 63:1-8); (10) installing red warning lights in secure areas to indicate the presence of a visitor without security clearance (*id.* 48:5-19); (11) requiring the IST security department to conduct random "walk arounds" to ensure that confidential information is not left out and viewable to a passerby (*id.* 54:11-16); (12) contracting with a third-party data security company to ensure the secure disposal of hard-copy documents (*id.* 55:3-14); (13) taking steps to collect IST property from departing employees (*id.* 63:21-64:16); and (14) as a last resort, "go[ing] a legal route" by filing suit to protect and recover proprietary and confidential information, (*id.* 64:16-20).

behalf of IST could identify a single trade secret prior to IST's expert identifying the alleged trade secrets in his report," dated March 4, 2010. (Glynn Mem. 37.) The argument seems to be that if IST could not even identify its trade secrets until 2010, then it could not have protected them and ensured their secrecy in 2006. Yet even if an IST employee declined during deposition testimony to give a legal opinion as to whether a certain piece of information constituted a trade secret, the record indicates that IST employees still understood the meaning of the term and the importance of protecting proprietary information. (IST Mot. Summ. J., Ex. 2, Dokmo Dep. 128:2-12, June 13, 2008; Ex. 36, Puzzo Dep. 67:16-68:8, 76:3-79:5; Ex. 49, Caprario Dep. 193:2-7.)

In his second argument, Glynn emphasizes that two other former IST employees, Paul Baryiames and John Joseph, possessed materials containing IST's proprietary information "at their homes well after their employment ended." (Glynn Opp'n 73.) Glynn maintains that if these employees were able to retain such documents after their departures from IST, then IST cannot be said to have taken reasonable steps to maintain the secrecy of its information. Yet by highlighting these two examples where IST's protective measures did not work perfectly, Glynn essentially argues that IST's proprietary materials cannot be considered "trade secrets" because the protection of its information was not foolproof. This is not the law. When protecting proprietary materials, "the secrecy . . . need not be absolute. Reasonable precautions to protect the secrecy of a trade secret will suffice." *Pioneer Hi-Bred Int'l v. Holden Found. Seeds*, 35 F.3d 1226, 1235 (8th Cir. 1994) (interpreting a provision of Iowa's trade secret law analogous to the New Hampshire provision at issue here). And although IST's security measures were not absolutely effective in these cases, Glynn admits that the company later recovered its proprietary materials from both Baryiames and Joseph. Ultimately, although IST may not have constructed

an impregnable barrier around its intellectual property, the evidence in the record creates, at a minimum, a triable question as to whether IST took reasonable steps to maintain the secrecy of its proprietary information. Accordingly, Glynn's argument on this point fails.

### 3. Actual or Potential Economic Value

Glynn's third argument in support of his motion for summary judgment as to Count III is that the technology identified by IST cannot constitute a "trade secret" because it does not possess "independent economic value, actual or potential" as required by the NHUTSA. *See* N.H. Rev. Stat. § 350-B:1. Specifically, Glynn contends that the technology that is the subject of IST's trade secrets claim is now out-of-date—and therefore lacking in value—because it has been replaced by newer and better technology.

During his time at IST, Glynn worked on the MBTNS and DDS modules, which were utilized and sold until 2005 and 2007 respectively, and it is these designs that contain the trade secrets allegedly misappropriated by Glynn. Accordingly, Glynn asserts that at the time IST filed its trade secrets claim in 2008, "it was no longer utilizing the very things it claimed were its trade secrets." (Glynn Mem. 44.) And since IST was no longer using these designs, Glynn argues that they necessarily lacked any economic value and therefore could not constitute trade secrets under the NHUTSA.

As mentioned, information must possess "actual or potential" economic value in order to qualify as a trade secret under the NHUTSA. N.H. Rev. Stat. § 350-B:1. This principle was confirmed in *Contour Design, Inc. v. Chance Mold Steel Co.*, a recent New Hampshire case in which the court held that the NHUTSA "encompasses confidential information that has 'potential' economic value, not just 'actual' economic value." No. 09-451, 2010 U.S. Dist. LEXIS 10026, at *20 (D.N.H. Jan. 14, 2010). That case involved a trade secrets claim brought

by Contour, a manufacturer of computer products, over the alleged misappropriation of designs for an ergonomic roller-ball computer mouse. The court explained that "Contour's concept for an ergonomic mouse with a removable roller proved difficult to execute, to the point that Contour decided to release the new version of its Roller Mouse product without that feature." *Id.* at *21. Nonetheless, the court concluded, that "there is evidence that the removable roller concept had 'potential economic value' . . . as reflected in the interest of one of Contour's customers" in the product. *Id.* at *22. Therefore, the court held that even the design for the old, replaced version of the Roller Mouse met the statutory definition of a trade secret under the NHUTSA.

*Contour* is directly applicable to the case at bar. Just as in *Contour*, IST's DDS module "proved difficult to execute" because of producibility concerns, and so IST "decided to release a new version" of its module that was more workable (the DRU module). *See Contour*, 2010 U.S. Dist. LEXIS at *20-21. And just as in *Contour*, "there is evidence that the [DDS module] concept had 'potential economic value' . . . as reflected in the interest of one of [IST's] customers." *See id.* at *22. Specifically, IST sold to the government both new C-IED systems containing its DDS module and "kits" containing the DDS module to be retrofitted into a new MMBJ-1A-ECP systems already in the field. (IST Mot. Summ. J., Ex. 4, IST Dep. 187:19-189:12.) In this way, the argument in favor of economic value is even stronger for IST because the DDS module possessed *actual*, and not just *potential*, economic value. Accordingly, if the information in *Contour* was found to possess independent economic value, then so too must IST's information relating to the MBTNS and DDS modules.[38]

---

[38] Glynn latches on to the statement in *Contour* that "[a] number of courts have applied the [NHUTSA] to confidential disclosures of concepts, or as yet-untested, ideas for a new product or a new process." *Contour*, 2010 U.S. Dist. LEXIS at *20. Glynn argues that this language shows that information can possess "potential economic value" only if it relates to a product that is new or untested. (Glynn's Reply 72.) This position is squarely contradicted by other authorities. For

Against these authorities, Glynn relies on a single case brought under Maryland's trade secret law. In that case, *Quality Systems v. Warman*, the court granted summary judgment to the defendant after the plaintiff acknowledged that "the information no longer [had] any continuing economic value." 132 F. Supp. 2d 349, 356 (D. Md. 2001). There are several problems with Glynn's reliance on this case. First, *Quality Systems* is easily distinguishable from the instant case. Unlike the plaintiff in *Quality Systems*, who admitted that its information lacked value, IST has consistently maintained that the MBTNS and DDS modules possess economic value. (*See* IST Mem. 71-74.) Second, *Quality Systems* devotes a single paragraph to a discussion of trade secrets law and does not engage in any in-depth analysis of the value of the information or the validity of the trade secrets claim in general. Given its cursory treatment of the trade secrets claim, Glynn's reliance on this single case is unfounded. Finally, Glynn misconstrues the applicable standard for trade secrets. Glynn seems to read the *Quality Systems* court's mention of "continuing economic value" as an additional requirement that would demand the continuous use of whatever information constitutes the basis of a trade secrets claim. The NHUTSA contains no such requirement, however, and this notion has been explicitly rejected by other authorities. *See, e.g.*, *Learning Curve*, 342 F.3d at 726 ("[T]hat the plaintiff did not actually use the concept in its business was irrelevant."); *see also* Uniform Trade Secrets Act § 1 cmt., 14 ULA 538 (noting that the Act eliminated the prevailing common-law requirement "that a trade secret be continuously used in one's business"). Because I am unpersuaded by this and other arguments advanced by Glynn, his motion for summary judgment as to count III is denied.

---

example, the Seventh Circuit has held that although a "prototype that did not work perfectly" and was subsequently replaced by a newer, better model, the old prototype still possessed economic value. *Learning Curve Toys, Inc. v. Playwood Toys, Inc.*, 342 F.3d 714, 726 (7th Cir. 2003). Thus, the court found potential economic value in a design was neither new nor untested.

### D. Breach of Fiduciary Duty, Tortious Interference, and Civil Conspiracy (Counts IV, VII, and XI)

In Count IV, IST brings a common law claim against Glynn for breach of fiduciary duty. (Second Am. Countercls. ¶¶ 80-85.) In Count VII, IST alleges that Glynn is liable to it for tortious interference with advantageous business relations. (Second Am. Countercls. ¶¶ 102-08.) And in Count XI, IST brings a claim against Glynn for civil conspiracy to commit unlawful acts. (Second Am. Countercls. ¶¶ 120-23.) I discuss these counterclaims together because they all fail as a matter of law for the same reason: IST has not carried its burden of establishing damages.[39]

#### 1. Breach of Fiduciary Duty

As to its breach of fiduciary duty claim in Count IV, IST argues that even if it cannot establish any business losses, it is entitled to recover for breach of fiduciary duty on an unjust enrichment theory. (IST Mem. 64.) In support of this proposition, IST relies on *In re Guardianship of Dorson*, 934 A.2d 545 (N.H. 2007), a case involving a dispute between a trustee and the beneficiary of a trust in which the court imposed a surcharge as an "equitable penalty" against the trustee. This case is only tangentially applicable to the instant controversy, however, and its holding should be limited to the probate context. Indeed, when imposing the equitable penalty, the *Dorson* court specifically noted that "equity is primarily responsible for the protection of rights arising under trusts." *Id.* at 549. Consequently, IST cannot recover damages for breach of fiduciary duty on an unjust enrichment theory.

#### 2. Tortious Interference

IST also fails to establish any damages under Count VII for tortious interference. IST alleges that Glynn made disparaging statements about the company in a letter he sent to Captain

---

[39] For the purposes of this discussion, I have assumed without deciding that Glynn's conduct meets the remaining substantive elements of these claims.

Kavanaugh, a NAVSEA employee, and that NAVSEA would have placed an order for more of IST's MMBJ products but for Glynn's comments. (IST Mem. 59-60.) In late 2007, NAVSEA awarded IST an Indefinite Delivery/Indefinite Quantity ("IDIQ") government contract for a maximum of 10,000 MMBJ systems.[40] Soon after IST had secured the bid, NAVSEA placed an order for 1,100 units, but IST received no follow-on orders for additional units thereafter. (IST Mot. Summ J., Ex. 49, Caprario Dep. 244:10-18). Caprario testified during his deposition that his "belief" was that NAVSEA "may have placed more" orders if Glynn had not written the letter to Captain Kavanaugh. (*Id.*)

Yet aside from the personal belief of an employee, IST offers no support for the notion that it lost business because of Glynn. Indeed, the record provides at least two other explanations for the lack of follow-on orders that are equally plausible, if not more so. First, the IDIQ contract was, by definition, a contract for an indefinite quantity of MMBJ units. The mention of 10,000 MMBJ systems was a reference to the IDIQ contract's maximum possible limit, not an actual order. Thus, there was never any guarantee that NAVSEA would place an order for any more units beyond the initial 1,100. Second, IST had to replace the DDS module of the 1,100 units covered by NAVSEA's initial order with the newer DRU model, causing a delay in their delivery. Warren Murrin, the President of IST, admitted that Captain Kavanaugh "wasn't happy" with this change of design and subsequent delay, (Glynn Mot. Summ. J., Ex. 55, Murrin Dep. 76:14-77:2), and this dissatisfaction could very well be the reason that NAVSEA declined to place additional orders.

"It is general law that one who claims damages has the burden of proof." *Pugliese v. Town of Northwood Planning Bd.*, 408 A.2d 113, 118 (N.H. 1979). The plaintiff must provide

---

[40] In the government contract field, an IDIQ contract is understood to be a contract that provides for an indefinite quantity of supplies or services.

some reasonable basis for its claimed damages, and the ultimate test is "whether the evidence on lost profits provides enough information under the circumstances to permit the fact finder to reach a reasonably certain determination of the amount of gains prevented." *Indep. Mech. Contractors v. Gordon T. Burke & Sons*, 635 A.2d 487, 491 (N.H. 1993). The self-serving testimony of an employee fails to meet this standard, especially in light of other more plausible explanations for the lack of additional orders under the NAVSEA contract. Accordingly, IST has failed to carry its burden of demonstrating damages for tortious interference under Count IV.

### 3. Civil Conspiracy

IST has also failed to establish that it has suffered any damages as a result of its civil conspiracy claim in Count XI. Under New Hampshire law, the elements for a civil conspiracy claim are: "(1) two or more persons (including corporations); (2) an object to be accomplished (i.e. an unlawful object to be achieved by lawful or unlawful means or a lawful object to be achieved by unlawful means); (3) an agreement on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Jay Edwards, Inc. v. Baker,* 130 N.H. 41, 47, 534 A.2d 706, 709 (1987). Even assuming that IST has met the first four elements of this claim, it has undoubtedly failed to adduce any evidence of damages arising from the alleged conspiracy. IST's civil conspiracy claim therefore fails as a matter of law.

In sum, IST has utterly failed to identify any economic damages as a result of Glynn's alleged misconduct under Counts IV, VII, and XI. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986). Consequently, I will grant summary judgment to Glynn on these counts.

**E. Conversion (Count V)**

In Count V, IST brings a counterclaim for conversion. (Second Am. Countercls. ¶¶ 86-93.) Glynn previously filed a motion to dismiss this count, which was granted in part in July 2009. (Order on Motion to Dismiss, July 23, 2009, ECF No. 239.) The counterclaim was dismissed to the extent that it relied on the misappropriation of IST's information—such as engineering schematics, drawings, and designs—because these allegations are preempted by the NHUTSA. (Memorandum on Motion to Dismiss, July 23, 2009, ECF No. 238 at 8.) However, I noted that "the counterclaim survives as to any claim for tangible items and property that is not based on improper use of information or trade secrets," and I explained that IST could prevail upon a conversion claim if it were able to show that Glynn had taken, for example, a chair or a desk from IST. (*Id.* at 8-9.)

Glynn now moves for summary judgment on the conversion counterclaim on the ground that IST has presented no evidence that Glynn misappropriated IST's tangible property. (Glynn Mem. 47.) This argument goes unopposed by IST in its opposition brief, and I have found no such evidence in the record. It is well-established that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Accordingly, I grant summary judgment to Glynn on Count V of IST's counterclaims.

**F. New Hampshire Consumer Protection Act (Count VIII)**

IST's Count VIII alleges that Glynn and SWT have willfully and knowingly "engaged in and continue to engage in unethical, unfair, deceptive and misleading acts that violate the New Hampshire Consumer Protection Act [("NHCPA")], N.H. Rev. Stat. Ann. § 358-A:1 et seq."[41] (Second Am. Countercls. ¶¶ 109-115.) The NHCPA provides, in relevant part:

> Any person injured by another's use of any method, act or practice declared unlawful under this chapter may bring an action for damages and for such equitable relief, including an injunction, as the court deems necessary and proper. If the court finds for the plaintiff, recovery shall be in the amount of actual damages or $1,000, whichever is greater. If the court finds . . . a willful or knowing violation of this chapter, it shall award as much as 3 times, but not less

---

[41] Specifically, IST claims that Glynn and SWT have engaged in acts including, but not limited to:

> (1) making disparaging and false statements to IST's vendors and customers, and other members of the government contractor business community;
> (2) causing likelihood of confusion or misunderstanding that Glynn was associated with or acting on behalf of IST when he made inquiries to vendors and members of the government contractor business community exclusively on his own behalf and/or on behalf of Martin/CadQual;
> (3) passing off the proprietary and confidential C-IED goods or services of IST as those of Glynn, Saltwhistle, FMI, Martin and/or CadQal;
> (4) using deceptive representations or designations in connection with the proprietary and confidential C-IED goods or services of IST;
> (5) representing that the proprietary and confidential C-IED goods or services of IST have characteristics that they do not have, such as being independently developed by Glynn, Saltwhistle, or FMI, and representing that FMI was affiliated, connected, or associated with IST by virtue of its business relationship with Glynn and with Martin;
> (6) representing that C-IED products of SWT/FMI that are based upon and/or include IST technology are original or new products developed by Glynn, Saltwhistle, or FMI;
> (7) representing that the proprietary and confidential C-IED goods or services of IST are of a particular model such as SWT-1000 or SWT-2000 when they are, in fact, of the model of IST's products such as the DDS and MBTNS modules;
> (8) wrongfully appropriating IST's proprietary and confidential C-IED goods, services, and trade secrets in an effort to market and profit from those IST assets;
> (9) using deceptive representations, marketing, and selling of IST's proprietary and confidential C-IED goods, services, and trade secrets in a manner that tends to harm competition.

(Second Am. Countercls. ¶ 110.)

> than 2 times, such amount. In addition, a prevailing plaintiff shall be awarded
> the costs of the suit and reasonable attorney's fees, as determined by the court.

N.H. Rev. Stat. § 358-A:10.

Glynn moves for summary judgment on this claim, focusing on the NHCPA's statement that a private action may be maintained by "any person *injured* by another's [misconduct]." *Id.* (emphasis added). Specifically, Glynn asserts that IST "has been unable to show that it was injured as a result of any alleged actions or inactions of Dennis Glynn and/or Saltwhistle Techonology, LLC." (Glynn Mem. 46.) Glynn therefore concludes that because "IST has failed to provide any evidence needed to maintain its [NHCPA claim] on its face, it must be dismissed as a matter of law." (*Id.*)

IST responds that the NHCPA expressly contemplates recovery of damages other than actual damages, as it provides that "recovery shall be in the amount of actual damages or $1,000, whichever is greater" and awards a prevailing plaintiff "the costs of the suit and reasonable attorney's fees, as determined by the court." (IST Mem. 65-66.) Indeed, the Supreme Court of New Hampshire has held that "[NHCPA] § 358-A:10 does not require a showing of actual damages for the claimant to be awarded the statutory minimum and attorney's fees." *Becksted v. Nadeau*, 926 A.2d 819, 824 (N.H. 2007) (citing *Preferred Nat'l Ins. Co. v. Docusearch*, 829 A.2d 1068 (N.H. 2003)).

Accordingly, Glynn's basis for his motion for summary judgment—namely, the absence of IST damages—fails as a matter of law. Even if  IST cannot prove actual damages, a rational juror could find that IST was injured by Glynn's alleged violations of the NHCPA and is

therefore entitled to statutory damages and attorney's fees under NHCPA § 358-A:10. I therefore deny Glynn's motion for summary judgment as to Count VIII.[42]

## G. Unjust Enrichment (Count IX)

Glynn also moves for summary judgment as to Count IX of IST's Second Amended Counterclaims, a stand-alone claim for unjust enrichment. (Second Am. Countercls. ¶¶ 116-119.) "It is a well-established principle that the court ordinarily cannot allow recovery under a theory of unjust enrichment where there is a valid, express contract covering the subject matter at hand." *Clapp v. Goffstown Sch. Dist.*, 977 A.2d 1021, 1025 (N.H. 2009); *see also Gen. Insulation Co. v. Eckman Constr.*, 992 A.2d 613, 621 (N.H. 2010) "[U]njust enrichment generally does not form an independent basis for a cause of action."); *Tentindo v. Locke Lake Colony Ass'n*, 419 A.2d 1097, 1100 (N.H. 1980) ("Where there is a valid express contract between the parties, however, the law will not imply a quasi-contract."). Glynn argues that he is entitled to summary judgment on this count because unjust enrichment "is simply not a viable claim where there is an express contract." (Glynn Mem. 30.) As discussed above, I have already found that the Employment Agreement constitutes a valid and enforceable contract, a finding which IST does not dispute here. Consequently, "the general rule that unjust enrichment cannot coexist with a valid contract applies." *Clapp*, 977 A.2d at 1025.

---

[42] Glynn asserts in a footnote of his opposition that "[i]t is questionable whether IST actually qualifies for protection under the act, as it is hard to reconcile that IST is a consumer, especially in connection with Glynn." (Glynn Opp'n 68 n.64.) Glynn misunderstands the purpose of the NHCPA, which exists, among other reasons, to protect consumers by preventing unfair or deceptive trade practices. *See Gilmore v. Bradgate Assocs.*, 604 A.2d 555, 557 (N.H. 1992), *overruled on different grounds by Averill v. Cox*, 761 A.2d 1083 (N.H. 2000). The NHCPA achieves this purpose by protecting both ultimate consumers and business competitors. *See E. Mt. Platform Tennis v. Sherwin-Williams Co.*, 40 F.3d 492, 497 (1st Cir. 1994) ("The unfair and deceptive practices prohibited by the CPA appear to include transactions between business competitors as well as those involving ultimate consumers."). Accordingly, contrary to Glynn's assertion, there is no question that IST qualifies for protection under the NHCPA.

In an attempt to circumvent the reach of this rule, however, IST latches on to a narrow exception that permits contracting parties to bring an unjust enrichment claim "where the benefit received [by the defendant] was outside the scope of the contract." *Clapp*, 977 A.2d at 1025. IST contends that this exception applies because Glynn made disparaging statements about the company to Captain Kavanaugh and because these statements purportedly amounted to "actions above and beyond those prohibited by the Employment Agreement." (IST Mem. 62.) This argument is specious. The record is completely devoid of any factual support for the proposition that Glynn somehow benefitted from writing an email to Captain Kavanaugh. IST speculates that Glynn's email to Captain Kavanaugh was designed to "curry favor and business for FMI," (IST Mem. 62), but the email does not even mention FMI or any business opportunity. (IST Mot. Summ. J., Ex. 3, IST Dep. 109:14-110:19 & Dep. Ex. 17.) Moreover, the exception applies only "where the benefit received was outside the scope of the contract." *Clapp*, 977 A.2d at 1025. The alleged benefit to Glynn here—a competitive advantage in securing future C-IED government contracts—was certainly well within the scope of the Employment Agreement. Indeed, the Employment Agreement expressly devoted an entire section to ensuring that Glynn would not enjoy a competitive advantage in the field in the event that he should leave IST. (*See* IST Mot. Summ. J., Ex. 37, Employment Agreement § 7.) Accordingly, the exception to the rule prohibiting an unjust enrichment claim in the face of an express contract does not apply, and Glynn is entitled to summary judgment on Count IX of IST's counterclaims.

A separate order is being entered herewith.


August 25, 2011                                    /s/
Date                                    J. Frederick Motz
                                    United States District Judge